**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**


UNITED STATES OF AMERICA,            )
                                     )
            PLAINTIFF,               )
                                     )
        vs.                          ) SACR NO. 20-00002-(B)-DOC
                                     ) Day 2, Volume II
HOANG XUAN LE ,                      )
                                     )
            DEFENDANTS.              )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

SANTA ANA, CALIFORNIA

TUESDAY, NOVEMBER 9, 2021

1:34 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                    TRACY L. WILKISON
                    ACTING UNITED STATES ATTORNEY

                    SCOTT M. GARRINGER
                    ASSISTANT UNITED STATES ATTORNEY
                    CHIEF, CRIMINAL DIVISION

                    GREGORY S. SCALLY
                    ASSISTANT UNITED STATES ATTORNEY
                    UNITED STATES DISTRICT COURT
                    8000 RONALD REAGAN FEDERAL BUILDING
                    SANTA ANA, CALIFORNIA 92701
                    (714) 338-3592
                    gregory.scally@usdoj.gov

                    GREGORY STAPLES
                    ASSISTANT UNITED STATES ATTORNEY
                    UNITED STATES DISTRICT COURT
                    8000 RONALD REAGAN FEDERAL BUILDING
                    SANTA ANA, CALIFORNIA 92701
                    (714) 338-3534
                    gregory.staples@usdoj.gov


    FOR THE DEFENDANT, HOANG XUAN LE:

                    CRAIG WILKE
                    LAW OFFICE OF CRAIG WILKE
                    305 NORTH HARBOR BOULEVARD
                    SUITE 216
                    FULLERTON, CALIFORNIA 92832
                    (714) 870-8900
                    craig@craigwilkelaw.com

                    SHEILA S. MOJTEHEDI
                    STRADLING, YOCCA, CARLSON & RAUTH,
                    P.C.
                    660 NEWPORT CENTER DRIVE
                    SUITE 1600
                    NEWPORT BEACH, CALIFORNIA 92660
                    (949) 725-4000
                    sheila.mojtehedi@gmail.com

I N D E X

PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

  BRANKICA PAUNOVIC, M.D.    8      38       57        60


  STEPHEN LU               64      91       98       103
                           70


E X H I B I T S

PLAINTIFF'S EXHIBITS:                    IDENTIFICATION  EVIDENCE

  20    Physical Item:  Bullet                              25
        Recovered From Victim's
        Back

  21    Photo of Bullet Recovered                           77
        From Victim's Back
                                                            78

  115   Autopsy Photos:  Photo of                           16
        Body Bag Tag

  116   Autopsy Photos:  Tattoo                             32

  117   Autopsy photos:  Bullet                             21
        Wound in James Dao's Upper
        Back

  118   Autopsy Photos:  James                              29
        Dao's face

E X H I B I T S

PLAINTIFF'S EXHIBITS:                    IDENTIFICATION  EVIDENCE

119, 120, 121 and 122                                        33
      Autopsy Photos:  Photos of
      James Dao's Hands; Autopsy
      Photos:  Photos of James
      Dao's Hands; Autopsy
      Photos:  Photos of James
      Dao's Hands; Autopsy
      Photos:  Photos of James
      Dao's Hands and Autopsy
      Photos:  Photos of James
      Dao's hands

123 and 124 Autopsy Photos:                                  23
      Bullet Recovered From James
      Dao's Back

125    Autopsy Photos:  Several                              27
       Lacerations on Top of Head

130    Photo of Entry and Exit                               25
       Wound

218    Screenshot Dated 7/15/2019                            82
       of Internet Ad for .38
       Special from Le's Google
       Account

219    Screenshot dated 7/15/2019                            82
       of Internet Ad for Smith &
       Wesson Revolver from Le's
       Google Account

222    Screenshot of .38 Specials                            84
       Dated 7/13/2019 from Le's
       Google Account

502    Photo of Jacket                                       50

*Deborah D. Parker, U.S. Court Reporter*

E X H I B I T S

DEFENDANT'S EXHIBITS:                    IDENTIFICATION  EVIDENCE

  117, 501-1, 501-2, 503-A and 503-B                      56
        Autopsy Photos:  Bullet
        Wound in James Dao's Upper
        Back; Diagrams and Autopsy
        Photos:  Photo of James
        Dao's knees

  501-4 Diagram of Head Injuries of                       60
        James Dao

6

SANTA ANA, CALIFORNIA; TUESDAY, NOVEMBER 9, 2021; 1:34 P.M.

-oOo-

1    *(The following proceedings were had in open court*

2    *in the presence of the jury:)*

3        THE COURT:  We're on the record.

4        All counsel are present.  The defendant is

5    present.

6        And, Deb, would you be kind enough to ask the jury

7    to join us.

01:34:23    THE CLERK:  Yes, Your Honor.

11    *(Pause)*

12    *(Jury enters courtroom.)*

13    *(The following proceedings were had in open court*

14    *in the presence of the jury:)*

01:36:19 15        THE COURT:  If you will, please, be seated.

16        While you're rejoining us and the jury is present

17    and alternates, is that about the right amount of time for

18    lunch?

19        Are you existing with that hour and 15 minutes,

01:36:33 20    satisfactorily?

21        Okay.  We'll talk about that later, if it's too

22    long or too short, okay.

23        All right then.  Counsel, if you would be kind

24    enough to call your next witness, please.

01:36:45 25        MR. STAPLES:  The United States calls Dr. Brankica

*Deborah D. Parker, U.S. Court Reporter*

01:36:48 1    Paunovic.

2            THE COURT:  If you will be step forward, please.

3        *(Pause)*

4            THE COURT:  Now, would you be kind enough to raise

01:36:54 5    your right hand, please.

6        BRANKICA PAUNOVIC, M.D., PLAINTIFF'S WITNESS, SWORN

7            THE WITNESS:  I do.

8            THE COURT:  If you'd walk around the side of the

9    jury railing, that's closest to the wall.  So if you would

01:37:10 10   walk right up to the wall.  Not this little door.  Right up

11   to the wall.  Just keep walking.

12           THE WITNESS:  Keep walking.

13           THE COURT:  And if you would be seated, please.

14           And after you're seated, would you face the jury

01:37:24 15   and state your full name, please, after you're seated.

16           THE WITNESS:  Do you want me to keep my mask?

17           THE COURT:  We're going to have you put on a clear

18   mask for a moment.  It's just to the left.  There's a whole

19   stack of them.

01:37:38 20           And the bottom portion is this black portion

21   *(indicating)*.  That way you have the indentation for the

22   nose on the top.

23           THE WITNESS:  Thank you.

24           THE COURT:  And so if you'd like --

01:37:48 25           THE WITNESS:  So take mine off and then put this

01:37:51  1    one on.

2              THE COURT:  You'll have to put the other one on

3    first.

4              THE WITNESS:  That's interesting.

01:38:06  5         *(Pause)*

6              THE COURT:  Okay.  Would you state your full name

7    for the jury, please, and spell your last name.

8              THE WITNESS:  Brankica Paunovic, B-R-A-N-K-I-C-A;

9    and last name, P-A-U-N-O-V-I-C.

01:38:24 10            THE COURT:  Thank you.

11             And this would be direct examination by the

12   Government.

13                        DIRECT EXAMINATION

14   BY MR. STAPLES:

01:38:27 15   Q    Good afternoon, Doctor.

16   A    Good afternoon.

17   Q    Where are you employed?

18   A    I'm a deputy medical examiner for San Diego Medical

19   Examiner's Office.

01:38:37 20   Q    And how long have you had that job?

21   A    I was employed in December 2017.

22   Q    What did you do prior to that?

23   A    I had one year of training in forensic pathology at the

24   same office.

01:38:53 25   Q    Okay.  And could you move a little closer to the

01:38:55  1  microphone.  The mask makes it little difficult for the jury

2  to hear.

3  A    Sure.

4  Q    Thank you.

01:39:00  5       I'm sorry.  One year of training where?

6  A    San Diego.  Same office as the forensic pathology

7  fellow.

8  Q    And prior to that?

9  A    Prior to that, I was pediatric pathology fellow --

01:39:21  10    *(Court Reporter requests clarification for the*

11    *record.)*

12  BY MR. STAPLES:

13  Q    That was in Philadelphia?

14  A    Yes.

01:39:24  15  Q    Where in Philadelphia?

16  A    St. Christopher's Hospital for Children.

17  Q    Do [sic] you attend medical school?

18  A    Yes.  So medical school was in Serbia, Belgrade.  And

19  then after that, I had to do training residency in anatomic

01:39:42  20  and clinical pathology.

21  Q    And where did you do that?

22  A    That was in Danbury Hospital in Connecticut.

23  Q    And I believe did you -- did you state -- did you do

24  any fellowships?

01:40:00  25  A    So those, what I mentioned were fellowships:  Pediatric

01:40:03   1   pathology and forensic pathology.

2   Q    And did you do a residency?

3   A    Yes.  The residency is the one in Connecticut.

4   Q    Okay.  And what are the responsibilities of the

01:40:16   5   San Diego County Medical Examiner's Department?

6   A    So we are the office that determines someone [sic]

7   cause and manner of death.  We don't get involved in all

8   that's in the County.

9        *(Court Reporter requests clarification for the*

01:40:35  10        *record.)*

11             THE WITNESS:  Just when death is unexpected or

12   when it's not natural.

13   BY MR. STAPLES:

14   Q    Are you licensed to practice medicine in California?

01:40:45  15   A    Yes, I am.

16   Q    When did you receive your license to practice in

17   California?

18   A    I received it before my fellowship:  2016.

19   Q    Are you board certified?

01:41:01  20   A    Yes, I'm board certified in anatomic pathology,

21   clinical pathology, pediatric pathology and forensic

22   pathology.

23   Q    Why don't we narrow that down and have you tell what

24   "forensic pathology" is?

01:41:19  25   A    So "forensic pathology" is the subspecialty of

11

01:41:23  1  pathology wherein we have to perform autopsies and external

2  examinations and determine cause and manner of death.

3  Q    Okay.  And just in general terms so the jury

4  understands what you're talking about, what is an "autopsy"?

01:41:39  5  A    So "autopsy" is a body examination, both external and

6  internal.

7  Q    And how many -- approximately, how many autopsies have

8  you performed at the San Diego County Medical Examiner's

9  Office?

01:41:58  10  A    Approximately 1,200 full autopsies and, probably, at

11  least, thousand more external examinations.

12  Q    Okay.  Now, you mentioned external examinations.  When

13  you conduct a "pathology," what are the sort of main steps

14  that you take?

01:42:19  15  A    So when we perform -- when the body is assigned to have

16  a full autopsy, so it starts with external exam where we

17  look for all the injuries, like a basic description --

18  what's the color of the hair, what's the color of the eyes,

19  tattoos -- and then we proceed with the exam of internal

01:42:41  20  cavities.

21  Q    And what would the "internal examination" consists of?

22  A    So it's layer by layer with opening the skin, chest

23  plate and then looking and examining all internal organs.

24  Q    In addition to that, do you take X-rays?

01:42:58  25  A    X-rays, we do for all homicide cases and normally we

01:43:04   1   don't, just if it's needed for regular cases.

2   Q    Okay.  And I assume you also take photographs?

3   A    We do.

4   Q    Do you also conduct tests of the blood and other fluids

01:43:18   5   in the body for chemicals or other substances?

6   A    Yes.  During autopsies, for most of the cases, we

7   collect blood and then later we test it for toxicology.

8   Q    Okay.  And have you testified as an expert in forensic

9   pathology, previously?

01:43:41   10   A    Yes, I did.

11   Q    Approximately, how many times?

12   A    I don't have, like, a list of cases I did it for, but

13   probably 20 to 30 times.

14   Q    Have you ever been offered in court as an expert in

01:43:55   15   forensic pathology and have the Court say you were not

16   qualified?

17   A    No.

18        MR. STAPLES:  At this time, Your Honor, I'm

19   offering Dr. Paunovic as an expert in the field of forensic

01:44:07   20   pathology.

21        THE COURT:  You may proceed.

22        MR. STAPLES:  If the Court would be willing, we

23   would ask that Instruction No. 24 be read concerning expert

24   opinion.

01:44:25   25        THE COURT:  Just a moment, Counsel.

01:44:40    1          *(Pause)*

            2              THE COURT:  Now let me ask both counsel if this is

            3      satisfactory, because I don't plan to piecemeal read

            4      instructions in and various portions of the law, unless

01:45:28    5      there's a stipulation along the way.

            6              You two meet and consult for just a moment,

            7      because there could be a similar request from the defense.

            8      There could be a similar request concerning intermittent

            9      instructions, and normally the Court would not do this.  I

01:45:44   10      would read these instructions at the end.

           11              So unless there's a stipulation, I'm going to

           12      decline that.

           13              MR. WILKE:  We have no objection to this

           14      instruction, Your Honor.  We think it's appropriate for the

01:45:59   15      course of trial.

           16              THE COURT:  If you both stipulate, because I'm not

           17      going to piecemeal and read different instructions along the

           18      way, unless there's an absolute stipulation between counsel.

           19              MR. WILKE:  This is a stipulated instruction, for

01:46:10   20      the course of -- during the course of --

           21              THE COURT:  Counsel, is this a stipulation?  Yes

           22      or no?

           23              MR. WILKE:  Yes.

           24              THE COURT:  Counsel?

01:46:15   25              MR. SCALLY:  Yes.

*Deborah D. Parker, U.S. Court Reporter*

01:46:16  1          "Ladies and gentlemen, you're about to

2          hear testimony from a witness who will

3          testify to opinions and the reasons for

4          his or her opinions.  This opinion

01:46:26  5          testimony is allowed because of the

6          experience of this witness.  Such

7          opinion should be judged like any other

8          testimony.  You may accept it or reject

9          it and give it as much weight as you

01:46:40 10          think it deserves, considering the

11          witness' experience, the reasons given

12          for the opinion and all the other

13          evidence in the case."

14          Counsel, proceed.

01:46:49 15          MR. STAPLES:  Thank you, Your Honor.

16   BY MR. STAPLES:

17   Q    Doctor, what is the process in your office for how a

18   case gets assigned to you?

19   A    So every morning we have morning meeting at 8:00

01:47:01 20   o'clock where we go through the list of cases that were

21   assigned to us for the day.  And then each doctor has a

22   position for the day.  So if I'm first up for the day, I'm

23   the one getting the most challenging cases and my maximum

24   should be two cases.  The next doctor gets two.  And that's

01:47:25 25   how we decide who's doing what.

*Deborah D. Parker, U.S. Court Reporter*

01:47:28  1    Q    Okay.  Now, do you recall on October 17th, 2019 being

2    asked to perform an autopsy on an individual named

3    Tri Minh Dao?

4    A    I do.

01:47:40  5    Q    Did you prepare a report of your findings?

6    A    Yes.

7    Q    Now, in this case, did you perform an external

8    examination?

9    A    Yes.  This case had a full autopsy, including internal

01:48:01  10   and external exam.

11   Q    Okay.  Now, in one of your first steps when you receive

12   the body, how does it come to you?

13        Does it come sealed?

14   A    Homicides do come sealed.

01:48:14  15   Q    Okay.  There should be some exhibits in front of you.

16        I'd ask you to take a look at Exhibit 115.

17   A    *(Witness so complies.)*

18   Q    Do you recognize that?

19   A    Yes.

01:48:24  20   Q    What is it?

21   A    So this is the body bag and the picture of the red seal

22   that was sealing the bag.

23   Q    For Tri Minh Dao?

24   A    Yes.

01:48:37  25        MR. STAPLES:  Your Honor, I would offer

*Deborah D. Parker, U.S. Court Reporter*

01:48:38    1    Exhibit 115 into evidence.

            2              THE COURT:  Is it 115?

            3              MR. STAPLES:  115, Your Honor.  I'm sorry.

            4              THE COURT:  Thank you very much.

01:48:44    5              It's received.

            6         *(Plaintiff's Exhibit 115 received in evidence.)*

            7              MR. STAPLES:  Placing 115 on the ELMO.

            8         *(The document was published in open court.)*

            9    BY MR. STAPLES:

01:48:54   10    Q    So when you were performing this autopsy, the body came

           11    to you in a bag with this seal on it?

           12    A    Yes.

           13    Q    The red clamp sort of thing is a seal?

           14    A    Correct.

01:49:06   15    Q    And do you or an assistant of yours actually break that

           16    seal to get into the bag?

           17    A    Yes.  This seal is placed by our investigator.

           18    Investigator goes to the scene.  They put body in a body

           19    bag.  They put this red seal that has the specific number.

01:49:24   20    And this seal cannot be opened any other way except cut.

           21              So that means when I go there in the morning, I

           22    match the number that I have with the number investigator

           23    gave me so I'm sure that no one touch this bag before me.

           24    Q    Okay.  And so in this case, is this a photograph that

01:49:42   25    you took?

*Deborah D. Parker, U.S. Court Reporter*

01:49:43  1    A      Yes.

        2    Q      And the seal is intact?

        3    A      Correct.

        4    Q      And you state that it numbers.  Is that the case number

01:49:50  5    for the examiner's office?

        6    A      Yes.  That's our case number.

        7    Q      And that's the date that the body was tagged?

        8    A      Yes.

        9    Q      October 16th, 2019?

01:49:59 10    A      Correct.

       11    Q      And that number there, does that refer to the clamp?

       12    The sealing clamp?

       13    A      Yes.  It's matching that number on the red seal.

       14    Q      Thank you.

01:50:14 15           Now, when you received the body of Tri Dao, do you

       16    recall what kind of condition it was in?

       17    A      I remember the body was wet and had -- still had

       18    clothes on.

       19    Q      When you say "wet," what do you know what it was wet

01:50:33 20    from?

       21    A      Before we start with the autopsy, we get information

       22    from the investigator.  So that's where -- how we can

       23    actually approach the case.  Without investigator report, my

       24    work is not -- it's limited, right?  Because when I get

01:50:53 25    someone with gunshot wound, they don't tell me what were the

01:50:56   1   circumstances -- you know, was it a suicide, was it a

           2   homicide -- I cannot decide those things.

           3           So that's why I had preliminary information that

           4   this body was recovered from the ocean.

01:51:07   5           MR. STAPLES:  Okay.  Now, I'm going to show what's

           6   previously been admitted as Exhibit 126.

           7       *(The document was published in open court.)*

           8   BY MR. STAPLES:

           9   Q    This was a photograph taken of the body shortly after

01:51:19  10   it was recovered from the ocean.  Is that roughly the

          11   condition the body was in when you saw it for the first

          12   time?

