1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3       **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                  Plaintiff,          )   <u>**CERTIFIED TRANSCRIPT**</u>
                                       )
7          vs.                         )   Case No.
                                       )   8:20-cr-00002-DOC-2
8   SHEILA MARIE RITZE,                )
                                       )
9                  Defendant.          )   **Day 2, Volume IV**
                                       )
10  ─────────────────────────────────

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                        JURY TRIAL

17                 TUESDAY, APRIL 5, 2022

18                        3:10 P.M.

19                  SANTA ANA, CALIFORNIA

20

21

22

23
    ───────────────────────────────────────────────────────

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25          411 WEST 4TH STREET, ROOM 1-053
                SANTA ANA, CA 92701
                dhinospaan@yahoo.com


                    **UNITED STATES DISTRICT COURT**

1                    **APPEARANCES OF COUNSEL:**

2    **FOR PLAINTIFF:**

3            TRACY L. WILKISON
             Acting United States Attorney
4            BY:  GREGORY SHEPHERD SCALLY
                  Assistant United States Attorney
5            411 West 4th Street
             Suite 8000
6            Santa Ana, California 92701
             714-338-3592
7            gregory.scally@usdoj.gov

8            TRACY L. WILKISON
             Acting United States Attorney
9            BY:  GREGORY W. STAPLES
                  Assistant United States Attorney
10           411 West 4th Street
             Suite 8000
11           Santa Ana, California 92701
             714-338-3535
12           greg.staples@usdoj.gov

13
     **FOR DEFENDANT:**
14
             WIECHERT MUNK & GOLDSTEIN PC
15           BY:  DAVID W. WIECHERT, ESQ.
             27136 Paseo Espada
16           Suite B1123
             San Juan Capistrano, California 92675
17           949-361-2822
             dwiechert@aol.com
18
             WIECHERT MUNK & GOLDSTEIN PC
19           BY:  WILLIAM JAMES MIGLER, ESQ.
             27136 Paseo Espada
20           Suite B1123
             San Juan Capistrano, California 92675
21           949-361-2822
             william@wmgattorneys.com
22

23

24

25


                    **UNITED STATES DISTRICT COURT**

1                         **I N D E X**

2   **WITNESSES**                                          **PAGE**

3   **STEPHEN LU, CALLED BY THE GOVERNMENT**
        Cross-Examination by Mr. Mr. Migler              4
4       Redirect Examination by Mr. Scally              15

5

6

7

8

9

10

11

12

13

14                           **EXHIBITS**

15

16                                          **IN        MARKED**
    **EXHIBIT**                              **EVIDENCE**
17
    505        Photo of bullets from Le's        10
18             house

19  506        Photo of AR-15 from Le's house              13

20  507        Photo                             13

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
         1              SANTA ANA, CALIFORNIA; TUESDAY, APRIL 5, 2022

         2                            3:10 P.M.

         3                            - - -

         4

03:10PM  5              THE COURT:  Back on the record.

         6              Counsel, this would be cross-examination, please.

         7    Thank you.

         8              MR. MIGLER:  Thank you, Your Honor.

         9    STEPHEN LU, GOVERNMENT WITNESS, WAS PREVIOUSLY SWORN

03:11PM 10                      CROSS-EXAMINATION

        11    BY MR. MIGLER:

        12    Q    And good afternoon, Mr. Lu.

        13    A    Good afternoon.

        14    Q    On direct examination, you discussed both class and

03:11PM 15    individual characteristics.

        16         Do you recall that?

        17    A    Yes.

        18    Q    Now, I want to focus first on the individual

        19    characteristics.  And just to make sure that I heard your

03:11PM 20    testimony correctly, individual characteristics come from the

        21    unique imperfections created in a given firearm by the

        22    manufacturing process; is that right?

        23    A    Yes.

        24    Q    And these unique imperfections can serve as a unique

03:11PM 25    identifier of that given firearm; is that correct?
```

```
 1    A     Yes.
 2    Q     So is it fair to analogize these unique imperfections to
 3    a person's fingerprints?
 4    A     Yes.  That's one analogy that you can make.
 5    Q     Now, are you aware of any governmental agency that
 6    maintains a database cataloging individual characteristics for
 7    bullets recovered from crime scenes?
 8    A     Not that I'm aware.  I think the -- there's an IBIS
 9    database.  IBIS stands for the Integrated Ballistics
10    Identification System.  And we use that for cartridge cases.
11    At least the San Diego Sheriff's Department uses IBIS for
12    cartridge cases.  However, we don't upload bullet
13    characteristics --
14    Q     Okay.  And so it's fair --
15    A     -- into the database.
16    Q     It's fair to say that you did not compare the bullet
17    recovered from the deceased in this case to any other bullets
18    analyzed by law enforcement in other cases; correct?
19    A     No.  We did not compare those characteristics with any
20    bullet database that's available, because we do not -- we do
21    not participate in that program.
22    Q     So as you sit here today, you can't give an opinion on
23    whether the firearm used to shoot the bullet that was recovered
24    from the deceased is connected in any way to firearms for -- in
25    other crimes being analyzed by other law enforcement agencies;
```

**UNITED STATES DISTRICT COURT**

```
 1   correct?
 2   A     That's correct.
 3   Q     Now, I want to move on to the class characteristics.
 4         And first, are you -- were you able to determine the
 5   twist of the bullet recovered from the deceased in this case?
 6   A     Yes, I was.
 7   Q     And what direction was the twist?
 8   A     May I refer to Exhibit 100 to --
 9   Q     By all means.  Actually, let me -- I'll put that on the
10   Elmo for you.
11         Can you see that, Mr. Lu?
12   A     Yes.
13         So that was a right-twisting rifling pattern.
14   Q     Okay.  Great.  Thank you.
15         And do Smith & West-manufactured [sic] firearms
16   twist bullets right?  Correct?
17   A     They do.  I'm not aware -- I cannot think off the top of
18   my head if they have any firearms that twist left.  But
19   everything in firearms is a generality, because there is --
20   there are different variations of firearms, even within the
21   same manufacturer.  So there may be some firearms by Smith &
22   Wesson that do twist left as well.
23   Q     And are you aware of what direction a Rossi -- or
24   Rossi-manufactured firearms twist their bullets?
25   A     I would need to look that information up.  I'm not aware.
```

```
 1   Q    So you can't say right now today what direction Rossi
 2   bullets are twisted?
 3   A    That's correct.
 4   Q    Okay.
 5   A    Thank you.
 6   Q    Now, you testified on direct that, in your opinion, the
 7   bullet recovered from the deceased is consistent with either a
 8   .38 Special or a .357 Magnum round; is that correct?
 9   A    Yes.
10   Q    Now, isn't it true that those are two very popular types
11   of ammunitions sold here in the United States?
12   A    Yes.
13   Q    So it's fairly common for a forensic examiner to come
14   across .38 Special bullets; correct?
15   A    Yes.
16   Q    And .357 Magnum round bullets; correct?
17   A    Yes.
18   Q    Now, as you stated on direct, .38 Special ammunition is
19   primarily used in -- or are primarily used in revolvers;
20   correct?
21   A    In general, they're typically used in revolvers.  However,
22   there are semiautomatic pistols that do fire a .38 Special.
23   Q    So they're not revolver-exclusive rounds; correct?
24   A    That's correct.
25   Q    Now, there is another type of .38 caliber round called
```

Timestamps: 03:14PM (line 5), 03:15PM (line 10), 03:15PM (line 15), 03:15PM (line 20), 03:16PM (line 25)