          13   A    Yes.  This is the picture from the scene.  And after

          14   this, he was placed in a body bag.

01:51:34  15   Q    Okay.  And when you opened the bag, for instance, there

          16   is still the blood and all that?

          17   A    Yes.

          18   Q    Is it -- in your experience, it's the practice that the

          19   body is delivered to you in as close to the condition it was

01:51:48  20   found in as possible?

          21   A    Yes, most likely.  Sometimes investigating agency would

          22   take clothing at the scene, but more often we get them

          23   clothed.

          24   Q    Now, in conducting your external examination of

01:52:13  25   Mr. Dao's body, how did you go about that?  Obviously, do

*Deborah D. Parker, U.S. Court Reporter*

01:52:16  1   you have to remove his clothing?

2   A    Yes.  So we go layer by layer.  Clothes is removed.  We

3   take pictures, if needed.  And then we wash the body, and we

4   start the exam.

01:52:31  5   Q    Okay.  And in this case, do you recall examining an

6   orange jacket?

7   A    Yes, I do.

8            MR. STAPLES:  May I approach, Your Honor?

9            THE COURT:  You may.

01:52:51  10       *(Pause)*

11           MR. STAPLES:  And you may want to put some gloves

12   on.

13       *(Pause)*

14           THE WITNESS:  You have the jacket?

01:53:08  15  BY MR. STAPLES:

16   Q    Ma'am, before you is Exhibit 100, previously admitted.

17           Do you recognize that?

18   A    Looks like -- yes, it looks like his jacket.

19   Q    Okay.  And when you removed it, you examined that

01:53:43  20  jacket?

21   A    Yes.

22   Q    And did you find anything of interest in it?

23   A    I found a defect on the left upper back.

24   Q    And can you tell the jury what you mean by a "defect"?

01:53:58  25  A    I believe it was this one *(indicating)*.

01:54:00  1  Q    And what is it that you're pointing to?

2  A    This hole here on the left upper back that I was

3  thinking it was corresponding to the gunshot wound he had.

4  Q    Okay.  I was going to get to that.

01:54:13  5         You go ahead and put the jacket down or put it

6  back in the bag.  Thank you.

7         You sort of pre-staged my question.  Having found

8  the hole, did you look at the body?

9  A    Yes.

01:54:31  10  Q    Okay.  And did you find a hole corresponding to,

11  roughly, the location of the hole in the jacket?

12  A    Yes.

13  Q    Would you take a look at Exhibit 117 in front of you?

14  A    *(Witness so complies.)*

01:54:50  15  Q    Do you recognize that, ma'am?

16  A    I do.

17  Q    What is it?

18  A    This is the entrance gunshot wound on the left back.

19  Q    Okay.  And it has a small card on it with a number.

01:55:04  20         Do you see that?

21  A    Yes.

22  Q    Is that the number that corresponds to the tag that was

23  on the body bag when you received it?

24  A    Yes.  So this is our tag that we use every time we take

01:55:14  25  pictures so we can match the body with the case number.

*Deborah D. Parker, U.S. Court Reporter*

01:55:18   1   Q    Okay.  And does it fairly and accurately represent what
           2   the condition was at the time you took the photo?
           3   A    Yes.
           4          MR. STAPLES:  I'd move 117 into evidence,
01:55:28   5   Your Honor.
           6          THE COURT:  Received.
           7       *(Plaintiff's Exhibit 117 received in evidence.)*
           8   BY MR. STAPLES:
           9   Q    And can you explain to the jury what they're seeing
01:55:38  10   there?
          11          Your Honor, may the Doctor stand up to indicate?
          12          THE COURT:  You may, if we can hear you.
          13          THE WITNESS:  Okay.
          14          THE COURT:  Please speak loudly so we can hear
01:55:50  15   you.
          16          THE WITNESS:  So this is the back on the
          17   decedent's --
          18       *(Court Reporter requests clarification for the*
          19       *record.)*
01:56:16  20          THE COURT:  Deb, can you hear her?
          21          Deb, if we have a microphone, maybe we can give
          22   the witness the microphone.
          23          It's not your problem.  We have to be able to hear
          24   you.
01:56:16  25          Now, let's start, again, with your answer, please.

*Deborah D. Parker, U.S. Court Reporter*

01:56:19   1           THE WITNESS:  So this is back of the decedent's

2   head, neck.  This is left shoulder or left upper back.  And

3   this is the entrance gunshot wound.

4   BY MR. STAPLES:

01:56:31   5   Q    Now, when you examine the wound, what do you look for?

6   A    So for every gunshot wound, we measure the wound, how

7   big it is, then is there any surrounding abrasion.  We're

8   looking for soot.  That's burned gunpowder.  For stippling,

9   unburned gunpowder or any surrounding skin changes.

01:57:02  10   Q    And you said "stippling."  That's unburned gunpowder,

11   you said?

12   A    Yes.

13   Q    Okay.  I take it, you also look for a bullet itself?

14   A    Correct.

01:57:13  15   Q    And did you find a bullet in this case?

16   A    Yes, I did.

17   Q    Would you take a look at Exhibits 123 and 124 in the

18   stack before you, please, ma'am.

19   A    *(Witness so complies.)*  I have 123.

01:57:35  20   Q    And one behind it:  124?

21   A    Yes.

22   Q    Okay.  Do you recognize those?

23   A    Yes, I do.

24   Q    And do they have the San Diego County Medical

01:57:47  25   Examiner's case number on both?

01:57:51    1    A    Yes.

            2    Q    And what are they?

            3    A    So this is the bullet that I recovered from left upper

            4    back.

01:57:57    5    Q    From the picture you just showed us?

            6    A    Yes.  It's just -- this is the entrance and bullet is

            7    recovered a little bit more further.

            8    Q    Can you take the microphone and show, approximately --

            9    the jury approximately -- how far the bullet went in?

01:58:11   10    A    So this is where the bullet entered *(indicating)*, but

           11    it was traveling subcutaneously or under the skin, up to

           12    here *(indicating)*.  So somewhere here *(indicating)*, I could

           13    feel the bullet.  I cut the skin, and I could recover it.

           14    Q    Thank you.

01:58:30   15         MR. STAPLES:  Your Honor, I would move 123 and 124

           16    into evidence.

           17         THE COURT:  Received.

           18         *(Plaintiff's Exhibits 123 and 124 received in*

           19         *evidence.)*.

01:58:35   20         THE COURT:  Each are received, Deb:  123 and 124.

           21    BY MR. STAPLES:

           22    Q    Just so the jury can see, this is one photo, the

           23    bullet, ma'am -- Doctor; is that correct?

           24    A    Correct.

01:58:46   25    Q    And this, I take it, is a photo of its --

24

01:58:51  1    A    Base.

2    Q    Sorry?

3    A    Of the base of the bullet.

4    Q    Thank you.

01:58:57  5         MR. STAPLES:  And if I may approach, Your Honor, I

6    have a physical exhibit of the actual bullet I would like

7    the Doctor to identify.

8         THE COURT:  You may.

9    BY MR. STAPLES:

01:59:27 10   Q    Doctor, I've just placed before you an exhibit marked

11   20.

12        THE COURT:  2-0?

13        MR. STAPLES:  2-0, Your Honor.

14   BY MR. STAPLES:

01:59:38 15   Q    I would ask you to look at the container, once you get

16   your gloves on, and tell me if you recognize the contents.

17        *(Pause)*

18        THE WITNESS:  There is the scissors to open?

19        MR. STAPLES:  Yes.

02:00:16 20        *(Pause)*

21        THE WITNESS:  I have it.

22   BY MR. STAPLES:

23   Q    Do you recognize that, ma'am?

24   A    It looks like a bullet in a picture.

02:00:25 25   Q    Okay.  Can you hold it up for the jury?

02:00:29  1    A    (Witness so complies.)

2              MR. STAPLES:  Your Honor, I would move Exhibit 20

3    into evidence.

4              THE COURT:  Received.

02:00:34  5        (Plaintiff's Exhibit 20 received in evidence.)

6              MR. STAPLES:  Thank you, ma'am.  You can put the

7    bullet back into the container.

8    BY MR. STAPLES:

9    Q    Now, in addition to the bullet wound that you just

02:01:00 10   showed us in Exhibit 117 that was in the upper back, did you

11   find another bullet wound on Mr. Dao's body?

12   A    Yes.  He had gunshot wound of top of the head.

13   Q    And did you take a photograph of that?

14   A    Yes, we did.

02:01:15 15   Q    Doctor, would you take a look at Exhibit 130, please?

16   A    (Witness so complies.)

17   Q    Do you recognize 130, Doctor?

18   A    I do.

19   Q    What is it?

02:01:40 20   A    So this is gunshot wound entrance and exit on the

21   decedent's head.

22             MR. STAPLES:  All right.  I would move Exhibit 130

23   into evidence, Your Honor.

24             THE COURT:  Received.

02:01:51 25       (Plaintiff's Exhibit 130 received in evidence.)

02:02:04    1          MR. STAPLES:  With the Court's permission, I'd ask

        2   if the Doctor can take a microphone and describe to the jury

        3   what's in the photograph on the screen.

        4          THE COURT:  You may.

02:02:16    5          THE WITNESS:  So this is the top of the head

        6   *(indicating)*, but I shaved the hair so we can visualize.

        7          This is the right side *(indicating)*.  And this is

        8   entrance *(indicating)*.  See how it's more round.  And then

        9   here is the exit.  Exits are usually more irregular.

02:02:40   10   Q    More what?

       11   A    Irregular.

       12   Q    Thank you.

       13          And do you recall about how long that is in terms

       14   of inches?

02:02:52   15   A    Between them?

       16   Q    Yes.

       17   A    We don't measure the distance between entrance and

       18   exit.

       19   Q    Okay.

02:03:02   20   A    But here you can actually see on that ruler it's

       21   approximately 2 inches.

       22   Q    You say it entered and exited.  How far into the head

       23   did it go?

       24   A    It just went under the skin.

02:03:12   25   Q    Okay.  Did it graze the skull?

*Deborah D. Parker, U.S. Court Reporter*

02:03:14  1    A    No.

2    Q    Okay.  Now, in addition to the two bullet wounds, did

3    you see any other injuries to Mr. Dao's body?

4    A    He had what we call lacerations or skin tears on top of

02:03:36  5    the head.  He also had laceration on the left forehead and

6    some abrasions and contusions on the face.

7    Q    Okay.  And you took pictures of those as well?

8    A    Yes.

9    Q    Doctor, could you take a look at Exhibit 125, please?

02:03:52  10   A    *(Witness so complies.)*

11   Q    Do you recognize that?

12   A    Yes.

13   Q    Is that a photograph you took?

14   A    Yes.

02:04:04  15   Q    And what does it depict?

16   A    So it shows top of the head.  We can still see this

17   entrance and exit gunshot wound and additional skin tears.

18         MR. STAPLES:  Your Honor, I would move Exhibit 125

19   into evidence.

02:04:19  20        THE COURT:  Received.

21        *(Plaintiff's Exhibit 125 received in evidence.)*

22   BY MR. STAPLES:

23   Q    Now, again, you testified that you had shaved the head

24   of Mr. Dao, prior to taking, these pictures?

02:04:29  25   A    Correct.

02:04:34  1    Q    And that's your case number there, correct?

       2    A    Correct.

       3              MR. STAPLES:  And, once again, Your Honor, if the

       4    Doctor may take the microphone and point out to the jury

02:04:44  5    what is in this photograph?

       6              THE COURT:  You may, Doctor.

       7              THE WITNESS:  Again, it's the top of the head.

       8    This is his face here (indicating).  So hair is shaved.

       9              We, again, see the entrance wound, exit wound and

02:05:03 10    there are additional four injuries.  One, two, three, four.

      11    All skin tears.

      12    BY MR. STAPLES:

      13    Q    And were you able to determine the nature of those

      14    injuries, what might have caused them?

02:05:21 15    A    So skin tears or lacerations are blunt force injuries.

      16    That means they were caused by blunt object.

      17    Q    Okay.  Now, would you also take a look at Exhibit 118,

      18    please.

      19    A    Yes.

02:05:49 20    Q    Do you recognize that shot, Doctor?

      21    A    Yes.

      22    Q    Is that a photograph you took?

      23    A    Yes.

      24    Q    And that's of Mr. Dao's face?

02:05:58 25    A    Correct.

02:05:59  1          MR. STAPLES:  Your Honor, I would move Exhibit 118

2    into evidence 118.  1-1-8.

3          THE COURT:  Received.

4          *(Plaintiff's Exhibit 118 received in evidence.)*

02:06:04  5      *(The document was published in open court.)*

6    BY MR. STAPLES:

7    Q    And, again, just for the jury, here's your card showing

8    your office's case number, correct?

9    A    Correct.

02:06:18  10  Q    And this is the photo of Mr. Dao's face.

11         Now, you had washed the blood off, prior toking

12   that this picture?

13   A    Correct.

14         MR. STAPLES:  Your Honor, if I can ask, again, if

02:06:29  15  the Doctor could use the microphone to point out to the jury

16   what's in the photo.

17         THE COURT:  You may.

18         THE WITNESS:  Picture of decedent's face.  On the

19   left forehead, again, skin tear.  And these injuries here

02:06:50  20  *(indicating)* are bruises and scrapes.  He also had the --

21   you cannot see it clearly in this pictures -- skin tears on

22   his lip.

23   BY MR. STAPLES:

24   Q    Okay.  And would these -- were you able to determine

02:07:02  25  the cause six of the injury?

*Deborah D. Parker, U.S. Court Reporter*

02:07:04  1    A    Same thing as for the ones in the skull.  It was blunt

        2    force injuries.

        3    Q    Okay.  And just so the jury is clear, you said a blunt

        4    object.

02:07:13  5         Would that include a fist?  A human fist?

        6    A    Any blunt object.  It excludes -- for our definition,

        7    it's not sharp.

        8         *(Court Reporter requests clarification for the*

        9         *record.)*

02:07:30 10         THE WITNESS:  It "excludes," and then I

       11    interrupted.  By definition, it excludes gunshot wounds or

       12    sharp objects, like knives so any blunt object.

       13    BY MR. STAPLES:

       14    Q    Did you do X-rays of Mr. Dao's body?

02:07:47 15    A    Yes.

       16    Q    Did -- was there any findings in the X-rays that were

       17    of use to you?

       18    A    It was useful that it showed the projectile that we saw

       19    on his left upper back.  And that's why we are doing X-rays,

02:08:06 20    so we can easily locate foreign body.

       21    Q    And did you also do toxicology tests?

       22    A    Yes, we did.

       23    Q    What do you look for in toxicology tests?

       24    A    In this case, we looked for alcohol and drugs of abuse.

02:08:22 25    Q    Did you review the test results from the toxicology

02:08:27    1  tests?

2  A    Yes.  It was negative.  He didn't have alcohol or drugs

3  of abuse in his system.

4  Q    And when you say "drugs of abuse," just so the record

02:08:36    5  is clear, what are you referring to?

6  A    Common drugs of abuse.  There is a big list in our

7  toxicology report.  I don't know all of them, but it

8  includes methamphetamines, fentanyl, heroin.  More common

9  ones.

02:08:51   10  Q    Cocaine?

11  A    Yes.

12  Q    Marijuana?

13  A    Yes.

14  Q    Okay.  And, again, his results were negative for all of

02:08:57   15  those?

16  A    Correct.

17  Q    Now, in your -- in your external review of the body,

18  Doctor, do you look for identifying information such as

19  tattoos?

02:09:17   20  A    Yes.

21  Q    Did you find a tattoo in this case?

22  A    He had a tattoo on left shoulder and lateral left upper

23  arm.

24  Q    And, Doctor, if you would take a look at Exhibit 116,

02:09:30   25  please.

32

| | | |
|---|---|---|
| 02:09:30 | 1 | A   *(Witness so complies.)* |
| | 2 | Q   Do you recognize that photo, Doctor? |
| | 3 | A   Yes. |
| | 4 | Q   Is that a photograph you took? |
| 02:09:46 | 5 | A   Yes. |
| | 6 | Q   And it has your -- your department's case number on it? |
| | 7 | A   Correct. |
| | 8 | MR. STAPLES:  I would move 116 into evidence, |
| | 9 | Your Honor. |
| 02:09:57 | 10 | THE COURT:  Received. |
| | 11 | *(Plaintiff's Exhibit 116 received in evidence.)* |
| | 12 | BY MR. STAPLES: |
| | 13 | Q   Is that the tattoo that you saw on the body of |
| | 14 | James Dao? |
| 02:10:09 | 15 | A   Correct. |
| | 16 | Q   And that you say is on his left, I guess, bicep, |
| | 17 | shoulder? |
| | 18 | A   Left shoulder and lateral arm. |
| | 19 | Q   Now, did you also examine Mr. Dao's hands? |
| 02:10:26 | 20 | A   Yes. |
| | 21 | Q   And did you take photographs of those? |
| | 22 | A   Yes. |
| | 23 | Q   If you would take a look at Exhibits 119, 120, 121 and |
| | 24 | 122, please. |
| 02:10:54 | 25 | A   *(Witness so complies.)*  I have them here. |

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:11:04 | 1 | Q    Do you recognize those photographs, Doctor? |
| | 2 | A    I do. |
| | 3 | Q    Again, are those photos you took during the autopsy? |
| | 4 | A    Yes. |
| 02:11:10 | 5 | Q    And they each have your department's case number on it? |
| | 6 | A    Yes. |
| | 7 | MR. STAPLES:  I would move 119, Your Honor, 120, |
| | 8 | 121 and 122 into evidence. |
| | 9 | THE COURT:  Received. |
| 02:11:26 | 10 | *(Plaintiff's Exhibits 119, 120, 121 and 122* |
| | 11 | *received in evidence.)* |
| | 12 | *(The document was published in open court.)* |
| | 13 | BY MR. STAPLES: |
| | 14 | Q    Showing you, Doctor, Exhibit 119, is that the top of |
| 02:11:43 | 15 | his left hand? |
| | 16 | A    Yes. |
| | 17 | Q    When you examined his top of his left hand, did you see |
| | 18 | any wounds? |
| | 19 | A    No. |
| 02:11:52 | 20 | Q    No -- and, perhaps, since I'm talking to a doctor, I |
| | 21 | should be clear in my terms. |
| | 22 | By "wounds," would that include abrasions or |
| | 23 | anything like that? |
| | 24 | A    Yes.  So no injuries were seen. |
| 02:12:07 | 25 | Q    I'm showing you 120. |

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:12:11 | 1 | *(The document was published in open court.)* |
| | 2 | BY MR. STAPLES: |
| | 3 | Q    Is that the palm side of his left hand? |
| | 4 | A    Yes. |
| 02:12:19 | 5 | Q    I have to do the same. |
| | 6 | Again, when you examined it, did you see any |
| | 7 | injuries on it? |
| | 8 | A    No injuries seen. |
| | 9 | Q    And when you examine a hand like this, how closely do |
| 02:12:32 | 10 | you look? |
| | 11 | A    We look in detail. |
| | 12 | Q    Do you, for instance, look underneath the fingernails? |
| | 13 | A    Not underneath. |
| | 14 | Q    But I mean -- do you check -- I should say, check the |
| 02:12:46 | 15 | fingernails? |
| | 16 | A    We check them, yeah. |
| | 17 | Q    And the entire palm and all that? |
| | 18 | A    Correct. |
| | 19 | Q    And, again, on his left hand, both top and bottom, |
| 02:12:54 | 20 | there were no injuries? |
| | 21 | A    Correct. |
| | 22 | Q    Showing you 121, Doctor, that's the top of his right |
| | 23 | hand? |
| | 24 | *(The document was published in open court.)* |
| 02:13:06 | 25 | THE WITNESS:  Correct. |

*Deborah D. Parker, U.S. Court Reporter*

02:13:06   1   BY MR. STAPLES:

2   Q     And, again, when you examined the top of his right

3   hand, did you see any wound or injury?