```
 1         .38 Super; correct?
 2    A        Yes.
 3    Q        And .38 Super ammunition is primarily used in
 4    semiautomatic pistols; right?
 5    A        Typically, yes.  That's my understanding.
 6    Q        And the diameter difference between a .38 Special bullet
 7    and a .38 Super bullet is 0.001 inches; correct?
 8    A        I don't know off the top of my head.
 9    Q        Well, assuming that's right, that's a very small
10    difference; right?
11    A        Yes.
12    Q        And if you were to try to determine whether a bullet is
13    .38 Special or .38 Super based on the diameter measurement,
14    that would be very, very difficult; correct?
15    A        If you're only basing it on the diameter, yes.
16    Q        Okay.  Now, as a bullet is fired, it gets deformed, both
17    by the firing process and when it strikes an object; correct?
18    A        The bullet is generally deformed when it strikes an
19    object, not during the firing process.
20    Q        Okay.  And -- but the bullet recovered from the
21    deceased's body was deformed by striking -- by entering the
22    deceased's body here; correct?
23    A        It was slightly deformed, yes.
24    Q        Now, due to that deformation and the 0.001 diameter
25    difference, can you definitively say whether the bullet
```

|   |   |
|---|---|
| 1 | recovered from the deceased was .38 Special or .38 Super |
| 2 | ammunition? |
| 3 | A    .38 Super has different design characteristics. |
| 4 | Not only -- yes, the diameters are similar; however, the design |
| 03:17PM 5 | of the bullets are different.  And it has to do with the length |
| 6 | of the bullet. |
| 7 |         And in doing my examination, I looked at the |
| 8 | characteristics and the weight of those -- of that bullet that |
| 9 | I examined in this case, and those were consistent with |
| 03:18PM 10 | .38 Special or .357 Magnum.  Looking at the characteristics for |
| 11 | .38 Super, I don't believe that they were consistent with |
| 12 | .38 Super, because the -- there was a weight difference and, |
| 13 | also, there was a length difference. |
| 14 | Q    Okay.  Now, I believe there's a binder on that stand |
| 03:18PM 15 | labeled "Defendant Exhibits."  It's a white binder. |
| 16 | A    Yes. |
| 17 | Q    Can you turn to Exhibit 505, please.  Let me know when |
| 18 | you are there. |
| 19 | A    Okay. |
| 03:19PM 20 | Q    What is the document marked for identification as 505? |
| 21 | A    They are -- excuse me.  It's a photograph -- or two |
| 22 | photographs of four cartridges.  And there are designations on |
| 23 | the headstamp, which are the markings on the base of the |
| 24 | cartridge, are .38 Special. |
| 03:19PM 25 | Q    And so you recognize this to be a picture of .38 Special |

1    ammunition?

2    A     Yes.

3    Q     And is it a fair and accurate depiction of .38 Special

4    ammunition?

03:19PM 5    A     Yes.

6              MR. MIGLER:  Your Honor, at this time, I move to

7    admit Exhibit 505 into evidence.

8              THE COURT:  Received.

9              MR. MIGLER:  Thank you.

03:19PM 10             **(Exhibit Number 505 received.)**

11   Q     BY MR. MIGLER:  And just showing up on the Elmo what you

12   were looking at, Mr. Lu.

13   A     Yes.

14   Q     Now, from this picture, can you tell these are full metal

03:20PM 15   jacket bullets?

16   A     I cannot tell from this picture only if they are full

17   metal jacket or total metal jacket.  Full metal jackets do not

18   cover the base of the bullet, so the lead is exposed at the

19   core.  Total metal jackets, however, the jacket completely

03:20PM 20   encases the bullet so that the base is not exposed.  I cannot

21   tell in this picture because the bullet is housed in its

22   cartridge case.

23   Q     Okay.  But can you tell if the bullets depicted in

24   Exhibit 505 are semi-jacketed bullets or not?

03:20PM 25   A     No, these are not semi-jacketed.  These are jacketed

```
  1   bullets -- either full or total cased bullets -- with a flat

  2   top -- excuse me, a flat nose.

  3   Q    Showing you what has been previously admitted as

  4   Exhibit 100.  And this is the bullet that you examined,

03:21PM  5   correct, Mr. Lu?

  6   A    Yes.

  7   Q    And this is the bullet that you understand was removed

  8   from the deceased?

  9   A    Yes.

03:21PM 10   Q    Now, this is a -- this was a semi-jacketed bullet;

 11   correct?

 12   A    Yes.  Semi-jacketed because it does not completely go

 13   through the nose -- it does not completely cover the nose of

 14   the bullet.  So you can see there's lead exposed at the nose

03:21PM 15   where the jacket is scalloped.

 16   Q    And so the bullet that was removed from the deceased is

 17   inconsistent with these bullets.  Is that fair to say?

 18   A    Yes, it is inconsistent.

 19   Q    All right.  Thank you.

03:21PM 20        Now, can you turn to Exhibit 506, please.  Let me

 21   know when you're there.

 22        THE COURT:  Counsel, when you said they're

 23   "inconsistent with these," did you show an exhibit?  In other

 24   words, was --

03:22PM 25        MR. MIGLER:  For the record, I showed the witness
```

```
        1   Exhibit 505.
        2           THE COURT:  505.  Thank you very much.
        3           THE WITNESS:  I'm there.
        4   Q    BY MR. MIGLER:  And what is the document marked as
03:22PM 5   Exhibit 506?
        6   A    It appears to be a rifle.  I do not see any other markings
        7   or caliber designations.  So at this point, I can say it is a
        8   rifle.
        9   Q    Do you understand it to be an AR-15?
03:22PM 10  A    It does have characteristics that are consistent with
       11   being an AR-15.
       12   Q    So would you say that the document is a fair and accurate
       13   depiction of an AR-15?
       14   A    Yes.
03:23PM 15  Q    Now, can you turn to Exhibit 507.
       16   A    Okay.
       17   Q    And what is the document marked for identification as
       18   507?
       19   A    Exhibit 507 is a photograph of a -- an AK-style rifle.  It
03:23PM 20  has a wooden buttstock, and it also has a pistol grip.
       21   Q    Okay.  And so you understand it to be a photo of an AK
       22   rifle?
       23   A    Yes.
       24   Q    And is it a fair and accurate depiction of an AK rifle?
03:23PM 25  A    Yes.
```

```
  1              MR. MIGLER:  Your Honor, at this time I move to

  2     admit Exhibit 507 into evidence.