4   A     No injuries.

02:13:15   5   Q     And, finally, this would be the palm side of his right

6   hand, Doctor?

7        *(The document was published in open court.)*

8            THE WITNESS:  Correct.

9   BY MR. STAPLES:

02:13:22   10   Q     Did you see any injury or wound on his right hand?

11   A     No.

12   Q     For the pictures we just looked at both sides of his

13   hands, did you see any evidence that he had been involved in

14   a struggle?

02:13:42   15   A     I didn't see any injuries.

16   Q     Okay.  Now, also, did you examine his legs?

17   A     Yes.

18   Q     Did you find any abrasions on his legs?

19   A     No.

02:14:04   20   Q     Okay.  How about his knees?

21   A     No injuries -- no, sorry.  Yes.

22   Q     What did you find?

23   A     On knees -- there were scrapes on both knees.

24   Q     Okay.  I want to go back to the two bullet wounds.

02:14:31   25            Do you look for something called a trajectory when

*Deborah D. Parker, U.S. Court Reporter*

02:14:34  1   you examine a bullet wound?

2   A    Yes.  It's a part of our description of how -- what

3   direction the bullet traveled.

4   Q    And that's based on your examination of its entry and

02:14:46  5   path through the body?

6   A    Yes.

7   Q    And would the wound to the shoulder and the back, were

8   you able to determine the trajectory?

9   A    Yes.  It was right to left and upward.

02:15:03  10   Q    Okay.  And could you tell -- I withdraw that question.

11   And how about the wound on the head?  Did you

12   determine the trajectory for that?

13   A    It was same.  Right to left and back to front.

14   THE COURT:  And what?

02:15:20  15   THE WITNESS:  Back to front.  Forward.

16   BY MR. STAPLES:

17   Q    And I may have missed that.  Was the wound to the

18   shoulder back to front as well?

19   A    No.  It was just upward.  It kind of traveled just

02:15:33  20   parallel to the skin.

21   Q    Now, did you examine the organs of Mr. Dao?

22   A    Yes, I did.

23   Q    Did you note any abnormalities?

24   A    You mean like natural disease?

02:15:54  25   Q    Preexisting conditions, diseases, that sort of thing?

*Deborah D. Parker, U.S. Court Reporter*

02:15:58  1    A    He had fatty change of liver.

       2    Q    Fatty -- I'm sorry.  What?

       3    A    Fatty change of liver.

       4    Q    Change?

02:16:06  5    A    Yes.

       6    Q    Can you tell the jury what that is and what it means?

       7    A    So, normally, a liver should not have fat.  But in some

       8    people -- and it's pretty common thing, especially with

       9    obesity, with alcohol use, we get those fatty droplets in

02:16:24 10    the liver tissue.

      11    Q    All right.  As a result of the autopsy that you

      12    conducted on Mr. Dao, did you come to a conclusion regarding

      13    the manner and cause of his death?

      14    A    Yes, I did.

02:16:46 15    Q    What was the manner of the death of James Dao?

      16    A    Homicide.

      17    Q    And what do you understand that word to mean?

      18    A    For us by definition, homicide is death in hands of

      19    another person.

02:17:11 20    Q    And that's the manner of death.

      21         What was your determination of the cause of death?

      22    A    His cause of death was drowning.

      23    Q    And did you find contributing factors?

      24    A    Yes.  Those were blunt force injuries and gunshot wound

02:17:28 25    of head.

*Deborah D. Parker, U.S. Court Reporter*

02:17:29  1   Q    Can you explain to the jury what "contributing factors"

2   mean?

3   A    So that's a factor that is helping the main cause to

4   happen.

02:17:44  5            MR. STAPLES:  Okay.  That's all the questions I

6   have, Doctor.  Thank you.

7            THE COURT:  Cross-examination, please.

8            MR. WILKE:  Thank you, Your Honor.

9                     CROSS-EXAMINATION

02:17:55  10  BY MR. WILKE:

11  Q    Good afternoon, Dr. Paunovic.

12  A    Good afternoon.

13  Q    So you determined the manner of death to be homicide,

14  correct?

02:18:41  15  A    Correct.

16  Q    And I think you defined "homicide" as death at the

17  hands of another?

18  A    Correct.

19  Q    That -- you make no legal conclusion about that,

02:18:52  20  correct?

21  A    Correct.

22  Q    For instance, homicide is not equal to murder, correct?

23  A    Correct.

24  Q    And you understand that homicide can be justified at

02:19:01  25  times, correct?

*Deborah D. Parker, U.S. Court Reporter*

02:19:02  1   A    Yes.  For example, when you have kids.  One sibling

2   shoots another one, we still call it homicide, even [sic]

3   other kid is not responsible.

4   Q    So, essentially, homicide is to be distinguished, for

02:19:19  5   instance, by suicide which is death at one's own hands --

6        *(Court Reporter requests clarification for the*

7        *record.)*

8            THE COURT:  Sir, just a moment.

9            Mr. Wilke, I need you close to the microphone so

10  we can hear you.

11           Thank you, sir.

12  BY MR. WILKE:

13  Q    Also, to be distinguished from death by natural causes,

14  correct?

02:19:34 15  A    Correct.

16  Q    Now, here the cause of death was drowning, correct?

17  A    Correct.

18  Q    And you were able to determine that based on several

19  factors, correct?

02:19:49 20  A    Correct.

21  Q    One, the body was found in the ocean?

22  A    Yes.

23  Q    Two, there were watery contents in his digestive

24  system, correct?

02:20:00 25  A    Yes.

02:20:02   1   Q    And there was also water found in his lungs, correct?

2   A    Correct.

3   Q    What's known as pulmonary edema?

4   A    Yes.

02:20:11   5   Q    And from that you determined that when Mr. Dao entered

6   the water, he was alive, correct?

7   A    Correct.

8   Q    Now, the -- you also concluded that there were two

9   contributing factors; is that correct?

02:20:39  10   A    Yes.

11   Q    One is the blunt force injuries to the head, correct?

12   A    Yes.

13   Q    And the second were the gunshot wounds, correct?

14   A    Yes.

02:20:48  15   Q    And did you find there was a gunshot wound to the

16   shoulder -- the back and the shoulder, correct?

17   A    Correct.

18   Q    And one across the top of the head, correct?

19   A    Correct.

02:20:57  20   Q    And did you find both gunshot wounds to be contributing

21   factors?

22   A    No.

23   Q    Which gunshot wound did you find to be the contributing

24   factor?

02:21:05  25   A    The one on the head.

*Deborah D. Parker, U.S. Court Reporter*

41

02:21:07  1    Q     Now, the one on the head was -- only pierced the skin,

       2    correct?

       3    A     Correct.

       4    Q     It did not enter the skull, correct?

02:21:19  5    A     Correct.

       6    Q     And it entered -- it grazed the top of the scalp,

       7    piercing the skin and coming out again, correct?

       8    A     Yes.

       9    Q     Traveling approximately two inches above the skin

02:21:31 10    across the head?

      11    A     Right.

      12    Q     Now, to obtain that type of gunshot wound, it requires

      13    that the gun be fired almost parallel to the head, correct?

      14    A     Correct.

02:21:45 15    Q     Like, if somebody pointed a gun at somebody's head, a

      16    .38 caliber gun, that bullet would enter the skull, correct?

      17    A     Depends how far they are and what they want to -- you

      18    know, how good they are in shooting.

      19    Q     Okay.  So from, as far as I am from Mr. Scally, right

02:22:04 20    here, if I were to -- not that I would, but if I were to

      21    point a gun to his head straight in, you would expect a

      22    .38 caliber bullet to enter the skull, correct?

      23    A     If you are a good shoot, yeah.

      24         (Court Reporter requests clarification for the

02:22:20 25         record.)

Deborah D. Parker, U.S. Court Reporter

|      |                                                                    |
|------|--------------------------------------------------------------------|
| 1    | THE WITNESS:  Shooter.                                              |
| 2    | BY MR. WILKE:                                                       |
| 3    | Q    "A good" what?  I'm sorry.                                     |
| 4    | A    Shooter.  If you're good in it, right.  Even you want          |
02:22:24 | 5 | it sometimes --                                                  |
| 6    | Q    I understand.  You have to be a pretty bad shooter to          |
| 7    | miss from this far away, though, fair to say?                       |
| 8    | A    Although in this case --                                       |
| 9    | MR. STAPLES:  Objection.  Foundation.                               |
02:22:34 | 10 | THE COURT:  Sustained.                                          |
| 11   | BY MR. WILKE:                                                       |
| 12   | Q    Now, you did not find a gunshot wound to the shoulder          |
| 13   | to be a contributing factor at all, correct?                       |
| 14   | A    Correct.                                                       |
02:22:49 | 15 | Q    And that gunshot wound entered just left of the midline    |
| 16   | of the back, correct?                                               |
| 17   | A    Correct.                                                       |
| 18   | Q    Approximately -- I have the number here.                       |
| 19   | How far down the back?  Can you tell -- can you                     |
02:23:07 | 20 | tell the jury?                                                  |
| 21   | A    So we measured then from the top of the head, and it          |
| 22   | was 11 inches below top of the head.                                |
| 23   | Q    And, typically, what is the length of the head and neck        |
| 24   | until you get to the shoulders?                                     |
02:23:21 | 25 | A    Usually like 10.                                           |

02:23:22   1    Q    Okay.  So, basically, an inch down from the top of the

           2    back is the entry wound, correct?

           3    A    Correct.

           4    Q    And the bullet lodged in the shoulder, correct?

02:23:37   5    A    Yes.

           6    Q    Could we have --

           7              MR. WILKE:  May I have a moment, Your Honor?

           8              THE COURT:  You may.

           9         (Pause)

02:23:54  10    BY MR. WILKE:

          11    Q    I'm going to show you what's been admitted by

          12    stipulation as Exhibit 501-1.

          13              MR. WILKE:  May I just put it up on the ELMO,

          14    Your Honor?

02:24:33  15              THE COURT:  Is that acceptable, Counsel?

          16              MR. STAPLES:  No objection.

          17              THE COURT:  All right.  This is Exhibit 501,

          18    Counsel?

          19              MR. WILKE:  501-1, Your Honor.

02:24:43  20              THE COURT:  Ladies and gentlemen, you're about to

          21    be shown a stipulation by the parties.  They've marked it

          22    501.

          23              MR. WILKE:  It's an exhibit, Your Honor.  We're

          24    admitting by stipulation.

02:24:54  25              THE COURT:  And it's a stipulation, correct?

44

```
02:24:55   1              MR. WILKE:  No, it's a diagram.
           2              THE COURT:  My apologies.  Ladies and gentlemen,
           3   please, disregard what I said.
           4              Thank you.
02:25:01   5              MR. WILKE:  Thank you, Your Honor.
           6          (The document was published in open court.)
           7   BY MR. WILKE:
           8   Q    Dr. Paunovic, I'm showing what's been admitted as
           9   Exhibit 501-1.
02:25:11  10              Do you see that?
          11   A    Yes.
          12   Q    Do you recognize that?
          13   A    Yes.
          14   Q    What is that?
02:25:15  15   A    It's a body bag that I used while I was performing an
          16   autopsy.
          17   Q    And the handwriting on this exhibit, that's your
          18   handwriting?
          19   A    Yes.
02:25:25  20   Q    Okay.  I'm going to zoom in and show you what's been
          21   admitted as 501-2.  It's simply a closeup of the diagram of
          22   the right, which is the rear side of the body, the diagram.
          23              Do you see that?
          24   A    Yes.
02:25:43  25   Q    And the -- there is a hole that has a number "316"
```

02:25:57   1   right there, just to the left of the middle.

2              Do you see that?

3   A    Yes.

4   Q    Is that the entrance wound --

02:26:02   5   A    Yes.

6   Q    -- that we saw the picture of?

7   A    Correct.

8   Q    Okay.  Now, that entrance wound was asymmetrical; is

9   that correct?

02:26:14  10   A    Entrance wound was circular --

11          *(Court Reporter requests clarification for the*

12          *record.)*

13              THE WITNESS:  -- perforation that had asymmetrical

14   abrasion or scrape around it.

02:26:31  15   BY MR. WILKE:

16   Q    I'm sorry.  Could you repeat that, Dr. Paunovic?

17              I'm sorry.  I couldn't -- I didn't catch that.

18              THE COURT:  And, Counsel, first, the jury may not

19   be able to see what the doctor is testifying to.

02:26:42  20              So you've got leave to take the microphone and go

21   back to the "316," Counsel, if you'd like, because I think

22   some of the jurors are having a difficult time seeing the

23   description.

24              Kind of move to the side so the jury can see what

02:26:59  25   you are --

02:27:00  1          THE WITNESS:  We have jurors there --

       2          THE COURT:  Let Counsel ask his question first.

       3          Counsel.

       4    BY MR. WILKE:

02:27:07  5    Q     Thank you.

       6          Dr. Paunovic, could you point the jury to the spot

       7    on the diagram marking the entrance wound?

       8    A     So this diagram is the same one we already showed you

       9    on the body when I said this is the entrance on the upper

02:27:23 10   back.

      11          And this is just my diagramming before I dictated

      12    the report.  I used this to dictate the report.

      13          So you see this "316" is showing this round

      14    defect.  And then I have this three-quarters of the inch and

02:27:39 15   that is the abrasion or scrape.  And that is asymmetrical.

      16    So defect is not asymmetrical, but the abrasion is.

      17    Q     And the abrasion around the entrance wound is caused by

      18    the bullet entering, correct?

      19    A     Yes.  So how bullet is traveling, it's scraping the

02:27:57 20   skin in a way.

      21          MR. WILKE:  I'm going to put back up on the screen

      22    what was previously admitted as Exhibit 117.

      23          (The document was published in open court.)

      24    BY MR. WILKE:

02:28:04 25   Q     This was the earlier exhibit that Mr. Staples showed to

02:28:20  1    you, correct?

       2    A    Correct.

       3    Q    That's the photo of the entrance wound, correct?

       4    A    Yes.

02:28:24  5    Q    And the abrasion you're talking about is the lighter --

       6    the lighter area, right, around the darker wound, correct?

       7    A    Yes.

       8    Q    And the asymmetry of the abrasion around the exit wound

       9    tells you that the bullet came in from the side, correct?

02:28:50 10    A    Correct.

      11    Q    From the direction -- I'll put it back up.

      12          From this side this way *(indicating)*, correct?

      13    A    Correct.

      14    Q    And, additionally, I'm going to go back -- and I'll

02:29:07 15    just put this rather than --

      16          I'm going to go back and put the diagram back up

      17    on the stand, or the closeup of the diagram.

      18        *(The document was published in open court.)*

      19    BY MR. WILKE:

02:29:25 20    Q    This diagram shows you where the bullet ended up and

      21    lodged in the shoulder as well, correct?

      22    A    Correct.

      23    Q    And that is this area over here *(indicating)* marked

      24    "SOL," correct?

02:29:39 25    A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

48

02:29:40  1    Q    Okay.  And that is also measured from the top of the
       2    head as 10 inches, correct?
       3    A    Yes.
       4    Q    And 8 inches is that from the centerline of the --
02:29:52  5    A    Yes.  Left of posterior midline.
       6    Q    Okay.  And so what you can tell by this diagram and
       7    your notes is that the bullet traveled, essentially -- from
       8    two and a half inches to eight inches, so about
       9    five-and-a-half inches left to right and from 11 inches to
02:30:15 10    10 inches or about one inch from lower to up, correct?
      11    A    Correct.
      12    Q    Now, when you first examined the body, I understood you
      13    to say in your testimony on direct examination, that you
      14    were able to feel the bullet, correct?
02:30:34 15    A    Yes.
      16    Q    Okay.  So it did not lodge very deep, correct?
      17    A    Just under the skin.
      18    Q    Just under the skin.
      19         We're talking about the -- the bullet wound in the
02:30:45 20    shoulder, correct?
      21    A    Correct.
      22    Q    And that's similar to the bullet wound across the head.
      23    It just went through the skin.  It did not enter the skull,
      24    correct?
02:30:53 25    A    Correct.

*Deborah D. Parker, U.S. Court Reporter*

49

02:31:19   1   Q     Now, you mentioned that one of the things that you look

           2   for in your examination would be stippling, correct?

           3   A     Yes.

           4   Q     Is that the same as gunshot powder residue?

02:31:34   5   A     Yes.

           6   Q     Okay.  And that is, essentially, gunpowder that is

           7   released from the barrel of a gun after it's fired, correct?

           8   A     Correct.

           9   Q     And it can tell you something about the distance from

02:31:47  10   which a gun was fired -- from the distance of where it hit

          11   the person, correct?

          12   A     Correct.

          13   Q     Now, stippling, though, will dissipate when it -- over

          14   time, correct?

02:32:01  15   A     Not over time.  With distance.