  3              THE COURT:  Received.

  4              (Exhibit Number 507 received.)

03:23PM 5        MR. MIGLER:  And just for the record, I'm only

  6     marking Exhibit 506.  I'm not moving that into evidence.

  7              THE COURT:  All right.  Thank you.

  8              (Exhibit Number 506 marked for identification.)

  9              MR. MIGLER:  Just showing everyone up on the Elmo

03:24PM 10   what is 507 (indicating).

 11    Q    BY MR. MIGLER:  As you said, Mr. Lu, this rifle has wood

 12    paneling; correct?

 13    A    It has a wood shoulder stock.

 14    Q    Shoulder stock.  Okay.

03:24PM 15           And a wood grip; right?

 16    A    Yes.  A wooden pistol grip.

 17    Q    And it has this banana-shaped magazine; correct?

 18    A    Yes.

 19    Q    Now, would you agree that these are distinct

03:24PM 20   characteristics of AK rifles?

 21    A    That's not specifically what I'm looking at when I

 22    determine it's an AK style.  Specifically, I'm looking at

 23    the -- the dust cover is typical -- excuse me, the dust cover

 24    is the top portion of the firearm between the wood foresection

03:25PM 25   and the wooden shoulder stock.  So if you look on the top strap
```

1   area, that's the dust cover.  So that dust cover is typical of

2   AKs.

3           And, also, if you look at the safety mechanism,

4   which is located just above the trigger and the trigger guard,

03:25PM 5   it's that lever that's pointed up currently.  So that would

6   indicate that it's in the safe position.

7           So that safety selector lever is also typical of an

8   AK-style rifle.

9   Q    Okay.  And just to reiterate and break that up, so the

03:25PM 10  dust cover right here on top of the rifle --

11  A    And going to the rear.

12  Q    -- going to the rear, and then the safety valve, those

13  distinguish this rifle as an AK rifle, in your mind; correct?

14  A    Right.  The safety selector that you were pointing to,

03:26PM 15  yes.

16  Q    And those were not found on the rifle depicted in 506;

17  correct?

18          You can turn back to 506 to refresh your memory.

19  A    Okay.

03:26PM 20          That's right.  They were not on 506.

21  Q    Great.  Thank you.

22          MR. MIGLER:  Give me one moment, Your Honor.

23  Q    BY MR. MIGLER:  Just one last question about Exhibit 507.

24          Would you agree that the sight shown here is

03:26PM 25  different than the sight shown in 506?

```
 1   A      506, I cannot see -- I only see the muzzle of the --
 2   muzzle of the rifle.  So -- oh, wait.  Excuse me.  I see the
 3   sight.  Yes, they are not consistent with each other.
 4   Q      And the sight on this AK depicted in 507, that's a very
 5   typical site for an AK rifle.  Do you agree?
 6   A      Yes.
 7   Q      Thank you, Mr. Lu.
 8          MR. MIGLER:  No further questions, Your Honor.
 9          THE COURT:  And redirect examination?
10                    REDIRECT EXAMINATION
11   BY MR. SCALLY:
12   Q      Mr. Lu, you were asked some questions about Exhibit 100.
13   And I think you indicated this is a semi-jacketed .38 Special
14   bullet; is that right?
15   A      Yes.  That's correct.
16   Q      And then you were asked some questions about Exhibit 505,
17   and you indicated that's a non-jacketed .38 Special-type
18   ammunition; is that correct?
19   A      No.  That -- it is a -- either full or total
20   metal-jacketed bullet with a flat nose.  So it does have a
21   jacket; I just can't determine if it's full or total metal
22   jacket.
23   Q      I apologize.  I misheard you.
24          So, in other words, the ammunition in 505 is not
25   identical ammunition to the ammunition in Exhibit 100; is that
```

1  correct?

2  A    That's correct.  .38 Specials and all calibers, actually,

3  come in different variations.  They're not all just semi- or

4  total-jacketed.  They're not all hollow-point or flat-nosed.

03:28PM 5  They come in different varieties.

6        But the calibers are -- the calibers are things that

7  are consistent among ammunition.  So if you have a .38 Special

8  bullet and a .38 Special bullet but they're different jackets,

9  they're still .38 Special bullets; they just have different

03:29PM 10 designs.

11 Q    So could they fit in the same -- could they be chambered

12 and fired from the same .38 Special firearm?

13 A    Yes.

14        MR. SCALLY:  Nothing further.  Thank you,

03:29PM 15 Your Honor.

16        THE COURT:  Recross-examination, please.

17        MR. MIGLER:  No recross, Your Honor.

18        THE COURT:  Would you like the witness left on call,

19 Counsel?

03:29PM 20        MR. MIGLER:  Yes.  On call, please.

21        THE COURT:  All right.  Thank you, Counsel.

22        Then, sir, we're going to ask you to remain on call,

23 but we'll be polite.  I doubt that you'll be returning.  But

24 just in case, we don't want additional subpoenas to go out.

03:29PM 25 We're going to ask you to remain on call until April 19th.

```
 1                    THE WITNESS:  April 19th.  All right.
 2                    THE COURT:  Thank you very much, sir.
 3                    MR. MIGLER:  Thank you, Your Honor.
 4                    THE COURT:  You may step down.
03:29PM  5           And Counsel, your next witness would be?
 6                    MR. STAPLES:  United States calls Natalie Nguyen,
 7     Your Honor.
 8                    THE COURT:  All right.  Is Ms. Nguyen going to take
 9     some period of time for the Government?
03:30PM 10           MR. STAPLES:  Yes, Your Honor.
11                    THE COURT:  About how long on direct, approximately?
12                    MR. STAPLES:  Possibly an hour.  And there's an
13     issue I'd like to raise --
14                    THE COURT:  Well, thank you very much.
03:30PM 15           Then, ladies and gentlemen, I'm going to send you
16     home this evening.  I think I'd like to have you hearing
17     witnesses in a block of time and -- if possible.  So -- yeah.
18     Would 8:00 o'clock be convenient for you tomorrow?
19                    (The jury collectively responded "yes.")
03:30PM 20           THE COURT:  Okay.  Thank you.  I humbly thank you.
21     You're the American public.  You're amazing.  Thank you.
22                    You're admonished not to discuss this matter amongst
23     yourselves nor form or express any opinion concerning this
24     case.  Please drive safely.  Leave your notepad on the seat you
03:31PM 25     occupy, including the alternates as well.  And I think I'm
```

```
 1   going to block off this side of the courtroom tomorrow so that

 2   you have that total space.  Okay?

 3          So good night.  Drive safely.  We'll see you

 4   tomorrow at 8:00 o'clock.

 5          (Out of the presence of the jury.)

 6          THE COURT:  Counsel, if you'd be seated.  First of

 7   all, thank you for your courtesy.  When I heard "Natalie

 8   Nguyen," she's one of those critical witnesses, and I'd prefer

 9   not to have the testimony broken.  With some of the witnesses,

10   we can break in testimony, but I think she's very important to

11   both of you.  So let's have a fresh jury tomorrow.