          16   Q     It dissipates over distance, but -- yeah, time wasn't

          17   the right thing.

          18   A     Uh-huh.

          19   Q     What would be the effect of -- do you look on both the

02:32:15  20   clothes and the skin or just the skin for stippling?

          21   A     We look both.

          22   Q     You look both, okay.  And you found no stippling on the

          23   skin, correct?

          24   A     No.

02:32:24  25   Q     Okay.  And did you actually examine the clothes?

*Deborah D. Parker, U.S. Court Reporter*

02:32:27   1   A     Yes, I did.

2   Q     Okay.  And no stippling on the clothes, correct?

3   A     On this jacket, there were some minor defects that I

4   described, but I cannot claim is that from stippling.

02:32:41   5   Q     They were minor defects approaching the hole in the

6   jacket that corresponded to the entrance wound, correct?

7   A     Correct.

8             MR. WILKE:  Can I have just a moment?

9             *(Pause)*

02:34:10   10            MR. WILKE:  Your Honor, I have a document that I

11   would mark for identification as 502.

12            THE COURT:  502.

13            MR. WILKE:  I want to put it up on the screen.

14            THE COURT:  Well, it hasn't been received yet,

02:34:22   15   Counsel.

16            MR. WILKE:  Oh, I'm sorry.  I'd move to admit this

17   at this time, Your Honor.

18            The parties are --

19            MR. STAPLES:  No objection, Your Honor.

02:34:28   20            THE COURT:  Received.  Is it the back portion,

21   again?

22            MR. WILKE:  502?

23            THE COURT:  Yes.

24            *(Plaintiff's Exhibit 502 received in evidence.)*

02:34:33   25            *(The document was published in open court.)*

*Deborah D. Parker, U.S. Court Reporter*

51

02:34:33  1   BY MR. WILKE:

2   Q    Dr. Paunovic, do you recognize this to be a closeup of

3   the jacket and the bullet hole in the jacket?

4   A    Yes.

02:34:44  5   Q    Okay.  And I'm going to try and zoom this to see if we

6   can see what you were talking about here.

7            You said you noticed some kind of -- what did you

8   describe?

9            What did you describe it as?

02:35:00 10   A    There were like minute defects in the jacket.

11   Q    Okay.  In the fabric of the jacket, correct?

12   A    Yes.

13   Q    Okay.  And this jacket, is that Exhibit 100 that

14   Mr. Staples had showed you before?

02:35:12 15   A    Yes.

16   Q    And that appears to be a polyester type of windbreaker

17   type of jacket, correct?

18   A    Correct.

19   Q    And these minute little defects in the jacket, would

02:35:27 20   that be these -- is this what you're talking about?

21   A    Probably.

22   Q    Could you pull the jacket out and take a look at it for

23   us so we're certain?

24            It's in -- it's in the bag seated right behind

02:35:44 25   you.

*Deborah D. Parker, U.S. Court Reporter*

02:36:07  1   A    Yes.

2   Q    They appear to be small almost pinholes, correct?

3   A    Yes.

4   Q    Okay.  In this polyester fabric, correct?

02:36:16  5   A    Correct.

6   Q    Now, when gunpowder is released from the barrel of a

7   gun, it's hot, correct?

8   A    Yes.

9   Q    And hot particles --

02:36:27 10       (Court Reporter requests clarification for the

11       record.)

12   Q    Hot particles hitting polyester fabric will create --

13   will burn the fabric, correct?

14        It will create a defect in the fabric, correct?

02:36:37 15   A    So more than burning -- these -- stippling is unburned

16   gunpowder.  Soot would be burned.  So these are unburned,

17   kind of causing like a damage.  So if you would have them on

18   the skin, they would be like a small scrapes.

19   Q    A small --

02:36:54 20   A    Scrapes --

21   Q    -- scrape --

22   A    -- like abrasions.

23   Q    -- correct?

24       (Court Reporter requests clarification for the

02:36:56 25       record.)

*Deborah D. Parker, U.S. Court Reporter*

02:36:57  1          THE WITNESS:  That's called abrasions.

2    BY MR. WILKE:

3    Q    Okay.

4    A    And on a fabric, it will be like defects.

02:37:12  5    Q    A defect caused from hot particles hitting the jacket?

6    A    I don't know how hot they are, but it -- they're like

7    little -- almost like a metal damage.

8    Q    Okay.  Those defects that you see in the jacket extend

9    from the -- if you're looking at the back of the jacket from

02:37:38 10    the right side toward the -- toward the entrance, the hole

11    where the -- corresponding to the entrance wound, correct?

12    A    Correct.

13    Q    And that would be consistent with the gun being fired

14    from that side relatively close to where it entered the

02:37:58 15    body, correct?

16    A    Correct.

17         (Pause)

18              MR. WILKE:  May I have just a moment, Your Honor?

19              THE COURT:  Certainly.

02:38:47 20         (Pause)

21    BY MR. WILKE:

22    Q    Now, Dr. Paunovic, you, in your direct testimony,

23    identified or testified about some abrasions to the knees of

24    Mr. Dao that you observed?

02:39:11 25    A    Correct.

54

02:39:12   1   Q   These are relatively minor, correct?

2   A   Yes.

3   Q   And were you able to determine how old they were or

4   when may have been sustained?

02:39:21   5   A   No.

6           MR. WILKE:  Could we have just a moment,

7   Your Honor?

8           THE COURT:  You may.

9       (Pause)

02:39:31   10   BY MR. WILKE:

11   Q   We'll come back to that in just a moment.

12         You also testified on direct examination about

13   your examination of Mr. Dao's hands, correct?

14   A   Correct.

02:40:27   15   Q   Mr. Staples showed you those photographs, both sides of

16   both hands --

17   A   Yes.

18   Q   Correct?

19         Now, when -- if a person had been tied up, would

02:40:38   20   you expect to see the ligature marks?

21   A   Depend what's used at a type.  Something soft, maybe

22   wouldn't leave a mark.

23   Q   But with rope, for instance, would that tend to leave

24   some mark if the person had been tied up?

02:40:56   25   A   Tight rope would cause some mark.

*Deborah D. Parker, U.S. Court Reporter*

55

02:40:59   1    Q     Did you notice any type of marks suggesting that

2    Mr. Dao's hands had been tied?

3    A     No evidence of that.

4    Q     Okay.  If a person used, for instance, a chain or some

02:41:08   5    other material like that, metal material, you would expect

6    to see some damage to the hands had that happened?

7    A     Probably.

8    Q     And you noticed nothing like that, correct?

9    A     Correct.

02:41:19   10   Q     And similarly around the legs or the ankles, if a

11   person had been tied up around the ankles, would you expect

12   to see -- with a rope or a chain -- would you expect to see

13   some type of markings resulting from that?

14   A     Probably.

02:41:34   15   Q     And you observed nothing like that on Mr. Dao, correct?

16   A     Correct.

17         *(Pause)*

18         MR. WILKE:  Your Honor, I'm seeking to admit

19   Exhibit 502-A and -B, which are photographs of -- 503-A and

02:43:15   20   503-B, which are photographs of Mr. Dao's knees taken by

21   Dr. Paunovic during the autopsy.

22         MR. STAPLES:  No objection, Your Honor.

23         THE COURT:  503-A is received.  503-B is received.

24   502 was previously received.

02:43:30   25         Just for our records, 501-1 and 501-2 which were

*Deborah D. Parker, U.S. Court Reporter*

02:43:36  1   the diagrams, would you like them received?

2              MR. WILKE:  I would, Your Honor.  Thank you.

3              THE COURT:  And also 117, would you want that

4   received?

02:43:46  5              MR. WILKE:  That was previously admitted by the

6   Government, I believe.

7              THE COURT:  Received.

8       *(Defendant's Exhibits 117, 501-1, 501-2, 503-A,*

9       *503-B received in evidence.)*

02:43:48 10      *(The document was published in open court.)*

11   BY MR. WILKE:

12   Q    Okay.  I'm showing you what's been identified as 503-A.

13              Is that a picture of Mr. Dao's knees that you took

14   during the autopsy?

02:44:05 15   A    Yes.

16   Q    And the -- can you point out these minor abrasions that

17   you testified about?  Is it on this knee here *(indicating)*?

18   A    As I say, they were ill-defined.  By that I mean it's

19   hard to say how big it is exactly.  But this looked like a

02:44:27 20   pale red abraded skin.

21              MR. WILKE:  And can we look at 503-B?

22      *(The document was published in open court.)*

23   BY MR. WILKE:

24   Q    This would be his right knee, correct?

02:44:37 25   A    Correct.

02:44:37   1    Q    And, again, can you point out these abrasions that you

2    noticed?

3    A    I believe it was this one *(indicating)*.

4    Q    Okay.  And you would agree these are very minor,

02:44:47   5    correct?

6    A    Correct.

7    Q    And cannot -- you cannot determine when he sustained

8    those, correct?

9    A    Correct.

02:44:54  10         MR. WILKE:  I have no further questions.

11         THE COURT:  Redirect examination.

12                        REDIRECT EXAMINATION

13   BY MR. STAPLES:

14   Q    Doctor, you were just asked some questions about the

02:45:06  15   path two bullets took through Mr. Dao's body.

16         Do you recall that?

17   A    Yes.

18   Q    And in the case of the bullet to the head, Mr. Wilke

19   pointed out or had you point out that it did not penetrate

02:45:23  20   the skull but went through the skin, correct?

21   A    Correct.

22   Q    That would still be painful, wouldn't it?

23         MR. WILKE:  Objection.  Relevance.  403,

24   Your Honor.

02:45:30  25         THE COURT:  Overruled.

02:45:32 1          You can answer the question.

2          THE WITNESS:  Any injury is painful.

3    BY MR. STAPLES:

4    Q    There's a lot of nerves up in that area of the head?

02:45:39 5    A    Yes.  And it bleeds a lot.

6    Q    Bleeds a lot.

7          And, in fact, you list that as a contributing

8    factor to the cause of death, correct?

9    A    Correct.

02:45:48 10   Q    Why is that?

11   A    Why -- why did I list head gunshot wound --

12        *(Court Reporter requests clarification for the*

13        *record.)*

14        THE WITNESS:  Why did I list head gunshot wound

02:45:57 15   and not the one on the back?

16        Because when I opened the head, there was some

17   bleeding around his brain.  So there was substantial injury

18   of the head.  And I cannot say is that because of bullet

19   pass through his scalp or just the skin tears, so that's why

02:46:20 20   I had to list both of them.

21   BY MR. STAPLES:

22   Q    But there was bleeding around his brain?

23   A    Correct.

24   Q    Would that be debilitating to him?

02:46:28 25   A    People differently react, but they should have some

*Deborah D. Parker, U.S. Court Reporter*

02:46:33  1   symptoms.  You know, sometimes it can be just headache, but

2   it can also be confusion, loss of consciousness.  It's hard

3   to say.

4   Q     And, similarly, with the bullet that traveled through

02:46:46  5   his shoulder, would that have been painful to him?

6                 MR. WILKE:  Objection.  403.

7                 THE COURT:  Overruled.

8                 THE WITNESS:  Correct.

9   BY MR. STAPLES:

02:46:53 10   Q     And would that pain add any sense of shock, or affect

11   the mind in any way?

12   A     I don't know.

13   Q     You're familiar with shock as something that occurs

14   after a traumatic event?

02:47:12 15   A     From medical standpoint, we use shock more when you

16   lose too much blood.  But like on a mental level, I cannot

17   say.

18   Q     There was a good deal of blood, though, that you

19   observed on the body when you first got it?

02:47:30 20   A     Yes.

21                 MR. STAPLES:  One moment, please.

22           (Pause)

23                 MR. STAPLES:  Nothing further, Doctor.

24                 Thank you.

02:47:43 25                 MR. WILKE:  May I follow up, Your Honor?

*Deborah D. Parker, U.S. Court Reporter*

```
02:47:44   1              THE COURT:  Recross-examination.

           2              MR. WILKE:  Thank you.

           3                   RECROSS-EXAMINATION

           4    BY MR. WILKE:

02:47:49   5    Q    Doctor, I'm going to show you what's --

           6              MR. WILKE:  I'm going to seek to admit 501-4,

           7    Your Honor.  It's the diagram created by Dr. Paunovic of the

           8    head injuries to Mr. Dao.

           9              THE COURT:  All right.  Received.

02:48:02  10         (Defendant's Exhibit 501-4 received in evidence.)

          11         (The document was published in open court.)

          12    BY MR. WILKE:

          13    Q    Dr. Paunovic, do you recognize this?

          14              This is a closeup of your diagram of the head

02:48:29  15    injuries you observed to Mr. Dao during the autopsy?

          16    A    Yes.

          17    Q    Okay.  And this circle right here (indicating), that's

          18    the entrance wound.  I'm going to -- if you can --

          19              Oh, I'm sorry.  Right here (indicating), that's

02:48:47  20    the entrance wound, correct?

          21    A    Yes.

          22    Q    Okay.  And this "3-8" is irregular.  Is that the exit

          23    wound, or is it this earlier one?

          24    A    This is the exit wound (indicating).

02:49:01  25    Q    Okay.  So the one -- the arrow or shape here?
```

*Deborah D. Parker, U.S. Court Reporter*

02:49:06  1    A    Yes.  This line is interrupted and not good copy, but

2    it shows where exit is.

3    Q    And these other marks on here are the lacerations

4    caused by blunt force trauma that you testified to, correct?

02:49:23  5    A    Correct.

6    Q    Okay.  Now, you just testified on redirect examination

7    that the scalp injury would bleed alot, correct?

8    A    Yes.

9    Q    And, in fact, when Mr. Dao was taken from the water,

02:49:39  10   there was substantial blood on his head and face, correct?

11   A    He still had some blood on head and face, but it's hard

12   to say how much was prior he entered the water.

13   Q    Okay.  Would you expect there would have been even more

14   blood 36 hours earlier?

02:49:56  15   A    Probably.

16   Q    And when there is that much blood in a crime scene, you

17   would expect to see blood at the crime scene, correct?

18   A    Correct.

19        MR. WILKE:  Okay.  No further questions,

02:50:12  20   Your Honor.

21        THE COURT:  All right.  May the doctor be excused,

22   Counsel?

23        MR. STAPLES:  One moment.

24      (Pause)

02:50:23  25        MR. STAPLES:  Yes, Your Honor.

02:50:24  1          THE COURT:  Counsel?

       2          MR. WILKE:  No further questions, Your Honor.

       3          THE COURT:  May she be excused.

       4          MR. WILKE:  Yes, sir.

02:50:29  5          THE COURT:  Thank you very much.

       6          THE WITNESS:  Thank you.

       7          THE COURT:  Ladies and gentlemen, why don't we

       8  take a 20-minute recess.  And we'll see you about 10 after

       9  the hour.

02:50:37 10          Please, don't discuss this matter, nor form or

      11  express any opinion concerning the case.

      12          Have a nice recess.

      13          Counsel, then 10 after the hour, please.

      14      (Jury exits courtroom.)

02:51:27 15          THE COURT:  Have a nice recess, Counsel.

      16          If you would like to retrieve these items.

      17          Thank you very much.

      18      (Recess taken from 2:51 p.m. to 3:15 p.m.)

      19      (The following proceedings were had in open court

03:15:17 20      in the presence of the jury:)

      21          THE COURT:  The jury is present.  All alternates.

      22  The defendant.

      23          Counsel, would you like to call your next witness.

      24          MR. SCALLY:  Yes, Your Honor.

03:15:27 25          The United States calls Stephen Lu.

*Deborah D. Parker, U.S. Court Reporter*

03:15:32  1        THE COURT:  Would you raise your right hand.

2         STEPHEN LU, PLAINTIFF'S WITNESS, SWORN

3        THE WITNESS:  I do.

4        THE COURT:  Thank you, sir.

03:15:39  5        If you would walk along the side of the jury

6   railing.  The entrance of the jury box is actually closest

7   to this wall.  It's not this little door.  Just walk right

8   towards the wall.

9        THE WITNESS:  Thank you.

03:16:09 10        THE COURT:  Now, with that, there's a mask just

11  around the corner, a clear mask.  And the back portion with

12  the string goes on the bottom.

13        THE WITNESS:  Oh, okay.

14        THE COURT:  Okay.  Sir, would you state your full

03:16:43 15  name for the jurors, please.

16        THE WITNESS:  Stephen Lu.

17        THE COURT:  And would you spell your last name,

18  sir.

19        THE WITNESS:  Last name is spelled L-U.

03:16:52 20        THE COURT:  And your first name?

21        THE WITNESS:  Stephen, S-T-E-P-H-E-N.

22        THE COURT:  All right.  "P-H," not "-V."

23        All right.  Direct examination, please, by the

24  Government.

03:17:04 25        MR. SCALLY:  Thank you, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

                              DIRECT EXAMINATION

BY MR. SCALLY:

Q    Good afternoon, Mr. Lu.

A    Good afternoon.

Q    Where do you work, sir?

A    I work for the San Diego Sheriff's Department, Crime
Laboratory.

Q    What is your job title there?

A    I work for the San Diego Sheriff's Department as a
criminalist.  Specifically, I work in the firearms analysis
unit.

Q    What is a "criminalist"?

A    A "criminalist" is a scientist in a laboratory that
examines items of evidence in investigations.  And my
specific section, I investigate or examine firearms evidence
or firearms-related evidence.

Q    How long have you been in your position as a
criminalist at your current agency?

A    With the San Diego Sheriff's Department, I've been with
them since 2012.

Q    And you said you're currently assigned to the -- is it
the firearms unit?

A    Yes.  That's correct.

Q    Tell us a little bit about your assignment -- your
assignments within that unit.

03:18:10   1   A      So as part of the firearms analysis unit, I examine

2   firearms, ammunition, fire cartridge cases and fire bullets

3   in comparisons between evidence items, and test fires --

4          *(Court Reporter requests clarification for the*

03:18:38   5          *record.)*

6                THE WITNESS:  I'm sorry?

7                THE COURT:  The last part we got was "comparisons

8   between evidence items" and --

9                THE WITNESS:  Oh!  And test fires from evidence

03:18:41  10   guns.

11                I'll slow down.  Sorry.

12                I also perform operability on question firearms to

13   determine if the firearm is operable or not.

14                I also perform serial number restoration, and I

03:18:59  15   also do distance determination with shot pattern or gunshot

16   residue patterns.

17   BY MR. SCALLY:

18   Q      Tell us a little bit more about what you do in that

19   last area:  Gunshot residue patterns?