12          When Karlen comes back in, I'd like to go over the

13   record in terms of the exhibits that have been received.  I

14   have a couple -- well, why don't we start, and then you can

15   check with Karlen in just a moment.

16          Remember, I take notes chronologically.  So I'm

17   going to start repeating exhibits, but I'm going to begin with

18   Calvin Berger.  I have Exhibit 145 and Exhibit 142 on direct

19   examination.  I have both received.  I have no exhibits on

20   cross.  Is that accurate?

21          MR. MIGLER:  That's correct, Your Honor.

22          THE COURT:  Is that accurate?

23          MR. SCALLY:  If I just could have a brief moment,

24   Your Honor.  I don't have it chronologically, but --

25          THE COURT:  Well, he's the first witness.  145 and
```

The timestamps appearing in the left margin: 03:31PM (line 5), 03:31PM (line 10), 03:32PM (line 15), 03:32PM (line 20), 03:33PM (line 25).

1  142.

2         MR. SCALLY:  Yes.  Those are both admitted,

3  Your Honor.

4         THE COURT:  I'm going to wait for just a moment and

03:33PM  5  have Karlen here.  It will save her going back over the record.

6  We'll be right back with you, if you'd remain.

7         **(Pause in proceedings.)**

8         THE COURT:  We're on the record.  The defendant's

9  present.  All counsel are present.  The parties are present.

03:39PM 10         Karlen imparted some information to me earlier today

11  that she had received from one of the jurors.  And that

12  information was:

13         "I request to be excused from jury service.

14      I feel sick to my stomach, and I'm unable to focus

03:39PM 15      on the evidence being presented due to being overly

16      nervous, anxious, nauseated.  I don't believe I'm

17      able to properly fulfill the duties required for a

18      case like this."

19         It came to me sometime in the morning.  And we've

03:40PM 20  continued on throughout the day because I've had no

21  conversation with the juror.  It's come through Karlen.  And I

22  don't know if that's the subject matter, which is disturbing to

23  anyone, or possibly the unwillingness to make a decision on a

24  matter like this.

03:40PM 25         So I'm going to ask for your input.  And by the way,

20

1    it's Juror Number 12.  And I think Juror Number 12 had

2    previously expressed -- if we want to go back into the jury

3    questionnaire -- some concern.  So let's get out -- if you have

4    the Questionnaire Number 12.  If not, I'll share it with you.

03:41PM 5         And Karlen, to double-check, would that be Correa?

6    Okay.  This is the gentleman who -- four-year university, BS in

7    computer science and engineering at UC Irvine, several uncles

8    and cousins who are police officers.  But this is the gentleman

9    you both questioned on Question Number 17 where he responded,

03:41PM 10   "Murder makes me slightly uncomfortable."

11        And on page 40 -- which aroused my interest -- "I'm

12   only compensated for ten days of jury service by my employer."

13        So speculating, you could have a number of reasons.

14   First, the reason could be that he's nauseated by the subject

03:42PM 15   matter.  The second is that maybe he doesn't want to make a

16   decision.  And the third is he's got employer problems with ten

17   days.

18        But if that's the case, sometimes I've invited the

19   employer to respond because many of the employers are large

03:42PM 20   corporations who use the court, and they're usually very

21   patriotic about that.

22        I'm going to ask you two to maybe visit with each

23   other, and give me your best wisdom before I make a decision,

24   about how you'd like me to handle this.  You have five

03:42PM 25   alternates, but by the same token --

**UNITED STATES DISTRICT COURT**

```
 1                    MR. STAPLES:  One a day.

 2                    THE COURT:  One a day.

 3                    MR. STAPLES:  Your Honor, could we ask just for you

 4          to read the note again.

03:42PM 5             THE COURT:  Yeah.  In fact, why don't I just give it

 6          to you both.

 7                    MR. STAPLES:  May I approach?

 8                    THE COURT:  Yeah.

 9                    Remember this, though.  This is the way the last

03:42PM 10         trial started.  We went through two or three jurors in the

11         first two days.  So...

12                    While you're discussing that, remember, I can be the

13         person that gives the unsavory news to people.  I don't want

14         you necessarily involved or posturing in front of the -- but I

03:43PM 15         could say, "Sir" -- and we can listen to the problem, and I can

16         then invite him back tomorrow and just see how he does for an

17         additional day.  Then if we have a problem in good faith that

18         seems to be exacerbating, then we can discuss excusing him or

19         not.

03:43PM 20                    (Counsel conferred off the record.)

21                    THE COURT:  I'll be right back.

22                    (Pause in proceedings.)

23                    THE COURT:  Counsel, then we're back on the record.

24         And your wisdom in this matter?

03:46PM 25                    MR. SCALLY:  Your Honor -- oh --
```

22

```
          1                 MR. WIECHERT:  We would like to bring the juror up.
          2     We understand that he's still here.
          3                 THE COURT:  He's still here.  I had them bring him
          4     in.
03:47PM    5                 MR. WIECHERT:  There's some ambiguity in terms of
          6     the note, whether the anxiety and the nausea might be a
          7     physical kind of bad breakfast versus the contents of what
          8     he's --
          9                 THE COURT:  All right.  Could I -- is this
03:47PM   10     acceptable to the Government?
         11                 MR. SCALLY:  Yes, Your Honor.
         12                 THE COURT:  Maybe you can both intuitively gauge
         13     from the few questions.  But I think that it might be wise if
         14     we just let him express what his concerns are without
03:47PM   15     questions.
         16                 And then I think that we ought to ask the juror to
         17     go back for a moment while you have a discussion between
         18     yourself and then with the Court.  And then we might have a
         19     course of action, either excusing him or inviting him to come
03:47PM   20     back tomorrow.
         21                 So Karlen, would you be kind enough to get Juror
         22     Number 12.
         23                 **(In the presence of Juror Number 12.)**
         24                 THE COURT:  Mr. Correa, how are you?  Are you
03:48PM   25     Mr. Correa?
```

```
 1                    JUROR NUMBER 12:  Yes.

 2                    THE COURT:  And, Counsel, if you'd have a seat,

 3       then.

 4                    We're back on the record.  Mr. Correa is seated.

 5                    And normally, sir, are you in that seat or -- so

 6       you're Juror Number --

 7                    JUROR NUMBER 12:  12.

 8                    THE COURT:  -- Number 12.  Okay.

 9                    You wrote a note to me this morning about the jury

10       service and a concern that you have.  Would you be kind enough

11       to share that concern, sir.

12                    JUROR NUMBER 12:  Yeah.  I apologize, Your Honor.

13                    THE COURT:  No.  No need to at all, please.  But

14       share with us the concern.

15                    JUROR NUMBER 12:  I believe I should have more

16       strongly reiterated my desire to not be a part of -- excuse

17       me -- to not be a part of this.  I have just found this very

18       overwhelming, and at times it's -- it's difficult to be fully

19       present and absorb the information.  And I would like to be,

20       you know, as fair to both parties involved.