03:19:14  20   A      "Gunshot residue pattern" is created on an item when it

21   is -- when it comes in contact with gunshot residue.  So as

22   a result from being at a close enough distance that when the

23   gun is fired the burnt and unburnt powder and other

24   materials are expelled from the gun and they are deposited

03:19:39  25   onto the target surface.  When that occurs, a pattern is

*Deborah D. Parker, U.S. Court Reporter*

03:19:44   1    created and it's generally a pattern of powder that's been

       2    expelled from the gun and deposited on the target.  So I

       3    measure the characteristics of that pattern.

       4          In order to determine possible distance from the

03:20:03   5    target that the gun was fired, I make test fires at known

       6    distances, and I compare the test fire patterns to the

       7    evidence pattern to see if I can determine a possible range.

       8    Q    Let me move on with your background as well.

       9          Where did you work previous -- I'm sorry.  When

03:20:24 10    did you say you started with the San Diego County Sheriff's

     11    Department lab?

     12    A    I started in San Diego in 2012.

     13    Q    And where did you work previous to the San Diego County

     14    Sheriff's Department, Regional Crime Lab?

03:20:43 15    A    Previously, I worked with the Arizona Department of

     16    Public Safety in Phoenix and Tucson.  And I also worked for

     17    the California Department of Justice in the Bay Area at the

     18    Richmond DNA laboratory.

     19    Q    And your time at the Arizona Department of Public

03:21:00 20    Safety, was that also with a crime lab?

     21    A    Yes.  That's correct.  I was in the forensic biology

     22    unit.  I was doing DNA analysis.

     23    Q    And were you also a criminalist at that time?

     24    A    Yes, I was.

03:21:18 25    Q    And I'm sorry.  Where did you say you worked prior to

03:21:20  1    that?

2    A    I worked for the California Department of Justice in

3    the Bay Area.  I worked for the DNA laboratory there.

4    Q    And were you a criminalist in that position as well?

03:21:33  5    A    Yes.

6    Q    What is your educational background after high school?

7    A    I earned a bachelor's of science in biochemistry and

8    molecular biology from the University of Arizona.

9    Q    And did you attend any training to become a

03:21:52 10    criminalist?

11    A    Not to become a criminalist.  But after I obtained the

12    position, I acquired on-the-job training through formal

13    training programs at the different agencies that I was

14    employed at.

03:22:08 15    Q    And so tell us about that training.

16    A    The training is specific to the field that I am

17    assigned to.  So, for example, in firearms at the firearms

18    analysis unit, I went through a formal training program at

19    the San Diego Sheriff's Department.  It included practical

03:22:29 20    exercises, competency testing.  For example, that is looking

21    at knowns and unknowns.  And knowns are items that my

22    trainer has developed for me in order to test my abilities

23    in the field.

24            I also did literature reading.  I attended

03:22:52 25    lectures, and I performed -- excuse me, I completed

03:22:58  1   competency testing.  As an ongoing testing measure, I

2   participate in proficiency testing every year.

3   Q     Are you familiar with the term "qualified firearms

4   analyst"?

03:23:11  5   A     Yes.

6   Q     What does that mean?

7   A     "Qualified firearms analyst" has gone through the

8   training programs at either the agency that they're employed

9   at or with a different third-party agency, and they have

03:23:26 10   been signed off as being able to -- as being a qualified

11   examiner in the field of firearms, forensic firearms

12   analysis.

13   Q     Are you a qualified firearms analyst?

14   A     Yes.

03:23:39 15   Q     And how long have you been a qualified firearms

16   analyst?

17   A     I was qualified in 2000 -- well, let me see if I can

18   recall.  I don't recall the exact date that I was qualified.

19   I believe it was 2018.  And I started with the firearms

03:24:00 20   analysis unit in 2015 and started my training at that point.

21   Q     Are you a member of any professional groups concerning

22   the forensic analysis of firearms and crime scenes?

23   A     Yes, I am.  I am a part of the California Association

24   of Criminalists.  I am also a member of the Association for

03:24:21 25   Firearms and Toolmark Examiners.

```
03:24:26   1    Q    And have you testified in a court of law as a forensic
           2    firearms expert, previously?
           3    A    Yes, I have.  As a firearms analyst, I've testified
           4    approximately four times.  And over my career, I've
03:24:43   5    testified approximately 25 times.
           6    Q    And so some of those other times were in connection
           7    with your work doing DNA analysis?
           8    A    Yes.  As part of my work as a DNA analyst.  And, also,
           9    I was on the crime scene investigation rotation, so some
03:25:04  10    cases were related to that work as well.
          11    Q    Have you ever been offered as an expert in the field of
          12    forensic analysis of firearms and had your qualifications
          13    rejected by the Court?
          14    A    No, they have not.
03:25:21  15         MR. SCALLY:  Your Honor, at this time I would move
          16    to qualify as Mr. Lu as an expert in the field of forensic
          17    firearms analysis.
          18         THE COURT:  You may proceed with your analysis.
          19         MR. SCALLY:  I don't know if the Court would be
03:25:32  20    amenable to reinstructing the jury on --
          21         THE COURT:  As long as there's a stipulation.  But
          22    once again, let me remind counsel, I'm not going to get into
          23    a habit, pattern of instructing piecemeal throughout these
          24    proceedings.  So I'm going to order a meet and confer with
03:25:46  25    you and Mr. Wilke quietly at this moment, but I'm not going
```

*Deborah D. Parker, U.S. Court Reporter*

03:25:49  1    to be honoring these requests unless there's a stipulation.

2         MR. WILKE:  There's a stipulation, Your Honor, to

3    this instruction.

4         THE COURT:  Stipulate?

03:25:54  5    MR. WILKE:  Yes.

6         THE COURT:  All right.  As long as there's a

7    stipulation, Counsel.

8         *(Pause)*

9         THE COURT:  *(Reading)*

03:26:31 10        "Ladies and gentlemen, you're about to

11            once again hear testimony from a witness

12            who will testify to opinions and the

13            reasons for either his or her opinion.

14            This opinion testimony is allowed

03:26:43 15            because of the experiences of this

16            witness.  Such opinion testimony should

17            be judged like any other testimony.  You

18            may accept it or reject it and give it

19            as much weight as you think it deserves

03:26:57 20            considering the witness' experience, the

21            reasons given for the opinion and all

22            the other evidence in the case."

23        Counsel, please proceed.

24        MR. SCALLY:  Thank you, Your Honor.

25    ////

*Deborah D. Parker, U.S. Court Reporter*

DIRECT EXAMINATION

BY MR. SCALLY:

Q    Mr. Lu, you talked about -- let me ask you:  Have you had training specifically focused on being able to identify the kind of firearm that a fired bullet came from?

A    Yes.  I have had training in determining the characteristics of fired bullets and using a database of those characteristics to determine possible sources of that bullet.

Q    Tell us -- what does "characteristics" mean?

A    "Characteristics" are features of the bullet that has been fired through a gun that I examine.  There are two major classes of features or characteristics that I look at:  The first class is called "class characteristics."  And the second is called "individual characteristics."

     Class characteristics are characteristics that have been designed into the firearm by the manufacturer, and they are -- they are broad characteristics.  So, for example, caliber or the width of the bullet that it's chambered into the gun is a class characteristic.  The number of lands and groves from the barrel of the firearm is also a class characteristic and, also, the width of these lands and groves is a class characteristic.  So those are things that I can measure and determine, broadly, a type of firearm or which firearm it came from.

03:28:48  1          Individual characteristics are individual to the

2     firearm that fired that bullet.  So when a gun is

3     manufactured, it is a very aggressive process.  There is

4     hard metal machining hard metal.  And so very many

03:29:07  5     imperfections in the surface of the metal are left,

6     for example, on the surface of the barrel.

7          So when the bullet, which is made of soft metal,

8     passes through the barrel, it gets scratched or it comes

9     into contact with that hard metal of the barrel.  And those

03:29:27 10     individual characteristics, those imperfections are left on

11     the bullet.

12          So I'm able to microscopically compare those

13     individual characteristics on the evidence with test fires

14     from the evidence gun and determine if the evidence bullets

03:29:43 15     were fired by the same firearm.

16     Q    You've used the term "test fire."  What does that mean?

17     A    A "test fire" is to actually test fire the gun in

18     question.  I use reference ammunition from the laboratory in

19     order to make those test fires.

03:30:07 20     Q    Now, you also in discussing class characteristics

21     referred to "lands and groves."

22     A    Yes.

23     Q    Did you bring a demonstrative exhibit with you today

24     that would assist you in explaining what those are to the

03:30:22 25     jury?

03:30:22  1   A    Yes, I did.

2          MR. SCALLY:  And, Your Honor, I believe there's no

3   objection from the defense concerning the use of the

4   demonstrative exhibit.

03:30:31  5          MR. WILKE:  That's correct, Your Honor.  No

6   objection.

7          THE COURT:  Is it going to be marked and received

8   into evidence or only a demonstrative for the purposes of

9   this witness' testimony?

03:30:40 10          MR. SCALLY:  The latter, Your Honor.

11          THE COURT:  All right.  Thank you.

12   BY MR. SCALLY:

13   Q    Mr. Lu, if you could remove the demonstrative exhibit.

14   A    Okay.

03:31:06 15   Q    And if you could utilize that, it may make sense -- if

16   you can move those bags to your left.

17   A    Sure.

18   Q    Maybe just put those on the shelf to your right.

19   A    *(Witness so complies.)*

03:31:27 20   Q    Thank you, Mr. Lu.

21          And if you can use the demonstrative exhibit to

22   explain to the jury what it is you're referring to with

23   "class characteristics" and specifically "lands and groves"?

24   A    Sure.  I can explain with this aid here.  So this is a

03:31:46 25   plastic model of a portion of the bullet.  If you can see

03:31:50  1  it, there are -- there's rifling machined into the barrel.

2  These lands and groves have a twist to them, either right or

3  left, depending on the manufacturer's design.  So when the

4  bullet -- I'll use this as an example bullet.  When the

03:32:13  5  bullet is fired through the barrel, it comes into contact

6  with these lands and groves.  And as it contacts these lands

7  and groves, the lands and groves in part spin to the bullet.

8  So when it leaves the barrel, the bullet is actually

9  spinning.

03:32:32  10      Now, what this does is it gives the bullet

11  stability in-flight and accuracy to the target.  So it's

12  sort of like a football.  When you throw a football, you're

13  throwing it with a spin.  The theory is the same.  It -- the

14  spin gives the football stability in-flight and also longer

03:32:53  15  distance and accuracy.  So that's what these lands and

16  groves do.

17      And these machined lands and groves are the --

18  these impart the individual characteristics onto the fired

19  bullet that I can examine microscopically and compare

03:33:14  20  evidence to test fires that I make in the laboratory and see

21  if this bullet went through the same barrel as the test

22  fires.

23  Q   Are you sometimes in a situation where in a case you

24  might be examining a bullet alone, not in reference to "test

03:33:32  25  fires" as you say?

03:33:36  1    A     Yes, I do.

       2    Q     And what is your typical protocol or process in

       3    examining a bullet from a fired weapon?

       4    A     In the process of that is to document the bullet and

03:33:52  5    its condition, what damage has been done to it, whether I

       6    see any trace material on it.  And then I go into class

       7    characteristics.  I look at the weight of the bullet.  I

       8    look at the number of lands and groves that have been

       9    impressed onto the bullet, and I also measure the width of

03:34:14  10   those lands and groves.  I also look at the direction of

       11   twist.

       12          So all these characteristics that I've measured

       13   have been designed by the manufacturer into the firearm and

       14   they're specific to that manufacturer.

03:34:30  15   Q     And is that helpful in assisting you to determine

       16   whether a bullet came from a particular type of firearm?

       17   A     Yes.  It allows me to -- to determine possible sources

       18   of the fired bullet.

       19   Q     And what's your process for doing that?

03:34:49  20   A     We use a -- excuse me.  I use a database of general

       21   rifling characteristics which are those characteristics that

       22   I've measured.  And this database has a list of

       23   manufacturers and models, and they're correlating

       24   characteristics.  So I take the characteristics that I've

03:35:10  25   measured and enter that into the database and do a search

76

03:35:13  1    for those correlating characteristics and come up with a

2    list of manufacturers that design their firearms in such

3    manner.

4    Q     And who is that database maintained by, if you know?

03:35:26  5    A     That database is maintained by the Federal Bureau of

6    Investigation.

7    Q     Is it generally relied upon in your field?

8    A     Yes.

9    Q     Did you receive a bullet to examine in this case?

03:35:39 10    A     I did, yes.

11    Q     And I'll just ask if -- I think you just put some paper

12    bags back on the shelf behind you.  If you can find the

13    smaller of the two paper bags, which I believe is

14    Exhibit 20 --

03:35:55 15    A     Okay.

16    Q     -- already in evidence.

17          Mr. Lu, do you recognize that?

18    A     Yes.

19    Q     If you need to open it up -- go ahead and put the

03:36:14 20    gloves on.

21    A     Okay.  Yes, I do recognize it.

22    Q     And what do you recognize that to be?

23    A     I recognize it as the bullet that I received for

24    examination in this case.

03:37:01 25    Q     Okay.  And is it substantially the same condition as

03:37:05   1    when you examined it?

2    A    Yes.

3    Q    Okay.  Now, in front of you, sitting on the table in

4    front of you, should be some documentary exhibits.

03:37:17   5         Can you, please, take a look at Exhibit 21?  It

6    should be the -- on the top of the pile there.

7    A    Yes, I see it.

8    Q    And do you recognize that?

9    A    Yes.  It is a photocopy of a page of my examination

03:37:38  10    notes.

11    Q    And what does it depict?

12    A    It depicts that item -- the bullet that I examined.

13    Q    Does it fairly and accurately depict the bullet you

14    examined?

03:37:49  15    A    Yes, it is.

16         MR. SCALLY:  Your Honor, at this time I would move

17    to admit Exhibit 21 into evidence.

18         THE COURT:  Any objection?

19         MR. WILKE:  No objection, Your Honor.

03:37:55  20         THE COURT:  21 is received.  20 was previously

21    received.

22         MR. SCALLY:  21 was previously received?

23         *(Plaintiff's Exhibit 21 received in evidence.)*

24         THE COURT:  20 was previously received, I'm sorry.

03:38:05  25    And 21 is received.

*Deborah D. Parker, U.S. Court Reporter*

03:38:06  1          MR. SCALLY:  Thank you, Your Honor.

2          *(Plaintiff's Exhibit 21 received in evidence.)*

3          *(The document was published in open court.)*

4    BY MR. SCALLY:

03:38:13  5    Q    Mr. Lu, just showing you Exhibit 21 on the screen, is

6    that the bullet that you examined in this case?

7    A    Yes, it is.

8    Q    Okay.  And I want to show you what's already been

9    admitted into evidence as Exhibit 123 and ask if you are

03:38:38  10   able to recognize that?

11   A    I recognize it.  I did not receive the photo as part of

12   my examination, however.

13   Q    Okay.  But Exhibit 123, is it -- is that consistent in

14   appearance with the bullet that you examined?

03:38:55  15   A    Yes, it is consistent.

16   Q    And Exhibit 124 already in evidence, same question?

17   A    Yes, it appears to be the base of that bullet.

18   Q    Now, let's talk about your examination of that bullet.

19          Do you have a protocol to designate that with an

03:39:27  20   item number?

21   A    Yes, I do.

22   Q    And in this case, did you designate the bullet in

23   question with an item number?

24   A    Yes, I did.

03:39:38  25   Q    And what is that item number?

*Deborah D. Parker, U.S. Court Reporter*

03:39:40   1   A    I don't recall off the top of my head.  I would need to

2   refresh my recollection, if I may.

3   Q    Do you have your report with you?

4   A    I do, yes.

03:39:49   5        MR. SCALLY:  With the Court's permission, go ahead

6   and pull out your report.

7            THE COURT:  You may do so.

8            THE WITNESS:  Okay.

9        *(Pause)*

03:40:16  10        THE WITNESS:  Okay.  I've refreshed my

11   recollection.

12   BY MR. SCALLY:

13   Q    Okay.  Just to be clear, are you referring to your

14   report dated December 13th, 2019?

03:40:27  15   A    Let me check.

16        *(Pause)*

17            THE WITNESS:  Yes, that's correct.

18   BY MR. SCALLY:

19   Q    So did you designate the bullet with an item number?

03:40:37  20   A    I did.

21   Q    What item number was that?

22   A    It was designated as Item 1.2.

23   Q    And what is Item 1.2?  What is the bullet you examined

24   in this case?

03:40:48  25   A    So as a result of my examination, I determined that

*Deborah D. Parker, U.S. Court Reporter*

03:40:51  1   Item 1.2 was a semi-copper jacketed hollow point bullet, and

2   it is consistent in design, size and weight with bullets

3   that are used in .38 caliber and .357 Magnum ammunition.

4   Q    And were you able to determine if the bullet had been

03:41:18  5   fired?

6   A    Yes.  It was a fired bullet.

7   Q    And how did you make the determination that it was

8   consistent in its features with .38 caliber and .357

9   ammunition?

03:41:34  10   A    The caliber is consistent with .38 Special and

11   .357 Magnum.  Also, the weight of the bullet classified it,

12   also, as a .38 Special or .357.

13   Q    Does that conclusion mean, specifically, that the

14   firearm that fired this bullet was a revolver or a

03:42:02  15   semiautomatic?

16   A    No, it does not.

17   Q    That's not a determination you're able to make, based

18   on the presentation of this bullet?

19   A    Based on solely the weight and the other

03:42:14  20   characteristics, no, I cannot make that determination.

21   Q    I'm going to direct your attention to some additional

22   exhibits in front of you, the documents there.  Did you

23   receive some photographs to examine in this case?

24   A    Yes, I did.

03:42:33  25   Q    If you could take a look at Exhibit 218 in front of

03:42:38  1    you.  Let us know.

2              Do you recognize that?

3    A    Yes, I recognize it.

4    Q    And is that a photograph that was provided to you by

03:42:49  5    agents in this case for your analysis?

6    A    Yes, it is.

7    Q    And did you make any -- any conclusion about the gun

8    depicted there?

9    A    In terms of the gun that's depicted on the photograph,

03:43:09 10    it showed me that the description of this photograph is

11    correlated to this photograph.  The gun that's depicted in

12    the photograph is chambered for .38 Special ammunition.