21                    THE COURT:  Are you physically ill from it, sir?  Is

22       it causing you -- in other words, the manifestation of this.

23                    JUROR NUMBER 12:  I would say anxiety and stress.  I

24       don't -- the physical manifestations of anxiety and stress, of

25       increased heart rate.  I -- I'm not sure how to answer that.
```

Timestamps in left margin: 03:48PM (line 5), 03:48PM (line 10), 03:49PM (line 15), 03:49PM (line 20), 03:50PM (line 25).

THE COURT:  Well, mostly just as much information as
we can, because both parties wanted you to sit as a juror in
this matter.  And so I'm seeking any other information before
we discuss this amongst all the parties.  So is there anything
03:50PM  else you can share with us?

JUROR NUMBER 12:  No, Your Honor.

THE COURT:  Would you be kind enough, then, sir --
and we really appreciate it, by the way.  Thank you so much.
Would you be kind enough to go back in the jury room for just a
03:51PM  moment so we can have a conversation.  And we'll be right back
with you.

**(Out of the presence of Juror Number 12.)**

THE COURT:  Counsel, I'm going to look to both of
you.  I'm not prepared to excuse a juror without a stipulation,
03:51PM  frankly.  Because I think that one of you would probably object
or -- but if you both stipulate, then I'll follow your lead.
But based on that information, I'm having a difficult time
finding cause.

MR. STAPLES:  What I heard, Your Honor, was
03:51PM  essentially he's not able to perform as a juror.  When he says
that "I cannot absorb the information" on day one --

THE COURT:  Excuse me.  Why don't you two have a
conversation amongst each other.  You may agree; you may not
agree.  If you agree, I'm going to excuse.  But I'm not
03:52PM  prepared to do that on the Court's own motion sua sponte and

 1    then have one of the parties later object.

 2              **(Counsel conferred off the record.)**

 3              MR. STAPLES:  The parties would stipulate to him

 4    being excused, Your Honor.

03:52PM 5              MR. WIECHERT:  Yes, Your Honor.

 6              THE COURT:  Stipulated by the defense?

 7              MR. WIECHERT:  Yes.

 8              THE COURT:  Then why don't we ask the gentleman to

 9    come back in.  But I think we should ask him one other

03:52PM 10   question, and that is, if he shared any of this with other

 11   jurors.  Because you're going to have potentially an avalanche

 12   effect, and you should know that.

 13              MR. STAPLES:  No objection.

 14              THE COURT:  Acceptable to the defense?

03:52PM 15              MR. WIECHERT:  No objection.

 16              THE COURT:  Okay.  Karlen, would you be kind enough

 17   to summon Juror Number 12.

 18              **(In the presence of Juror Number 12.)**

 19              THE COURT:  Thank you, sir.  Mr. Correa, thank you.

03:53PM 20              If you'd be seated.  Along with counsel, the

 21   defendant's present.  The investigating agency's present.

 22              Sir, have you shared this with any of the other

 23   jurors?

 24              JUROR NUMBER 12:  I have not.

03:53PM 25              THE COURT:  Okay.  Counsel, acceptable?

|   |   |
|---|---|
| 1 | MR. STAPLES:  Yes, Your Honor. |
| 2 | THE COURT:  Prior stipulation? |
| 3 | MR. STAPLES:  Yes. |
| 4 | THE COURT:  Mr. Correa, we're going to thank and |
| 03:53PM  5 | excuse you.  Both parties have stipulated.  I want to express |
| 6 | to you how much all of us appreciate your jury service. |
| 7 | JUROR NUMBER 12:  Thank you, Your Honor. |
| 8 | THE COURT:  And if you'd be kind enough -- I don't |
| 9 | think you'll be associating with any other jurors during the |
| 03:53PM 10 | trial.  But we'd appreciate it, until the end of the trial, if |
| 11 | you do have any type of contact, which we expect that you will |
| 12 | not -- |
| 13 | JUROR NUMBER 12:  I do not. |
| 14 | THE COURT:  -- that you not share the stipulated |
| 03:54PM 15 | excuse -- or -- well, stipulation that you be excused.  Okay? |
| 16 | JUROR NUMBER 12:  Yes.  Thank you. |
| 17 | THE COURT:  Thank you very much, sir.  You're |
| 18 | excused from the proceedings. |
| 19 | **(Juror Number 12 left the courtroom.)** |
| 03:54PM 20 | THE COURT:  Counsel, if you'd be seated.  I think we |
| 21 | have five alternates left.  And we'll go through the process |
| 22 | again tomorrow morning. |
| 23 | Karlen, if you'd be kind enough, we'll draw the next |
| 24 | alternate to take Juror Number 12's position in the jury's |
| 03:54PM 25 | presence so that they know that that's random. |

1          Now, very quickly, I'd like to go over the exhibits

2    each day.  I take these chronologically.  I'm going to start

3    with direct examination.  My notes certainly aren't perfect.

4    But your responsibility now is to verify whether my notes are

03:55PM 5    perfect.  And we are going to check those against Karlen.

6          On direct examination with Calvin Berger,

7    Exhibit 145 and 142, both are received.  Is that correct, on

8    behalf of the Government?

9          MR. SCALLY:  Yes, Your Honor.

03:55PM 10          THE COURT:  There were no exhibits on

11   cross-examination.  Is that correct, on behalf of the defense?

12          MR. MIGLER:  Yes, Your Honor.

13          THE COURT:  As to Witness Number 2, Angela Benefiel,

14   Exhibit 142 was received.  That's a photo of James Dao.

03:55PM 15          Exhibit 143 was received.  Those are the head

16   injuries.

17          There's another photo, Exhibit 404, which was the

18   jacket and the holes in the jacket in the upper back.

19          Exhibit 104, the pockets were searched with a

03:55PM 20   driver's license.  It's a photo of that license.

21          Exhibit 101, fishing license from October 14, 2019,

22   to March 18, 2020.

23          Exhibit 147, a knife.

24          And Exhibit 144 was the tagged body bag with a

03:55PM 25   2019-02681.  The other marking was 2258348.

1          Each of those exhibits were received on direct

2     examination; is that correct?

3          MR. SCALLY:  Yes, Your Honor.

4          THE COURT:  Any correction that you need to make?

03:56PM  5     I'm on direct examination now; I'm not on cross.  I'll go over

6     them again:  142, 143, 404, 104, 101, 147, 144.  Is that

7     correct?

8          MR. SCALLY:  Yes, Your Honor.

9          THE COURT:  All right.

03:56PM 10          On cross-examination, defense referred to

11     Exhibit 101, which was received.  Those are the last exhibits I

12     have.

13          Is that correct, on behalf of the defense?

14          MR. MIGLER:  That's correct.

03:56PM 15          THE COURT:  All right.  Dr. Paunovic on direct

16     examination, these exhibits were received:  142 -- remember, I

17     know that that's already received, but these are chronological

18     notes.

19          You then referred to 131, which is the photo of the