13    Q    So is that consistent with the bullet recovered in this

14    case?

03:43:28 15    A    Yes.  That caliber is consistent with the caliber that

16    was of the bullet that was examined.

17              MR. SCALLY:  Your Honor, at this time I would move

18    to admit Exhibit 218 into evidence.

19              THE COURT:  Any objection?

03:43:42 20              MR. WILKE:  May I have a moment, Your Honor?

21         (Pause)

22              MR. WILKE:  Your Honor, the parties are in

23    agreement it can be conditionally admitted at this time,

24    subject to a later motion --

03:45:00 25              THE COURT:  Conditional receipt then by the Court,

*Deborah D. Parker, U.S. Court Reporter*

03:45:02   1   subject to later objection.

2               You may proceed.

3               MR. SCALLY:  Thank you, Your Honor.

4          (Plaintiff's Exhibit 218 received in evidence.)

03:45:08   5   BY MR. SCALLY:

6   Q    So, Mr. Lu, showing you Exhibit 218 on the screen, is

7   that one of the photos you examined?

8   A    Yes, it is.

9   Q    And is that the one that you just testified about that

03:45:30  10   the gun depicted here as described in the writing is

11   consistent with the bullet recovered in this case?

12   A    That's correct.  Yes.

13   Q    And I'll ask you some similar questions about the next

14   two exhibits.

03:45:51  15               If you can take a look at Exhibit 219 in the

16   documents in front of you.  Is that another photograph that

17   you received from the agents in this case to examine?

18   A    Yes.

19               MR. SCALLY:  And, Your Honor, I'd move to admit

03:46:06  20   Exhibit 219.

21               THE COURT:  Same, conditionally, Counsel?

22               MR. WILKE:  Yes, Your Honor.

23               THE COURT:  Conditional receipt then, subject to

24   further objection.

03:46:15  25          (Plaintiff's Exhibit 219 received in evidence.)

*Deborah D. Parker, U.S. Court Reporter*

03:46:15   1          *(The document was published in open court.)*

2    BY MR. SCALLY:

3    Q    And, Mr. Lu, showing you Exhibit 219 on the screen, did

4    you -- did you make any conclusions about the firearm

03:46:28   5    depicted there?

6    A    Yes, I did.

7    Q    What was that conclusion?

8    A    My conclusion was that the caliber of the firearm

9    that's depicted in the photograph, assuming that the

03:46:38   10   description correlates to that photograph, is consistent

11   with the caliber of the bullet that I examined.

12          Although I don't see the caliber specifically

13   explicitly designated here on the description, I checked

14   with the manufacturer to determine that their 642

03:46:59   15   Airweight --

16          *(Court Reporter requests clarification for the*

17          *record.)*

18          THE WITNESS:  642 Airweight double-action revolver

19   is specifically chambered in .38 Special.

03:47:15   20   BY MR. SCALLY:

21   Q    And, again, is that consistent with the bullet

22   recovered in this case?

23   A    Yes, that's correct.

24   Q    And let me ask you a similar question about

03:47:27   25   Exhibit 222.

84

```
03:47:30    1              THE COURT:  And once again, Counsel, subject to
            2    conditional receipt?
            3              MR. WILKE:  Yes, Your Honor.
            4              THE COURT:  All right.
03:47:38    5              MR. SCALLY:  Thank you, Your Honor.
            6         (Plaintiff's Exhibit 222 received in evidence.)
            7         (The document was published in open court.)
            8              MR. SCALLY:  And Exhibit 222, up on the screen --
            9    BY MR. SCALLY:
03:48:01   10    Q    Mr. Lu, is this another photograph from the agents for
           11    examination in this case?
           12    A    Yes, it is.
           13    Q    And did you draw any conclusions about the firearms
           14    depicted in -- in this exhibit?
03:48:14   15    A    Yes.  For the photographs of the firearms that have a
           16    description attached to it, with a specific caliber of
           17    .38 Special, the firearms depicted in those photographs have
           18    the caliber that are consistent -- that have the caliber
           19    that is consistent with the bullet that I examined.
03:48:38   20    Q    Okay.  Thank you, Mr. Lu.
           21              Did you also examine an orange jacket in this
           22    case?
           23    A    Yes, I did.
           24    Q    And if I can direct your attention to the larger of the
03:48:53   25    two bags that are either on the shelf or on the -- I believe
```

03:48:59  1  are on the shelf, at this point.  And if you could with the

2  gloves pull out the item inside Exhibit 100 already in

3  evidence.

4  A    (Witness so complies.)

03:49:35  5  Q    Do you recognize Exhibit 100 in evidence, Mr. Lu?

6  A    Yes.  Yes, I do.

7  Q    And is that the jacket you examined in this case?

8  A    Yes, it is the jacket that I examined.

9  Q    And tell us what your process is for examining an item

03:49:54  10  such as this.

11  A    This item I examined for the presence of gunshot

12  residue, or GSR and also determined whether the defects or

13  the damage that I observed on the jacket were consistent

14  with being firearm-related damage.

03:50:13  15       So in order to do that, I laid it out on the

16  bench, and I took photographs -- overall photographs and

17  closeup photographs of the damage that I observed on the

18  jacket.

19       Then I documented the size and the characteristics

03:50:33  20  of these defects, and I determined whether they were firearm

21  related or not.  And then after that point, I completed my

22  examination and I sealed it back up and returned it to our

23  property evidence unit.

24  Q    Okay.  And you've talked about "gunshot residue."  Can

03:50:55  25  you tell us the types of gunshot residue that exist?

*Deborah D. Parker, U.S. Court Reporter*

03:51:00   1    A    Yes.  Gunshot residue consists of many different

2    materials.  Mainly, these materials are result of a firearm

3    being fired.  So there -- in gunshot residue there is burnt

4    and unburnt powder.  There is also sooting that occurs from

03:51:23   5    the burnt powder depositing on a target.  It's -- it looks

6    similar to black charring and a black burn mark that is

7    considered to be sooting.

8         If unburnt powder strikes a surface and it leaves

9    an indent, that is known as stippling.  If the unburnt

03:51:48  10    powder deposits on the surface and it embeds itself into

11    that target surface, I would be able to observe a black

12    piece of material on the target surface.  That is known as

13    tattooing.

14    Q    Your analysis of stippling and soot and tattooing, can

03:52:13  15    that sometimes help you determine the distance that the

16    muzzle of the firearm was from the target at the time the

17    firearm was fired?

18    A    Yes.  That's correct.

19    Q    When stippling or soot or tattooing is dense, what does

03:52:32  20    that suggest?

21    A    Excuse me.  I'm sorry.  I missed that word.

22    Q    Well, maybe it wasn't a very good question.  When --

23         How do you make that determination?  How is that

24    distance determination done?

03:52:46  25    A    Sure.  So, in order to do that distance determination,

*Deborah D. Parker, U.S. Court Reporter*

03:52:51  1    I look at the pattern -- the powder pattern that has been

2    deposited on the target surface.  And the main

3    characteristic that I'm looking at is the size and

4    distribution of those powder particles.  When a firearm is

03:53:08  5    relatively close to a target, the powder hasn't really had a

6    chance to expand or spread out.  There's no distance in

7    order for it to do that.  So the closer that the firearm is

8    to a target, the smaller that pattern will be.  If the

9    firearm is further away from the target, there's more

03:53:30 10    distance for the powder to disperse and distribute itself so

11    that when it deposits on the target surface, the pattern is

12    overall larger.

13            So what I do is, I measure the pattern, how large

14    this is in its dimensions on the evidence item.  And then,

03:53:51 15    if I have -- if I have the question firearm and the question

16    ammunition, I do test fires at known distances from the

17    target surface.  And then I take those target surfaces, and

18    I measure the powder pattern deposition on those target

19    surfaces, and I compare that with the evidence to see how

03:54:14 20    large that powder is -- that powder pattern is.  And in

21    doing so, I can come up with a possible range from which the

22    firearm was when it fired onto the evidence.

23    Q    You mentioned in the course of your explanation a

24    firearm and ammunition to make comparison to; is that

03:54:39 25    correct?

03:54:39  1  A     Yes.  That's correct.

2  Q     And is that necessary for you to make a distance

3  determination?

4  A     Yes.  In order to do the distance determination with

03:54:52  5  accuracy, the -- I would need -- I would require the

6  original firearm in question and if possible the original

7  ammunition, simply because different firearms create

8  different -- they disperse powder in different ways.

9         So even among different types of ammunition, the

03:55:15  10  powder pattern will be different.  So in order to get a --

11  an accurate determination of a distance, I would need the

12  actual firearm and, if possible, the source ammunition.

13  Because there's so much variability between firearms and

14  even within -- even within ammunition, there's so much

03:55:37  15  variability.

16  Q     Did you do a distance determination in this case?

17  A     No, I did not.

18  Q     Why not?

19  A     I did not have the original firearm in question or any

03:55:50  20  of the source ammunition.

21  Q     If you do a distance determination, does it give you an

22  exact number of inches or feet that the muzzle was from the

23  target?

24  A     No.  I cannot determine an exact distance.  What I can

03:56:07  25  do, though, is determine a possible range in which the

*Deborah D. Parker, U.S. Court Reporter*

03:56:13   1   firearm was when it fired.

2   Q   So what, if anything, did your examination of the

3   jacket in this case reveal?

4   A   In my examination of the jacket, I determined that the

03:56:31   5   defects -- two of the defects that I observed on the

6   jacket -- on the back of the jacket were firearm related;

7   meaning, that a bullet passed through the jacket and created

8   the two defects.

9   There was also a cluster of defects that was

03:56:51   10   beside the other two defects.  And I could not make a

11   determination as to whether that was due to powder

12   deposition or not, simply because the material of the jacket

13   is so flexible.  It's not fixed.  And I don't know the

14   conditions under which the firearm was fired.  So I can't

03:57:12   15   take into account any physical obstructions, such as

16   clothing -- other clothing, movement or folding -- or folds

17   in the clothing, so I was not able to determine whether that

18   cluster of defects was, indeed, due to powder deposition.

19   Q   You've mentioned that the bullet in this case was a

03:57:43   20   hollow point bullet?

21   A   Yes, that's correct.

22   Q   What does that mean?

23   A   A "hollow point bullet" is a bullet that has a cavity

24   at the nose.  What this cavity does is, it allows the bullet

03:57:57   25   to expand or to mushroom open when it hits a target.

03:58:02  1    Q     Had the bullet in this case expanded?

       2    A     No, it did not.

       3              MR. SCALLY:  If I can have a brief moment,

       4    Your Honor?

03:58:19  5              THE COURT:  You may.

       6         *(Pause)*

       7    BY MR. SCALLY:

       8    Q    Mr. Lu, if the bullet in this case had been fired from

       9    a muzzle point blank, what would you expect to see?

03:58:48 10    A     If the -- so to explain "point blank," that means that

      11    the firearm was at either contact or very near contact to

      12    the surface when it fired.  If that was the case, I would

      13    expect to see a lot of damage -- a lot more damage than I

      14    observed on the jacket.

03:59:07 15              The defect would be due to the gases being

      16    expelled right next to the surface.  A lot of damage going

      17    through the jacket, so the hole would be much bigger.  I

      18    would also expect to see a lot more sooting or burn marks

      19    from the jacket.  I also would not expect to see any powder

03:59:33 20    deposition, because the powder has no chance to disperse.

      21    It goes straight through the defect, because it's so close.

      22    I would not expect to see any powder.

      23    Q     So in this case, based on your examination of the

      24    jacket, were you able to rule out a point-blank firing?

03:59:54 25    A     Yes.  In my opinion, this -- the damage I observed on

| | | |
|---|---|---|
| 04:00:00 | 1 | the jacket was not due to a point-blank firing. |
| | 2 | MR. SCALLY:  I have no questions, Your Honor. |
| | 3 | THE COURT:  Cross-examination, please. |
| | 4 | MR. WILKE:  Thank you, Your Honor. |
| 04:00:23 | 5 | CROSS-EXAMINATION |
| | 6 | BY MR. WILKE: |
| | 7 | Q    Good afternoon, Mr. Lu. |
| | 8 | A    Good afternoon. |
| | 9 | Q    I want to talk about this terminology -- |
| 04:00:37 | 10 | (Court Reporter requests clarification for the |
| | 11 | record.) |
| | 12 | BY MR. WILKE: |
| | 13 | Q    This term you used -- that Mr. Scally used, "point |
| | 14 | blank," if it was fired "point blank"? |
| 04:00:44 | 15 | A    Sure. |
| | 16 | Q    I want to make sure what that means.  "Point blank" |
| | 17 | means that the barrel of the gun is pointed directly at the |
| | 18 | surface, correct? |
| | 19 | A    Yes.  That's one scenario of "point blank." |
| 04:00:56 | 20 | Q    Or slightly off the surface, correct? |
| | 21 | A    Yes. |
| | 22 | Q    Okay.  If it's basically -- with contact of the |
| | 23 | surface, that's where you would expect to see no powder |
| | 24 | around it, because the powder goes straight through, |
| 04:01:11 | 25 | correct? |

*Deborah D. Parker, U.S. Court Reporter*

04:01:12  1              Was that your testimony?

2       A     That's correct.  Yes.

3       Q     And if it's slightly away from the surface but very

4       close, you would expect to see a minimal amount of powder

04:01:22  5       around the hole where the bullet enters, correct?

6       A     Possibly, yes.

7       Q     Okay.  Now that whole question assumes that the barrel

8       of the gun is perpendicular to the target, correct?

9       A     Yes.

04:01:40 10       Q     Okay.  But if the barrel of the gun is not

11       perpendicular to the target, that has nothing to do with

12       whether it's fired at point blank, correct?

13       A     You mean, if it was off like --

14       Q     Yes.  So if this is the target and the barrel of the

04:01:59 15       gun is fired fairly close but at an angle to the side, you

16       wouldn't consider that to be point blank, would you?

17       A     I'm not sure about the definition.  It's -- it's more

18       of a colloquial term.  I like to define my distances with

19       actual numbers, so it really depends on how you define

04:02:23 20       "point blank."

21       Q     It does, doesn't it?

22       A     Yeah.  Yes.

23       Q     For your testimony here in court, you're defining it as

24       the gun being perpendicular to the surface, correct?

04:02:33 25       A     Yes.  That's correct.

93

04:02:34   1    Q    And so when you say that you concluded that this shot
           2    was not fired at point blank, that's what you're saying;
           3    that the shot was not fired perpendicular to the surface,
           4    correct?

04:02:47   5    A    Yes.  That's correct.

           6    Q    Close in contact with the surface or at least very
           7    close contact?  That's what you're saying by that, correct?

           8    A    Correct.

           9    Q    Okay.  And it would only be in that situation where it
04:03:09  10    was fired at point blank, as you have defined it, that you
          11    would expect to see more damage to the surface of the jacket
          12    identified as Exhibit 100, is that correct, in response to
          13    Mr. Scally's question?

          14    A    Yes.  I would expect to see that the defect would have
04:03:29  15    more damage.  It would be larger than I observed on the
          16    jacket.  And also more sooting, because it was so much --
          17    that much closer to the muzzle of the firearm.

          18    Q    Okay.  All right.  Now, you also examined the --
          19    Exhibit 100, the orange jacket for gunshot residue, correct?

04:04:00  20    A    Yes.  That's correct.

          21    Q    Now, were you aware that the person wearing this
          22    jacket -- the deceased, Mr. Dao -- had been floating in the
          23    Pacific Ocean for approximately 36 hours, following after
          24    being shot?

04:04:19  25    A    I was made aware of that after my examination and

04:04:22   1   discussion with the case agent.

2   Q    Okay.

3   A    Yes.

4   Q    And the presence of the orange jacket in the saltwater

04:04:32   5   of the Pacific Ocean, would affect the gunshot residue,

6   correct?

7   A    It could possibly, yes.

8   Q    Now, additionally, you spoke in your direct examination

9   about two firearm-related defects to the orange jacket

04:04:54  10   identified as Exhibit 100, correct?

11   A    Yes.

12   Q    Okay.  One of those defects was pretty obvious,

13   correct?

14   A    Yes.  Two of them were.  The two in the back of the

04:05:06  15   jacket:  One was on the exterior.  One was on the interior.

16   And they lined up with each other.  So that's consistent

17   with a bullet passing through the two layers of material.

18   Q    Okay.  And that was, essentially, the -- we have that

19   exhibit.  Maybe I can put it up.

04:05:25  20          MR. WILKE:  Yeah, that's fine.  I'm going to put

21   it up on the ELMO.  It's already been admitted as

22   Exhibit 502.

23       *(The document was published in open court.)*

24   BY MR. WILKE:

04:05:41  25   Q    Do you recognize this as a closeup of a photo you --

*Deborah D. Parker, U.S. Court Reporter*

95

04:05:45  1  taken during your examination?

2  A    Yes.

3  Q    And the one of the defects here is on the far left,

4  correct?

04:05:54  5  A    Yes.

6  Q    And that appears to be where the bullet entered --

7  passed through the exterior of the jacket, correct?

8  A    Yes.  That's correct.

9  Q    And this other cluster of defects that you spoke of

04:06:08 10  would be these small -- they appear to be dots on the photo.

11  Is that what you're speaking of?

12       Here *(indicating)*.  Here *(indicating)*.  Here

13  *(indicating)*.  Here *(indicating)*.  Here *(indicating)*.  Here

14  *(indicating)*, extending this way from the bullet hole?

04:06:30 15  A    The picture up here is not entirely clear.

16  Q    Would you take a look at the jacket?

17       Would you pull it out for us and take a look at it

18  so we --

19  A    Sure.  *(Witness so complies.)*

04:07:07 20       Okay.  Yes.  So those points -- those defects --

21  those pointed defects that you pointed, they appear to

22  correlate with the defect that I observed.  Those pinpoint

23  defects on the jacket.

24  Q    They're also like little pinholes or something like

04:07:25 25  that, correct?

*Deborah D. Parker, U.S. Court Reporter*

96

04:07:26   1   A     Yes.   That's correct.

2   Q     And they extend -- this bullet hole is on the upper

3   left-hand side of the jacket, correct?

4   A     It's -- I observed it on the --

04:07:42   5   Q     Well, if you were wearing the jacket, it would be

6   consistent with the bullet entering the left side.   Maybe

7   left of center, correct?