03:56PM 20     seal on the body bag.  Received.

21          133 is the back showing the gunshot wounds, the

22     entrance, right upper.  Received.

23          Exhibit 146, the head with the bullet entrance again

24     and the other lacerations.  Received.

03:57PM 25          141, once again, the top of the head.  Received.

1        134, the injuries to the face, the abrasions,

2   scrapes, and blunt-force trauma.  Received.

3        135, 136, 137, 138.  All received.

4        139, the recovered bullet from the left shoulder.

03:57PM 5   And 140 also.

6        132, and the actual bullet, 400.

7        So let me go over those again.  On direct

8   examination, you have the following received:  142, 131, 133,

9   146, 141, 134, 135, 136, 137, 138, 139, 140, 132, 400.  Is

03:57PM 10   there any correction needed?

11        MR. SCALLY:  No, Your Honor.  Thank you.

12        THE COURT:  On cross-examination, you referred to

13   556, which was a stipulation of facts.  That was received.

14        You referred back again to 104, the driver's license

03:58PM 15   of Dao; 101, the fishing license; 132, the tattoos.  All

16   received.

17        You referred to 503A and 503B, which is the prop of

18   the engine and trim cab, respectively.  Both received.

19        You referred to 562A and 562B.  Those are the two

03:58PM 20   fishing gaffs.  Those are received.

21        And on cross-examination, you then went on to 136

22   and 137.  Those were showing the left wrists; that there were

23   no tie marks, et cetera.  Both are received.

24        502A, 502B, those were both respective knees.

03:58PM 25   Slight redness or abrasions but no wrapping or ties.

1          And we stopped with those exhibits.  Is that

2    accurate?  Or does the Court need correction?

3          MR. MIGLER:  That's all correct, Your Honor.

4          THE COURT:  Okay.  Redirect, you referred back to

03:59PM 5    141.  Those are the blunt-force trauma, the six blows,

6    et cetera, to the top of the head.

7          Is that accurate, Counsel?

8          MR. SCALLY:  Yes, Your Honor.

9          THE COURT:  Now, with that witness, is the Court

03:59PM 10   missing in its notes, or with the clerk, any exhibits?

11         MR. SCALLY:  No, Your Honor.

12         MR. MIGLER:  No, Your Honor.

13         THE COURT:  All right.  Then on Stephen Lu, this is

14   your ballistics firearm expert.  On direct examination,

03:59PM 15   Exhibit 100, which were the copy of the case notes, I have

16   those finally coming into evidence.  Received.

17         On direct examination you referred back to 139, 140,

18   the bullet recovered, two photos.  You referred back to 400,

19   the actual bullet, which has previously been received as well.

03:59PM 20         You referred back to 185.  It's a photo

21   advertisement of Smith & Wesson 642 Airweight Centennial .38

22   Special.  I have that as received.

23         With 186, I don't have a record of that being

24   received.  I have a reference to it.

04:00PM 25         MR. SCALLY:  That's correct, Your Honor.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  So that hasn't been received yet.

2          Yet 187 is the .38 snubnose and the Rossi Special.

3     That was the large photograph with numerous weapons on it.

4          And then 404, the clothing.

04:00PM 5          Go over your notes, and I'll repeat back to you what

6     I have.  And then as -- I have 100, 139, 140, 400, 185,

7     received.

8          186, I do not have as received.

9          187, received.

04:00PM 10          404, received.

11          That was the end of direct examination.  Does the

12     Court need correction?

13          MR. SCALLY:  No, Your Honor.  Thank you.

14          THE COURT:  Cross-examination -- now, Exhibit 505, I

04:00PM 15     may have missed that.  I don't have -- I have that marked.  I

16     don't have that received.  I think you intended it to be

17     received.  Do you have it received?

18          MR. MIGLER:  Yes, sir.

19          THE COURT:  I missed that.  My apologies.  505 was

04:01PM 20     received or was previously received.  Thank you.

21          Thanks, Karlen.

22          100, received.

23          I have 506 marked only, not received.

24          I have 507, received, which is the AK-47.  Is that

04:01PM 25     accurate for the defense?

1          MR. MIGLER:  All accurate, Your Honor.

2          THE COURT:  Redirect I have 100 received.  It's the

3     jacketed.

4          And I have 505, full metal again, received.  Is that

04:01PM 5     accurate?

6          MR. SCALLY:  Yes, Your Honor.

7          THE COURT:  Then I ask you to double-check with

8     Karlen this evening and make certain that you have an accurate

9     record through the Court.

04:01PM 10         Karlen, does the Court need any correction on that?

11         THE COURTROOM DEPUTY:  No.  I have everything.

12         THE COURT:  You have the same.  Okay.

13         Then, Counsel, you also had a discussion you wanted

14    to have about Natalie Nguyen.  And I thought it would be better

04:01PM 15    to break with Ms. Nguyen, because by the time we took a recess,

16    came back, you'd have 45 minutes; you wouldn't finish your

17    direct.  So tomorrow morning she'll be the first witness at

18    8:00 o'clock.

19         What are the concerns, Counsel?

04:02PM 20         MR. STAPLES:  Your Honor, there's two for the

21    Government's side.  I was going to argue the first one and ask

22    Mr. Scally to address the second.

23         THE COURT:  All right.

24         MR. STAPLES:  The first concerns the ruling the

04:02PM 25    Court made concerning domestic violence incident involving

James Dao and Natalie Nguyen.

THE COURT:  This was the assault in 2016 with the weapon?

MR. STAPLES:  Correct.

THE COURT:  Just a moment.  I want to be sure I'm accurate, because he had a history.  I'm going to repeat.  Is this the 2016 assault where a firearm was used allegedly?

MR. STAPLES:  Yes.

THE COURT:  Okay.  And I thought initially I was inclined not to allow that, and then I reversed myself in the first trial and allowed that testimony.

MR. STAPLES:  And the basis now is the reason it came in -- and there's two issues with it.  The second part, Mr. Scally will -- but the reason it came in during the first trial was because of the assertion of the self-defense.

Having heard the opening argument from the defense, I did not hear an assertion of self-defense.  Which, if that's the case, would render this not only irrelevant but highly prejudicial.

It's just -- it has nothing to do with -- under 403, it has nothing to do with the facts of the case, if he's not going to argue self-defense.  And furthermore -- and this is the part I would ask Mr. Scally to address -- when the Court ruled, I believe it was yesterday, that it could come in, I believe the Court said that the evidence of the domestic