8   A     Oh, yes.   That's correct.

9   Q     I guess if you're -- and these -- this cluster of

04:08:00   10   smaller pinpoint holes, the cluster of defects you noted,

11   they extend from the bullet hole over to the right side or

12   across the back, if you will, of the jacket, correct?

13   A     Yes, they do.

14   Q     In a pattern that is almost cone-shaped, correct?

04:08:22   15   A     I did not -- I did not determine the shape of the

16   pattern.   I just noted the cluster of defects.

17   Q     Okay.   You didn't notice this cluster of defects

18   anywhere else around this bullet hole, correct?

19   A     No.   It was not aligned with those defects.   It was off

04:08:42   20   to the right.

21   Q     Off to the right.   It didn't encircle the bullet hole,

22   if you will?

23   A     That's correct.

24   Q     Only went to the right?

04:08:51   25   A     That's correct.

04:08:54  1    Q    Now, can you look at the tag there on that jacket at
       2    the top?
       3    A    This tag?
       4    Q    No, the tag inside on the inside of the jacket.  At the
04:09:07  5    top collar.
       6              Do you see that?
       7    A    The size?
       8    Q    The jacket tag with the manufacturer and the material.
       9              Do you see that?
04:09:25 10    A    Yes.  It says: "Size Extra, Extra, Extra Large.  Made
      11    in China."  And I believe it's kind of worn away, but I
      12    believe it says "100 percent polyester."
      13    Q    And you know as a criminalist, polyester is a synthetic
      14    fabric, correct?
04:09:48 15    A    I'm not trained in materials or how they're made.  But
      16    just my general knowledge, I know that polyester is a
      17    synthetic material, yes.
      18    Q    And what happens to polyester when it comes into
      19    contact with something hot?
04:10:05 20              THE COURT:  We couldn't hear you, Counsel.
      21    BY MR. WILKE:
      22    Q    What happens to polyester when it comes into contact
      23    with something hot?
      24    A    From my general knowledge, it melts.
04:10:19 25    Q    These pinpoint holes in the cluster of defects that you

*Deborah D. Parker, U.S. Court Reporter*

04:10:24  1    observed, those are consistent with hot particles expended

2    from a firearm, correct?

3    A    I did not make that determination.

4    Q    Would you agree with me that when the particles are

04:10:40  5    expended from the firearm, they're hot?

6    A    Yes, they are hot.

7    Q    And would you agree with me that hot particles coming

8    into contact with a polyester surface will cause it to burn?

9    A    Yes, that's correct.

04:11:15  10        MR. WILKE:  May I have just a moment, Your Honor?

11         THE COURT:  Certainly.

12    (Pause)

13         MR. WILKE:  I have nothing further.

14         Thank you, Mr. Lu.

04:11:25  15         THE COURT:  Redirect examination, please.

16         MR. SCALLY:  Just one moment, Your Honor.

17         THE COURT:  Certainly.

18    (Pause)

19              REDIRECT EXAMINATION

04:12:28  20    BY MR. SCALLY:

21    Q    Mr. Lu, looking at Defense Exhibit 502, can you orient

22    us as to which way this would be on -- if worn by someone?

23    A    Yes.  The -- so the little pinpoint defects that are

24    observed on the center part of the photograph and extend to

04:12:56  25    the right of the photograph, that's on the back exterior

04:13:01   1    towards the right.  So if you wore the jacket, it would be
           2    near your midback and the pinpoint defects would extend
           3    toward your right shoulder.
           4            MR. SCALLY:  So, Your Honor, could I ask that the
04:13:27   5    microphone be made available to Mr. Lu so he can point that
           6    out?
           7            THE COURT:  Certainly.
           8        *(Pause)*
           9    BY MR. SCALLY:
04:13:42  10    Q    Can you -- if I could ask you, Mr. Lu, if you're
          11    comfortable, to stand and make that explanation with respect
          12    to the exhibit behind you.
          13    A    Oh, okay.  So these -- excuse me.  So these pinpoint
          14    defects at the center of the photograph that extend towards
04:14:08  15    the right -- for example, if you were wearing the jacket,
          16    you would be looking at your midback, and this would be
          17    going towards your right shoulder *(indicating)*.  And this
          18    main defect on the back exterior is right near to the
          19    midback just to the left of the center.
04:14:36  20    Q    And so we're actually -- in looking at the exhibit as
          21    it's oriented, we're looking at it properly oriented as
          22    though we're looking at the person's back?
          23    A    Yes.  That's correct.
          24    Q    And so is it the case that the deposits you're talking
04:14:54  25    about, the pinpoint holes, those are actually to the right

04:15:03  1   of the defect; is that correct?

2   A    Yes.

3   Q    And if I ask you to assume that the muzzle was not

4   perpendicular to the body but rather behind and pointing up,

04:15:20  5   what does that mean about where that deposit is in relation

6   to the defect?

7   A    So let me just make it clear, if I may.  So you're

8   asking if the firearm was pointed, like, from the bottom up,

9   like this *(indicating)*?

04:15:38  10  Q    And from the right to left?

11  A    And from right to left?

12  Q    Yes.

13  A    It really would depend on how far away from that defect

14  it would be.

04:15:55  15  Q    Well, let me ask you this:  Is the pinpoint -- the

16  pinpoint holes and the defects to the right, are those on

17  the way to the defect -- the main defect or after the main

18  defect, given that assumption?

19            MR. WILKE:  I'm going to object as vague,

04:16:19  20  Your Honor.

21            THE COURT:  Sustained.

22            Restate the question.

23  BY MR. SCALLY:

24  Q    Is the deposit that you've noted, is that before the

04:16:32  25  bullet hole or after?

04:16:35  1    A     Oh, okay.  I see.  So the defects that I noted here,

2    the pinpoint defects that I noted -- if the firearm was

3    pointed to the left, these defects would be before the main

4    bullet defect.

04:16:55  5    Q     And what conclusions -- and I'm sorry.

6              If you could have a seat, Mr. Lu.

7    A     Okay.

8    Q     What conclusions, if any, could you draw about the

9    distance based on what you just said?

04:17:18  10   A     I did not or could not draw any conclusions regarding

11   the distance determination for this evidence item.

12   Q     And whether the bullet is -- excuse me, whether the

13   deposit that you noted is to the right or to the left of the

14   bullet hole doesn't affect your determination, or -- doesn't

04:17:43  15   assist you in making a distance determination?

16   A     No, it does not.  Simply because I did not determine

17   whether those pinpoint defects were, in fact, a result of

18   powder deposition or not.

19              MR. SCALLY:  If I could have a brief moment,

04:18:00  20   Your Honor?

21              THE COURT:  You may.

22        (Pause)

23   BY MR. SCALLY:

24   Q     Let me ask you, Mr. Lu, if -- and I won't use the word

04:18:50  25   "point blank," since it sounds like that's -- there's a --

04:18:52 1      You'd rather talk in actual distances; is that

2  right?

3  A    Yes.  That would be my preference.

4  Q    So if the firearm were right up against the bullet hole

04:19:06 5  or the main defect in the jacket, would you expect to see

6  this -- this pattern?

7  A    If assuming those pinpoint defects are created by

8  pattern deposition, I would not expect to see that pattern

9  if the firearm was in contact with the material.

04:19:35 10  Q    Why not?

11  A    Simply because there's no space for the powder to

12  deposit.  All the powder, as I mentioned previously, would

13  go through the defect.

14  Q    And does that hold true even if it's at an angle?

04:19:56 15  A    Possibly, there's -- if it's at an angle, there is some

16  space for powder to escape, so I might expect to see some

17  powder deposition on the exit side.

18  Q    When you say "the exit side," what do you mean?

19  A    Excuse me.  Towards the -- on the opposite side of the

04:20:15 20  defect.  So, for example, if the firearm was aimed to the

21  left of this picture, I would expect to see some powder

22  deposition if it was at an angle to the left of that main

23  defect.  Not to the right.

24  Q    And in this case, the powder deposition that you've

04:20:32 25  noted is to the right; is that correct?

*Deborah D. Parker, U.S. Court Reporter*

04:20:34    1    A    If assuming that those defects are a result of powder

            2    deposition, that's correct.

            3                MR. SCALLY:  Nothing further, Your Honor.

            4                Thank you.

04:20:42    5                THE COURT:  Recross-examination?

            6                MR. WILKE:  Yes, Your Honor.

            7                       RECROSS-EXAMINATION

            8    BY MR. WILKE:

            9    Q    Mr. Lu, your expectation that you would see a powder

04:20:56   10    defect to the left of the bullet holes assumes that the gun

           11    is in contact with the target with a slight -- with a slight

           12    variation at an angle allowing for powder to escape the

           13    barrel?

           14    A    Yes.

04:21:10   15    Q    So that's what we're talking about here.  We're talking

           16    about something in contact or very close contact with the

           17    target where you would then expect to see powder to the left

           18    of the bullet hole, because it escapes from the part of the

           19    barrel that's actually exposed and not up against the

04:21:31   20    target.  Is that fair?

           21    A    That's correct.  Yes.

           22    Q    That doesn't mean -- and, in fact, in this case, sir,

           23    were you provided with the coroner's report?

           24    A    No, I was not.

04:21:52   25    Q    Okay.  So your opinions do not take into account the

04:21:57   1    findings of the medical examiner, Dr. Paunovic, correct?

           2    A     No.  These are possible scenarios that we're

           3    discussing.  I did not make any conclusions in terms of

           4    distance determination or anything related to that in this

04:22:15   5    case.

           6    Q     Okay.  But we're not asking for a conclusion about

           7    distance determination, because you've already testified

           8    that you're unable to do that without the firearm or the

           9    ammunition to test fire, correct?

04:22:27  10    A     Yes.  That's right.

          11    Q     Because in your field as a firearms examiner, to make a

          12    distance determination, you want to be precise, and you need

          13    those items in order to make a precise distance --

          14          (Court Reporter requests clarification for the

04:22:45  15          record.)

          16    BY MR. WILKE:

          17    Q     You need both the firearm and the type of ammo in order

          18    to make a precise distance determination, correct?

          19    A     Yes.  That's correct.

04:22:53  20    Q     Okay.  But as a firearms examiner --

          21          THE COURT:  Mr. Wilke, could you move closer to

          22    the microphone so we can hear?

          23          MR. WILKE:  Yes.

          24    BY MR. WILKE:

04:22:59  25    Q     As a firearms examiner, making a distance determination

04:23:03   1   isn't the only thing you do, right?

2   A    That's correct.

3   Q    You can tell and explain how firearms operate and how

4   they expel powder, both burnt and unburnt, correct?

04:23:16   5   A    Yes.

6   Q    As you have here in court, correct?  You've explained

7   that to us today?

8   A    I'm sorry.  Can you rephrase the question?  I missed

9   the last part of that.

04:23:27  10   Q    I mean, you've educated all of us here in court about

11   firearms, what happens when they're fired, residue, powder

12   that's expelled, both burnt and unburnt, right?

13        That's your expertise as a firearms examiner,

14   correct?

04:23:44  15   A    Yes.

16   Q    As a criminalist, okay.

17        So the fact that that you cannot make a precise

18   distance determination says nothing about what else you can

19   tell us about this evidence, correct?  We [sic] have other

04:24:00  20   things you can tell us, correct?

21   A    I did not determine whether those pinpoint defects are,

22   in fact, a result of powder deposition.

23   Q    Did anybody ask you to?

24   A    Yes.  I was asked to determine whether the -- there was

04:24:16  25   any gunshot powder residue, or -- excuse me,

*Deborah D. Parker, U.S. Court Reporter*

04:24:21  1    firearms-related damage on the jacket.

       2    Q    And in the firearms-related jacket, you noted the

       3    bullet hole here on the far left, correct?

       4    A    Yes.

04:24:33  5    Q    The bullet hole, that was firearms-related damages you

       6    testified to, correct?

       7    A    Yes.

       8    Q    And you noted the cluster of defects that you testified

       9    to extending to the right, correct?

04:24:43 10    A    Yes.  But I did not determine whether that was a result

      11    of powder deposition or not.

      12    Q    But you did determine it was firearm-related defect,

      13    extending from -- to the right of the bullet hole, correct?

      14    A    I did not make that determination, no.

04:24:56 15    Q    That was your testimony earlier.  That was one --

      16         *(Court Reporter requests clarification for the*

      17         *record.)*

      18    BY MR. WILKE:

      19    Q    You previously testified that was one of the two

04:25:04 20    firearms defects that you noted in this jacket?

      21    A    No.  The two defects that I noted that were firearms

      22    related was the main defect on the exterior and the defect

      23    to the interior of the jacket.

      24    Q    I'm sorry.  I misunderstood you.

04:25:32 25    A    Okay.

*Deborah D. Parker, U.S. Court Reporter*

04:25:32  1   Q    And you did not review Dr. Paunovic's report, correct?

       2   A    I'm sorry.  Who?

       3        THE COURT:  Counsel, would you move closer to the

       4   microphone?

04:25:40  5   BY MR. WILKE:

       6   Q    You did not review Dr. Paunovic's report, correct?

       7        MR. SCALLY:  Object.  Asked and answered.

       8        THE COURT:  Overruled.

       9        You can answer the question, sir.

04:25:48 10        THE WITNESS:  No, I did not.

      11   BY MR. WILKE:

      12   Q    If you knew that the bullet traveled from approximately

      13   just left of center and lodged in the right shoulder at a

      14   fairly low -- low depth such that it could be felt through

04:26:07 15   the skin, would that affect your opinion --

      16   A    No.

      17   Q    -- as to where the gun was fired?

      18   A    No, it does not.  I do not take the coroner's report

      19   into my analysis.  I only look at the evidence and determine

04:26:24 20   what I can determine in terms of the firearms evidence.

      21   Q    You don't consider it -- the firearms evidence in

      22   conjunction with the trajectory of the bullet?

      23   A    No, I did not -- I did not make that determination.

      24   Q    Is that something you do as a firearms examiner,

04:26:39 25   though, is to take into account the trajectory of the bullet

*Deborah D. Parker, U.S. Court Reporter*

04:26:43  1    in rendering your opinions about the firearms evidence?

       2    A     Yes, but I did not do that in this case.

       3    Q     And were you asked to do that in this case?

       4    A     No.

04:26:51  5    Q     And if you knew that the bullet had, in fact, traveled

       6    from approximately just left of mid-center to the right

       7    shoulder at a slightly upward trajectory and a very low

       8    depth, would that affect your opinion as to whether this

       9    cluster of defects we've been talking about is a

04:27:14  10   firearm-related defect?

       11   A     No, it does not.

       12   Q     As you sit here today, you cannot -- you have no

       13   opinion as to whether these pinpoint holes in the synthetic

       14   pattern that appears to be burns caused by small particles

04:27:32  15   are related to a firing of a gun?

       16   A     No, I cannot, because -- in order to do so, I would

       17   need to take into account a number of variables that I can't

       18   take into account at the laboratory.  For example, folds in

       19   the clothing when the fire was -- when the shot was fired,

04:27:51  20   any physical obstructions, other clothing.  Water -- you

       21   mentioned that the body was in the water, so I can't take

       22   those variables into account.  All those variables affect

       23   the way powder is deposited onto a surface and what type of

       24   pattern it creates, so I was not able to make that

04:28:11  25   determination.

*Deborah D. Parker, U.S. Court Reporter*

04:28:11  1    Q    You would agree with me that these pinpoint --

2              THE COURT:  Counsel, please, closer to the

3    microphone so we can hear you.

4    BY MR. WILKE:

04:28:16  5    Q    You would agree with me that these pinpoint holes and

6    these clusters of defects to the right of the bullet hole

7    are consistent with hot powdered material as is expelled

8    from a firearm?

9              Would you agree with that?

04:28:28 10    A    I did not make that determination, no.

11    Q    Are you saying it's inconsistent?

12    A    I'm sorry?

13    Q    Are you saying it's not consistent?

14    A    No, it's a possibility, but I did not make that

04:28:39 15    possibility a definition.

16    Q    But you're an expert here testifying here in court

17    under oath before this jury.

18              THE COURT:  Counsel, would you move closer to the

19    microphone.

04:28:48 20    BY MR. WILKE:

21    Q    You don't notice these same type of defects anywhere on

22    this jacket?  You examined it thoroughly, correct?

23    A    Yes.

24    Q    And your testimony here today is you don't know whether

04:29:05 25    it is consistent with the firearm being fired, consistent

04:29:10  1   with the trajectory of the bullet as determined by the

2   medical examiner?

3           MR. SCALLY:  Objection.  Vague.  Asked and

4   answered.

04:29:17  5           THE COURT:  It's been asked and answered, but I'll

6   allow the answer one more time.

7           THE WITNESS:  No, that's correct.  As I mentioned,

8   the variables that have to be taken into account to

9   determine whether those defects are, in fact, a result of

04:29:31  10  powder deposition, I can't take into account at the

11  laboratory, because I don't know those conditions.  And I

12  don't know how powder -- how the powder reacts or acts when

13  it comes into contact with another substance such as water.

14  BY MR. WILKE:

04:29:49  15  Q    Water puts out burning material.  Fair to say?

16  A    Yes.  It makes it cooler, right.

17          THE COURT:  Counsel, closer to the microphone,

18  please.

19  BY MR. WILKE:

04:29:57  20  Q    You could -- you had the capacity in the lab to

21  determine how hot particular powder might affect the orange

22  jacket, correct?

23          You could you have taken a sample of the orange

24  jacket and determined that, correct?

04:30:10  25  A    Yes, we can.

*Deborah D. Parker, U.S. Court Reporter*

04:30:12   1   Q    Okay.  Sir, are you going to keep denying that these

2   particulate -- these cluster of defects which are small

3   pinpoint holes in a synthetic material, are you going to

4   deny that that is consistent with expelled powder residue

04:30:26   5   from a gun?

6                   MR. SCALLY:  Objection.

7                   THE WITNESS:  I didn't deny it.  It is a

8   possibility.

9                   MR. WILKE:  No further questions, Your Honor.

04:30:31  10                   THE COURT:  Okay.  May the witness be excused,

11   Counsel, or would you like him left on call?

12                   MR. SCALLY:  He can be excused, Your Honor.

13                   MR. WILKE:  He can be excused, Your Honor.

14                   THE COURT:  Sir, thank you very much.  You're

04:30:43  15   excused.  Please, be careful.

16                   Ladies and gentlemen, the next witness is going to

17   take a little bit of time, and I would like to have you hear

18   evidence at one time.  So let's excuse you for this evening

19   and reassemble tomorrow.