```
 1   violence incident could come in as a character of violence --
 2   character for violence.  That being the case, Mr. Scally will
 3   address the door that that would open.
 4           MR. SCALLY:  If the Court, Your Honor, was admitting
 5   the 2016 domestic violence incident as a character -- evidence
 6   of James Dao's character trait for violence, then I believe
 7   that would trigger 404(a)(2)(B)(ii).
 8           THE COURT:  Counsel, help me.
 9           MR. SCALLY:  Sure.  That's Federal Rule of Evidence
10   404(a)(2) capital (B) lower Roman numeral (ii).
11           THE COURT:  All right.  Now, just a moment.
12           So 404(a) would be character evidence or trait of
13   character is not admissible to prove a person acted in
14   conformity except.  And subsection (ii) states "Character of
15   alleged victim.  In a criminal case, as subject to Rule 412, if
16   offered first by accused or prosecution to rebut same or
17   peaceful character of the alleged victim by prosecutor in a
18   homicide case to rebut evidence that the alleged victim was the
19   first aggressor."
20           MR. SCALLY:  I'm looking at --
21           THE COURT:  I'm looking at 404(a)(2).
22           MR. SCALLY:  Right.  The following exceptions apply
23   in a criminal case.  And under (B), subject to the limitations
24   in Rule 412 --
25           THE COURT:  Well, just a moment.  But that's not
```

1  (a)(2).  You're looking at (B), evidence of other crimes or

2  acts inadmissible to prove a person acted in conformity.

3          Now, that's an entirely different section.

4          MR. SCALLY:  I'm sorry, Your Honor.  I thought --

04:06PM 5  and maybe I misspoke.  I thought I was referring to (a)(2)(B).

6          THE COURT:  All right, Counsel.  Your argument,

7  please.

8          MR. SCALLY:  (a)(2)(B) provides that a defendant may

9  offer evidence of an alleged victim's pertinent trait.  And if

04:06PM 10 the evidence is admitted, the prosecutor may offer evidence of

11 the defendant's same trait.  Now --

12         THE COURT:  Just a moment.  Mr. Dao has a -- help

13 me, from the first trial.  I think he has a rather lengthy

14 issue, doesn't he, concerning assaults, including beating up

04:07PM 15 the person in -- I think it's Garden Grove?  Is my memory

16 accurate, Counsel?

17         MR. SCALLY:  I'm not recalling a Garden Grove.

18         THE COURT:  Okay.

19         MR. SCALLY:  But the reason it was admitted in the

04:07PM 20 trial of Mr. Le was that counsel for Mr. Le indicated that, and

21 represented prior to our case-in-chief, that defendant was

22 going to testify.  And he was going to testify that he knew

23 about Mr. Dao's alleged acts of violence.

24         And the Government agreed in that case that if the

04:07PM 25 defendant, who's asserting self-defense, knows of the victim's

prior violent acts, then that is relevant to the assessment of

any -- whether he had a belief that he needed to defend himself

and the reasonableness of that belief and how much force he

needed to use and whether it was proportional to the danger

04:08PM  posed.

          And we agreed that that was relevant under those

circumstances.

          In this trial, there is no allegation -- there's

no -- there's no allegation that Ms. Ritze -- that this

04:08PM  defendant knew anything about Mr. Dao's prior violent history.

And thus, we don't see where -- how that comes in as anything

other than character evidence.  And --

          THE COURT:  But I'm curious, and help me with this.

My memory of this four-hour tape is as the defendant gives,

04:08PM  from your standpoint, different versions.  One of those

versions is arguable by the defense as being self-defense or at

least a struggle taking place on that boat.  And if you're not

going to play the tape, tell me.  But I think you are.

          MR. SCALLY:  I'm going to play the tape.

04:09PM  THE COURT:  And it depends upon which of those three

versions.  So think back at that tape for a moment.  My memory

is, we listened for that for 4 hours, 12 minutes, and 37

seconds -- just kidding you; but I'm not -- there is an

ability, I think, for the defendant to claim that there was a

04:09PM  struggle.  There was spontaneous.  She didn't know.  He went

1   off the back of the boat.  Of course that changes.

2          MR. SCALLY:  The last ten minutes of the second

3   interview, Your Honor, blows that theory out of the water.

4          THE COURT:  Doesn't matter.  That issue is for the

04:09PM 5   jury to decide.  I'm a gatekeeper.  So you may say that that

6   blows that theory out of the water.  But that's for you to

7   argue.  The defense is entitled to bring forth whatever they

8   want as a defense.

9          And if you're not going to play the tape, I might

04:10PM 10   agree with you.  But if you're playing the tape, then they have

11   got the rule of completeness on top of that.  And I don't think

12   that you can pick and choose, you know, what comes in and what

13   doesn't.  So that's my concern.

14          MR. SCALLY:  I am going to play the tape.  And I

04:10PM 15   would just argue that if it is then being offered for -- for --

16   as evidence of the victim's pertinent trait, then under

17   404(a)(2)(B)(ii), we're allowed to offer evidence of her same

18   trait for violence.

19          THE COURT:  And help me with what those traits are.

04:10PM 20   I don't recall in any pretrial motion this being raised in

21   terms of her alleged violence.

22          MR. SCALLY:  No.  Right.  And it hasn't, because we

23   didn't intend --

24          THE COURT:  So just a moment.  So let's assume that

04:10PM 25   you don't prevail on this motion, hypothetically.  I'd like to