04:30:55  20                   But let me ask:  Would 8:30 be acceptable to all

21   of you, instead of 9:00 o'clock?  Now, I'm not going to

22   press 8:00 o'clock right now or 7:30, okay?  Let's -- 8:30,

23   okay, and see how we do.

24                   Please, don't discuss this matter with anyone,

04:31:11  25   nor -- even form or express any opinion.  Please, drive

*Deborah D. Parker, U.S. Court Reporter*

04:31:14  1    safely, and we'll see tomorrow morning.

2              Yes, sir?

3              Leave the notebooks right on the seat, including

4    in the audience.  There'll be nobody this side of the

04:31:23  5    courtroom.

6              Please drive safely, folks.

7         (*Jury exits courtroom.*)

8              THE COURT:  And, Counsel, with the alternate

9    juror, let him remain for just a moment.

04:31:57  10             And, Counsel, if you would have a seat.

11   Mr. Hernandez, if you would have a seat anyplace.

12             Mr. Hernandez, we can't make a determination about

13   what to do with this matter until I discuss this with

14   counsel, so you're ordered back tomorrow morning with the

04:32:16  15   rest of the jurors at 8:00 o'clock [sic].

16             Is that understood by you?

17             ALTERNATE JUROR HERNANDEZ:  Yes.

18             THE COURT:  Okay.  Number two, I'd like you to

19   help us with the name and phone number of the person that

04:32:26  20   you're speaking to in case we decide to reach out to that

21   person.

22             Would that be acceptable to you?

23             ALTERNATE JUROR HERNANDEZ:  That person --

24             THE COURT:  I'm sorry.  I can't hear you.

04:32:35  25             ALTERNATE JUROR HERNANDEZ:  The person I'm

*Deborah D. Parker, U.S. Court Reporter*

04:32:36   1    speaking to, it's my employer.

2              THE COURT:  I know.  We'd like that tomorrow

3    morning from you.  The name of your employer and a contact

4    number.

04:32:45   5              ALTERNATE JUROR HERNANDEZ:  Okay.

6              MR. STAPLES:  Get the microphone, Your Honor?

7              THE COURT:  Yes, let's get a microphone.

8              MR. STAPLES:  It's up here.

9              Good enough for tomorrow.  We'll see you tomorrow

04:32:54  10    at 8:30, but we'd like the name of your employer and a way

11    to reach your employer.  Would that be acceptable?

12              That's an order, sir.  Thank you.

13              We'll see you tomorrow morning at 8:30.  And we

14    want to be patient with this; but remember, we've got a

04:33:09  15    whole jury to contend with now.

16              ALTERNATE JUROR HERNANDEZ:  Yeah.

17              THE COURT:  All right.  Thank you, sir.

18         (*Alternate Juror Hernandez exits courtroom.*)

19              THE COURT:  All right, Counsel.  Remember, my

04:33:28  20    notes are not necessarily accurate.  I take them

21    chronologically for a moment.  But before I start through

22    each exhibit tonight to make certain we're current, you have

23    an accurate record.  I'm looking for suggestions concerning

24    Mr. Hernandez.  He previously stated that he was able to

04:33:45  25    serve, had checked with his employer.  If there's a

04:33:50  1    stipulation, I will certainly excuse him for cause; if

2    there's not a stipulation, then I need to deal with it some

3    different way and I'm looking to you for any wisdom or

4    guidance.

04:33:59  5            MR. SCALLY:  Your Honor, there's not a

6    stipulation --

7            THE COURT:  The two of you can meet and confer

8    now --

9            MR. WILKE:  We did already.

04:34:05 10            THE COURT:  Okay.  Thank you.

11            MR. SCALLY:  The Government's position would be,

12    we don't want to lose a second juror on the first day of

13    trial.  And the Court's more familiar, I think, than we are

14    with the Court's ability to sort of push back with

04:34:22 15    employers, but we would support that effort by the Court.

16            THE COURT:  It's not my effort now.  I'm looking

17    to you for guidance.  In other words, it's whether you're

18    starting over or not or whether you're taking this risk in

19    this period of time.  And if I have a stipulation to excuse

04:34:38 20    the gentleman, I will; if not, then I'm looking to you for

21    guidance.

22            MR. WILKE:  I don't have any objection to excusing

23    him, Your Honor.

24            THE COURT:  To what?

04:34:44 25            MR. WILKE:  I have no objection to excusing him.

*Deborah D. Parker, U.S. Court Reporter*

04:34:46  1          THE COURT:  Okay.

          2          MR. SCALLY:  Your Honor, I think we'd prefer to

          3  keep him for another day, just to see what -- I think he's

          4  still being paid.

04:34:55  5          THE COURT:  Let me suggest a couple of things:

          6  He's being paid for three days.  I would suggest is that we

          7  at least exhaust those three days of pay.

          8          Number two, it seems to me like you're moving at a

          9  very good pace.  Frankly, you seem to be ahead of schedule.

04:35:14 10          MR. SCALLY:  That's right, Your Honor.

         11          THE COURT:  And in looking at this, you have

         12  Natalie Nguyen, who I think all of you would prefer to hear

         13  one block of time, so I didn't ask her to be called tonight,

         14  even if she's an extensive witness.

04:35:25 15          My guess is you're going to get through

         16  Daniel Phee tomorrow, who's the search and rescue

         17  specialist.

         18          My guess is you're going to get through

         19  Special Agent Charles Twomey tomorrow.  And my guess is that

04:35:38 20  you may be into Mica Ritze or even as far as Sandra Ritze.

         21  Now, that may be --

         22          If that's the case, Counsel, you've got

         23  Shawn Whalin, Vin Dao, Tony Hoang, Vu Nguyen and

         24  Special Agent Daniel Dingle, and you can conclude this case

04:35:58 25  as early as Tuesday or Wednesday next week.

*Deborah D. Parker, U.S. Court Reporter*

04:36:03  1        If that's the case, then I'm having trouble with

2    the financial hardship, but I don't want to press an

3    employer.  He may be a small -- or she may be a small

4    retailer.  But I think it would be incumbent upon all of us

04:36:22  5    to try to keep this juror, especially after these

6    representations.  And I think it would be extraordinarily

7    detrimental to both the defense and the Government --

8    because of the way the case is spacing out over Thanksgiving

9    that -- if you were going to start over again.  I cannot

04:36:41 10    anticipate that either the defense or the Government at this

11    time would even stipulate to less than 12 jurors.

12        So I think that we ought to make that effort.  I

13    think we should find out who the employer is, curiously

14    place a call and see if the employer be willing -- not

04:36:56 15    forced -- to come down and talk to the Court.  With larger

16    corporate entities in the past, in the four and six months

17    trials I've had, we've run into this situation before.  But

18    those were large employers who, basically, were willing to

19    sacrifice, but they were able to absorb the financial hit.

04:37:18 20    If this is a small retailer, we need to know that and then

21    act accordingly.

22        So let's ask him to get the employer's name and

23    also that forces us into a reality check.  It forces us to

24    really see if this is a problem from that employer.  I think

04:37:38 25    you'd be surprised at how willing and patriotic so many

04:37:41 1    people are in our society.

2            I have no better solution at this time, so he's

3    ordered back tomorrow.  He's minimally going to be sitting

4    on Friday.  If we haven't reached a resolution, then I'll

04:37:51 5    make the decision whether to exclude him or not.  Let's see

6    if we can contact that employer and ask the employer, not by

7    phone, if they would be willing to come down to court and

8    discuss this with us on Friday.

9            All right.  Now, my notes -- remember, handwritten

04:38:07 10   notes.  They may not be absolutely accurate.  But each night

11   we'll go through the evidence, very, very quickly.  And then

12   I'm going to excuse you tonight so that you get your rest

13   and make sure that you're on your best ability to proceed

14   tomorrow.

04:38:27 15           First witness was Chris Sukraw, I have one

16   exhibit:  Exhibit 129.

17           Would the agent, please, have a seat.

18           MR. STAPLES:  I'm sorry, Your Honor.

19           THE COURT:  Is this accurate, Counsel?  That was

04:38:40 20   received into evidence.

21           Accurate?

22           MR. STAPLES:  Yes, Your Honor.

23           THE COURT:  There was no exhibit on

24   cross-examination that I had.

04:38:48 25           MR. WILKE:  No.  We had no questions.

*Deborah D. Parker, U.S. Court Reporter*

04:38:50  1          THE COURT:  Second witness was Oceanside Police

2    Officer, Calvin Berger.  I had 126 received in evidence.

3    127 received in evidence.  There was no evidence on

4    cross-examination.

04:39:00  5          Is that accurate?

6              MR. SCALLY:  That's right.

7              MS. MOJTEDEDI:  Yes, Your Honor.  That's correct.

8              THE COURT:  The third witness was Angela Benefiel.

9    She was our examiner from San Diego.  I have Exhibit 126

04:39:12 10    referred to again -- remember, I'm taking this

11    chronologically -- received.  127 received.

12          The cross-examination was Exhibit 100 received,

13    which was our orange jacket.  The Exhibit 27, which was the

14    wallet.  Exhibit 23, which was the fishing license, and

04:39:27 15    Exhibit 24, which was, I believe, the other license.  Those

16    were at 9:15 and 9:05, on October 14th.  I have those

17    received.

18          I have Exhibit 131, the photo of the small knife.

19    I have Exhibit 132, the actual knife.  Exhibit 133, the

04:39:42 20    cash, which was one-five-dollar bill and eight one-dollar

21    bills, received.

22          I have 128, received.  That's the seal and body

23    tag.  On cross-examination, I have no exhibits.

24          Is that accurate?

04:39:56 25          MR. SCALLY:  Yes, Your Honor.

*Deborah D. Parker, U.S. Court Reporter*

04:39:57  1          THE COURT:  Counsel?

       2          MR. WILKE:  Yes.

       3          MS. MOJTEDEDI:  Yes, Your Honor.

       4          THE COURT:  Exhibit No. 4 was Dr. Paunovic.

04:40:07  5  Exhibit 116 was the body bag tag of the decedent.  Received.

       6          126, again, was the body of the decedent when they

       7  opened the bag, the photo, received.

       8          100 was jacket, the bullet hole in the upper left

       9  back area, received.

04:40:24 10          117 the entrance wound to Tri Dao's body on the

      11  left upper back, received.

      12          123 and 124, the actual bullet recovered, the

      13  casing.  Both received.

      14          120, the actual bullet, received.

04:40:40 15          And -- I'm sorry, I think 123 and 124 were

      16  photographs.  My apologies.  You might check that.

      17          MR. SCALLY:  I'm sorry, Your Honor.

      18          Did you refer to -- the actual bullet is 20.

      19          THE COURT:  That's 20.

04:40:54 20          MR. SCALLY:  Yes.  Thank you, Your Honor.  I

      21  thought I misheard you --

      22          THE COURT:  And 123 and 124, I think, are --

      23          MR. STAPLES:  Photographs.

      24          THE COURT:  Photographs.  And I said that that was

04:41:03 25  the bullet.  Both received.

*Deborah D. Parker, U.S. Court Reporter*

04:41:06  1            Then, back to 130.  This is the next bullet from

2    the head of the decedent.  Received.

3            125, the other injuries to the top of the head,

4    the forehead and the contusions -- or left forehead and

04:41:15  5    contusions.  Received.

6            118, the photo of Tri Dao's face.  Received.

7            116, the tattoos on the left shoulder, upper arm.

8    Received.

9            119, 120, 121 and 122.  The left hand and palm

04:41:33  10   with 119 and 120.

11           The right hand upper -- well, right upper hand and

12   the palm, 121 and 122, respectively, received.

13           Cross-examination was referenced 501-1, which is a

14   diagram and 501-2 -- and I want to make certain that those

04:41:55  15   were received.  My notes show that they were.

16           MR. SCALLY:  I believe were.

17           THE COURT:  I have 117.  Received.

18           I have 502, the closeup of the jacket.  Received.

19           I have 503-A and -B, the left and right knee area

04:42:07  20   photographs.  Received.

21           Redirect, I have nothing.

22           On recross, I have 501-4.  This was the shot of

23   the back of the head with the bullet moving forward.  That

24   was received.

04:42:19  25           Now, check your notes.  For the Government, is

04:42:21   1   that accurate?

2           MR. SCALLY:  If I can have just one moment,

3   Your Honor.

4           MR. WILKE:  It's the diagram.  Not a photo.  It's

04:42:32   5   a diagram.

6           THE COURT:  I don't have 501-4 received.

7           MR. WILKE:  Oh, I believe it was.

8           MR. SCALLY:  I do, Your Honor.

9           THE CLERK:  I do.

04:42:40  10           MR. WILKE:  And it's a diagram of the top of the

11   head.

12           THE COURT:  That's fine.  I missed it in my notes.

13   Thank you.

14           MR. SCALLY:  And, yes, Your Honor, the Government

04:42:46  15   confirms that the rest of those -- the rest of the Court's

16   comments are all accurate according to our --

17           THE COURT:  Counsel, for the defense, is that

18   accurate?

19           MR. WILKE:  Yes, Your Honor.

04:42:56  20           THE COURT:  Then, we have Stephen Lu.  And we have

21   Exhibit 20 and 21, both received.

22           I have 123 and 124.  I do not have those received.

23           THE CLERK:  They were received.

24           THE COURT:  They were received.

04:43:09  25           Thanks, Deb.  I really appreciate it.

04:43:12   1             Each were received.

           2             I have Exhibit 218.  Deb, do you have that as

           3     received?

           4             THE CLERK:  Conditionally, Your Honor.

04:43:22   5             THE COURT:  Conditionally.  219 conditionally and

           6     219 conditionally.

           7             Exhibit 100, the orange jacket which we previously

           8     received.  And I have nothing on cross-examination.

           9             Redirect, I have Exhibit 502.

04:43:44  10             Deb, do you have 502 received?

          11             THE CLERK:  Yes.

          12             THE COURT:  Now, Counsel for the Government, is

          13     that an accurate count?

          14             MR. SCALLY:  Yes, Your Honor.

04:43:51  15             THE COURT:  Counsel for the defense, is that an

          16     accurate count?

          17             MR. WILKE:  Yes, Your Honor.

          18             THE COURT:  Deb, is that an accurate summation?

          19             THE CLERK:  Yes, Your Honor.

04:43:57  20             THE COURT:  Then, Counsel, there's nothing further

          21     this evening.  Otherwise, get a good night's sleep.

          22             MR. SCALLY:  I apologize, Your Honor.

          23             Did the Court mention 115?

          24             THE COURT:  Just a moment.

04:44:09  25             THE CLERK:  Yes, he did.  And I have it checked

*Deborah D. Parker, U.S. Court Reporter*

04:44:11  1   off.

2                    MR. SCALLY:  Okay.  Thank you.  That's my mistake.

3                    THE COURT:  Yes, I did.  That is accurate then,

4        Counsel?

04:44:17  5                    MR. SCALLY:  Yes, Your Honor.  Thank you.

6                    THE COURT:  This is the heart of your case.  Let's

7        get as much sleep for all sides as we can, until we have to

8        spend some late hours, okay.  I don't think we will, though.

9                    Anything further, Counsel?

04:44:30 10                    MR. SCALLY:  No, Your Honor.

11                    THE COURT:  What time are we convening tomorrow?

12                    MR. SCALLY:  8:00 a.m. for the jury, Your Honor.

13                    MR. WILKE:  We'll be here at 8:00, right?

14                    THE COURT:  Excellent, Mr. Wilke.  Half hour.  If

04:44:39 15        we say 8:30, it's a half hour earlier for everybody, okay?

16                    MR. WILKE:  Your Honor, may I make one inquiry?

17                    I previously told the Court about this.  I had

18        cause for my subpoenas to be 12/1.  Is it looking like I

19        should get some witnesses here next week?

04:44:54 20                    THE COURT:  I would just suggest that we do.  One

21        of the reasons for that is, you want that continuity.

22                    MR. WILKE:  Right.

23                    THE COURT:  You want to look like you're

24        accurately prepared.  And even if take a break on the back

04:45:10 25        side as we get closer to Thanksgiving, I think just in

*Deborah D. Parker, U.S. Court Reporter*

04:45:15  1    fairness if we can work together -- and you and the

          2    Government are exemplary in this regard -- it gives a sense

          3    of preparation.

          4              MR. WILKE:  Well, I know -- I have a -- my

04:45:24  5    criminalist coming down from the Bay Area.  I could probably

          6    have him here late next week.  And I have a few others I

          7    could fill in, probably, a day or close to a day next week.

          8              THE COURT:  I'm guessing, but I can see the

          9    Government finishing their case as early as next Tuesday and

04:45:40 10    as late as next Wednesday.

         11              MR. WILKE:  Some of the later witnesses will be

         12    longer.

         13              THE COURT:  We're speculating now, but we're

         14    moving that quickly, quite frankly.  So even if we take half

04:45:49 15    a day, I can be the cover for you in front of the jury.  In

         16    other words, I can take the hit that the Court has other

         17    business, et cetera, et cetera, so it never reflects on all

         18    of you.  But I think the case has a good chance, frankly, of

         19    going to the jury sometime December 1st, 2nd or 3rd, but I'm

04:46:06 20    going to speculate.  We're just moving very, very quickly.

         21              MR. WILKE:  I think that's totally doable.

         22              THE COURT:  About two weeks earlier.

         23              Now, when I say that, we'll be here until -- so

         24    there's no time limit on each of you.  We're not pressing

04:46:20 25    that.  But it seems to me that we're moving at a pretty

*Deborah D. Parker, U.S. Court Reporter*

04:46:25  1    brisk rate and that's because you're cooperating with each

2    other on the obvious things that don't require stipulations.

3              Listen, go get some rest tonight.

4         *(At 4:46 p.m., proceedings were adjourned.)*

04:46:33  5

6                                  -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Deborah D. Parker, U.S. Court Reporter*

04:46:33   1                          CERTIFICATE

          2          I hereby certify that pursuant to Section 753,

          3   Title 28, United States Code, the foregoing is a true and

          4   correct transcript of the stenographically reported

04:46:33   5   proceedings held in the above-entitled matter and that the

          6   transcript page format is in conformance with the

          7   regulations of the Judicial Conference of the United States.

          8

          9   Date:   November 14, 2021

04:46:33  10

          11

          12                     _____/s/DEBORAH D. PARKER_____
                                 DEBORAH D. PARKER, OFFICIAL REPORTER
          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

*Deborah D. Parker, U.S. Court Reporter*