```
 1   hear now what traits you would be offering in terms of her
 2   violence.
 3              MR. SCALLY:  Well, in pretrial litigation --
 4              THE COURT:  I'm sorry.  I'm sorry.  What traits
 5   would you be offering in terms of her violence?
 6              MR. SCALLY:  "I'll drag you out and fuck you up."
 7   Comments that she made to coworkers.
 8              THE COURT:  I think that's already coming in, isn't
 9   it?
10              MR. SCALLY:  I think -- Your Honor, I think you
11   precluded that during the pretrial litigation.
12              THE COURT:  I may have, but you have an abundant
13   amount of violent statements that she's making.  And the other
14   prejudicial effect would outweigh the probative value.  In
15   other words, I have allowed those statements with a nexus to
16   the boat, the means for the homicide.  But as far as those --
17   what I call cloud statements, you know, general puffing, I
18   haven't allowed that.  But I don't see the prejudice to you.
19              You have an abundant amount of testimony about her
20   violent statements.  I mean, she's going to off him.  She's
21   making statements to coworkers.  I think this is kind of, like,
22   the mouse and the elephant routine.  You know what that is?
23   Well, it's like the elephant killing the mouse or the mouse
24   killing the elephant.  I forget it, but let's -- okay.  All
25   right.
```

```
  1              I'm going to allow this, Counsel.  Thank you very
  2    much.  The prejudicial effect does not outweigh the probative
  3    value.
  4              And Counsel, I know that you're seeking this
04:12PM 5    evidence.  Is that correct?
  6              MR. WIECHERT:  Yes, Your Honor.
  7              THE COURT:  Why don't you make your record, though,
  8    so I'm not precipitous in that.  But...
  9              MR. WIECHERT:  Yes, Your Honor.  The defense has
04:12PM 10   multiple theories in its case, and one of the -- and as the
 11    Government has indicated, there are multiple versions in the
 12    statements that she's going -- that are going to be played.
 13              We don't know what happened on that boat.  But we
 14    are going to argue that there is -- facts that she raised
04:12PM 15   during the course of her statements support multiple defenses.
 16    And one of the defenses would go to the propensity of the
 17    victim for violence.
 18              THE COURT:  I'm going to allow the statement,
 19    Counsel.  I can't imagine that the prejudicial effect would
04:13PM 20   ever outweigh the probative value here.  The probative value,
 21    frankly, outweighs the prejudicial effect.  And Mr. Dao is --
 22    has a lengthy history of violence in this matter.
 23              If the tape is not going to be played, though,
 24    inform me of that.  That might be a different ruling.
04:13PM 25             MR. SCALLY:  Understood, Your Honor.
```

UNITED STATES DISTRICT COURT

1              THE COURT:  So right now, that's the final ruling.

2              Now, what's the next concern?  There was a second

3      concern, Mr. Staples, I think that you had.

4              MR. SCALLY:  Your Honor, Mr. Wiechert sent a letter

04:13PM 5      to Natalie Nguyen -- and this will also come in with Sandra

6      Ritze -- requesting that they -- each of those witnesses

7      interview with Mr. Wiechert pretrial.  We conveyed to

8      Mr. Wiechert their response that they declined of their own

9      volition.

04:14PM 10             Mr. Wiechert has indicated he wants to introduce the

11     letter itself into evidence during cross-examination of these

12     witnesses.  We don't believe the letter itself is proper

13     evidence to come in.

14             THE COURT:  I would be concerned, Mr. Wiechert, but

04:14PM 15     I want to hear your argument.  I think that interjects the

16     conduct of the Government or the defense, and it becomes an

17     argument about the ethics, whether it should be received or

18     not.

19             What's the relevance of this?

04:14PM 20             MR. WIECHERT:  It goes to effect on the witness and

21     bias.  This witness has spent -- let me just explain, because

22     the letter that I sent, which is Exhibit 508 -- if the Court

23     wants to take a look at it -- is the same form of letter that I

24     used in a different case before Judge Carney, who admitted the

04:14PM 25     letter.  It involved a witness who had spent multiple occasions

1    with the Government and refused to talk to us.

2         And in the letter basically it says -- and I can

3    read it for the record:

4         "We represent Sheila Marie Ritze in the

04:15PM 5    prosecution" -- "of the prosecution.  The

6         Government has identified you as a witness it

7         intends to call in its case-in-chief in Ms. Ritze's

8         trial.  We recently requested the opportunity to

9         interview you on behalf of our client prior to the

04:15PM 10        trial's commencement currently set for April 4,

11        2022.

12         "We've been advised by the Government that

13        you have declined our request for interview.  Given

14        your extensive prior interaction with Government

04:15PM 15        agents and prosecutors in this case and the serious

16        nature of the charges, it is fair that you make

17        yourself available for an interview with us as

18        Ms. Ritze's defense counsel.

19         "Please reconsider your decision, and let us

04:15PM 20        know if you change your mind.  We are available for

21        an interview at your convenience at any time in the

22        next couple of months before your trial testimony.

23        We can proceed by telephone, videoconference, or in

24        person, whatever your preference."

04:16PM 25         Now, in that letter, there is an indication she's

UNITED STATES DISTRICT COURT

given extensive prior interaction with Government agents.

There's no question that that occurred; that this is serious

charges.  She absolutely knows that these are serious charges

because she was in conversations with the Government about

04:16PM 5   whether or not this should be treated as a first-degree murder

case.  She talks to the Government as a victim of this, and so

she's aware of the nature of the charges.

And a notion that it would be fair for an important

Government witness to at least talk to the defense is not

04:16PM 10  debatable.

THE COURT:  All right.  Thank you.

Counsel on behalf of the Government?

MR. SCALLY:  Your Honor, there's no reason a

written -- written commentary by the defense on what is and

04:16PM 15  isn't fair for witnesses to do prior to trial in making their

own determinations about whether to subject themselves to

interviews by the defense needs to be before the jury.  It's

basically commentary by defense counsel in written form that

would then be before the jury.  And I -- it doesn't -- it's not

04:17PM 20  proper impeachment.

THE COURT:  Thank you.

Counsel?

MR. MIGLER:  Again, I've had this letter -- I've had

this letter basically admitted verbatim in another case.  It

04:17PM 25  goes absolutely to bias.  I can ask the witness, "Weren't you

```
 1   asked to interview with me?"  She may say, "Yes," "No," "Maybe
 2   so."  But the jury should know that we requested, after her
 3   refusal, the opportunity to talk to her, and she refused.
 4           THE COURT:  You're mixing two things, both of you
 5   are.  First of all, you're never going to be precluded from
 6   questioning a witness about their availability and whether they
 7   responded to the letter.
 8           But tentatively, I am precluding that actual letter.
 9   I agree with the Government on that; that the actual letter
10   itself is somewhat commentary.  But you're not precluded from
11   that area.  You can ask if she received the letter, why she
12   refused to discuss this with you, what the circumstances were.
13           I'll think about that a little bit more this evening
14   and give you another final decision tomorrow.  But tentatively,
15   I would rule against you in terms of the actual receipt of the
16   letter.
17           Now what else, Counsel, this evening?
18           MR. STAPLES:  Nothing from the Government,
19   Your Honor.
20           THE COURT:  Counsel for the defense?
21           MR. WIECHERT:  Nothing further.
22           THE COURT:  All right.  How are you holding up?
23           MR. STAPLES:  Better than the jury.
24           THE COURT:  Well, yeah, I know that.  But how are
25   you holding up?  In other words, I want to keep you as fresh as
```

possible.  If we don't have to keep late nights, we won't.  But
at some point, we'll get to the jury instructions.  And are you
on schedule right now?

   MR. SCALLY:  Yes, Your Honor.

04:18PM   THE COURT:  With what you thought, are you on
schedule?

   MR. STAPLES:  We think we're going faster than we
anticipated, I think.

   THE COURT:  About -- a guestimate, about two weeks?

04:18PM   MR. WIECHERT:  My estimate, Your Honor, is that we
will be finished before Good Friday, and that we will do our
closings the following Monday.

   THE COURT:  Okay.  That's about two weeks, then.
All right.  I want to say to both of you, I think you're
04:19PM working extraordinarily well together, and there's no reason to
keep you this evening.  Go home.  Stay as rested as you can,
because this is the heart of the case.  If we need to keep the
late hours with jury instructions, we'll do that later on.
Okay?

04:19PM   So have a good evening.  And see you tomorrow at
what time?

   MR. MIGLER:  8:00 o'clock.

   MR. WIECHERT:  8:00 o'clock.

   THE COURT:  Excellent.  See you tomorrow.  Good
04:19PM night.

1          (Proceedings concluded at 4:19 p.m.)

2                        --oOo--

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  April 5, 2022

16

17

18

19                              /S/ DEBBIE HINO-SPAAN

20                              Debbie Hino-Spaan, CSR No. 7953
                                Federal Official Court Reporter
21

22

23

24

25
```