1                **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3          **HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,          )

6                   Plaintiff,         )   <u>**CERTIFIED TRANSCRIPT**</u>

7        vs.                           )   Case No.
                                       )   8:20-cr-00002-DOC-2
8   SHEILA MARIE RITZE,                )

9                   Defendant.         )   **Day 5, Volume II**

10

11

12

13

14

15                REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                          JURY TRIAL

17                   FRIDAY, APRIL 8, 2022

18                          9:45 AM.

19                   SANTA ANA, CALIFORNIA

20

21

22

23

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25          411 WEST 4TH STREET, ROOM 1-053
                SANTA ANA, CA 92701
                dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1                      APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF:

 3            TRACY L. WILKISON
              Acting United States Attorney
 4            BY:  GREGORY SHEPHERD SCALLY
                   Assistant United States Attorney
 5            411 West 4th Street
              Suite 8000
 6            Santa Ana, California 92701
              714-338-3592
 7            gregory.scally@usdoj.gov

 8            TRACY L. WILKISON
              Acting United States Attorney
 9            BY:  GREGORY W. STAPLES
                   Assistant United States Attorney
10            411 West 4th Street
              Suite 8000
11            Santa Ana, California 92701
              714-338-3535
12            greg.staples@usdoj.gov

13
      FOR DEFENDANT:
14
              WIECHERT MUNK & GOLDSTEIN PC
15            BY:  DAVID W. WIECHERT, ESQ.
              27136 Paseo Espada
16            Suite B1123
              San Juan Capistrano, California 92675
17            949-361-2822
              dwiechert@aol.com
18
              WIECHERT MUNK & GOLDSTEIN PC
19            BY:  WILLIAM JAMES MIGLER, ESQ.
              27136 Paseo Espada
20            Suite B1123
              San Juan Capistrano, California 92675
21            949-361-2822
              william@wmgattorneys.com
22
      ALSO PRESENT:
23
              Special Agent Austin Casey
24            Coast Guard Investigative Service

25
```

UNITED STATES DISTRICT COURT

1                          **I N D E X**

2     <u>**WITNESSES**</u>                                    <u>**PAGE**</u>

3     **AUSTIN CASEY, CALLED BY THE GOVERNMENT**
          Direct Examination by Mr. Scally (resumed)      4
4         Cross-Examination by Mr. Migler                 5
          Redirect Examination by Mr. Scally             17
5         Recross-Examination by Mr. Migler              18

6     **ANDREW CHO, CALLED BY THE GOVERNMENT**
          Direct Examination by Mr. Scally               27
7         Cross-Examination by Mr. Wiechert              27
          Redirect Examination by Mr. Scally             39

8

9

10

11

12

13

14

15                         **EXHIBITS**

16                                                  **WITHDRAWN**
                                          **IN**        **OR**
17    **EXHIBIT**                     **EVIDENCE**   **REJECTED**

18    323      Ritze interview clips       27
      through
19    345

20

21

22

23

24

25

|   | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; FRIDAY, APRIL 8, 2022** |
| 2 | **9:45 AM.** |
| 3 | **- - -** |
| 4 | |
| 09:45AM 5 | **(In the presence of the jury.)** |
| 6 | THE COURT:  We're back in session.  The jury is |
| 7 | present.  The alternates, all counsel, the defendant, |
| 8 | investigating agency. |
| 9 | And Counsel, if you'd like to continue with your |
| 09:46AM 10 | direct examination. |
| 11 | MR. SCALLY:  Thank you, Your Honor.  I'd just ask |
| 12 | for permission to publish Exhibits 312 through 322 to the jury. |
| 13 | THE COURT:  You may. |
| 14 | **AUSTIN CASEY, GOVERNMENT WITNESS, WAS PREVIOUSLY SWORN** |
| 09:46AM 15 | **DIRECT EXAMINATION (resumed)** |
| 16 | **(Audio recording was played, not reported.)** |
| 17 | MR. SCALLY:  Your Honor, I just paused it for a |
| 18 | moment.  I just wanted to make sure -- I don't know if the |
| 19 | Court wants to inquire if the jurors can all see or if we |
| 10:05AM 20 | should be moving any of the TVs for them. |
| 21 | THE COURT:  I'd be happy to. |
| 22 | Can all of you see the screens?  Okay. |
| 23 | MR. SCALLY:  And the alternates, Your Honor? |
| 24 | THE COURT:  And the alternates?  Okay.  And if you |
| 10:05AM 25 | need to, you can move. |

**UNITED STATES DISTRICT COURT**

```
 1                    Okay.  Thank you.
 2              (Audio recording was played, not reported.)
 3   BY MR. SCALLY:
 4   Q    Special Agent Casey, what happened with Sheila Ritze
 5   after this interview?
 6   A    After that interview, she was transported up to the jail
 7   by two other agents.
 8   Q    And is it your understanding she was interviewed by
 9   Special Agent Andrew Cho and Special Agent Christopher Gicking
10   at that time?
11   A    Yes.
12              MR. SCALLY:  No further questions, Your Honor.
13              THE COURT:  Cross-examination.
14              MR. MIGLER:  Yes, Your Honor.
15                         CROSS-EXAMINATION
16   BY MR. MIGLER:
17   Q    Good morning, Agent Casey.
18   A    Good morning.
19   Q    I first just want to briefly focus on some of the
20   documentary exhibits that you were shown on direct examination.
21   Can you turn to Exhibit 201.  And specifically, look at --
22   start at page 51.
23              MR. MIGLER:  And Exhibit 201 is already in evidence,
24   Your Honor.
25              THE WITNESS:  Okay.
```

```
 1   Q    BY MR. MIGLER:  And you were shown this exhibit during
 2   direct examination; is that correct?
 3   A    Yes, sir.
 4   Q    And just to refresh the Court and the jury, this is a
 5   photograph taken from Ms. Ritze's phone of a GPS tracking
 6   device; is that correct?
 7   A    That's correct.
 8   Q    Now, if you can turn to Exhibit -- sorry, page 61 of
 9   Exhibit 201.
10   A    Yes, sir.
11   Q    Is that a photograph of the same GPS tracking device?
12   A    Yes, sir.  I believe it's actually the same photo, just a
13   different version of it.
14   Q    That was my next question.
15        Now, is it the same photo, just maybe a little
16   clearer?  Is that fair to say?
17   A    Yes, sir.
18   Q    Now, the next page, page 62 of 201, is the metadata
19   associated with that picture; is that correct?
20   A    Yes, sir.
21   Q    And do you see the line "Capture Time"?
22   A    Yes, I do.
23   Q    And do you see that the date is February 14, 2019?
24   A    Yes, I do.
25   Q    So does that mean that this picture was taken by
```

| | |
|---|---|
| 1 | Ms. Ritze or someone using Ms. Ritze's phone on February 14, |
| 2 | 2019? |
| 3 | A     Yes, it does. |
| 4 | Q     And if you can turn to page 55 of Exhibit 201. |
| 11:43AM 5 | A     Okay. |
| 6 | Q     And you were shown that exhibit during direct |
| 7 | examination; correct? |
| 8 | A     Yes, sir. |
| 9 | Q     And what's on the Elmo is page 55; correct? |
| 11:43AM 10 | A     Yes, sir. |
| 11 | Q     And turn to page 59, please, of 201. |
| 12 | A     Okay. |
| 13 | Q     And it's the same photograph, just a little more clear; |
| 14 | is that correct? |
| 11:44AM 15 | A     Yes, sir. |
| 16 | Q     If you turn to the next page, that's the metadata |
| 17 | associated with this photo; correct? |
| 18 | A     That's correct. |
| 19 | Q     And if you look at the capture time, it's February 14, |
| 11:44AM 20 | 2019. |
| 21 |         Do you see that? |
| 22 | A     Yes, I do. |
| 23 | Q     Now, if I can have you look at Exhibit 231 already in |
| 24 | evidence. |
| 11:45AM 25 | A     Okay. |

1    Q    And can you turn to page 8 of 231, please.

2    A    Okay.

3    Q    Now, up on the Elmo I put page 8, 231.  And you were

4    shown this during direct examination.

11:45AM 5         Do you recall that?

6    A    Yes, I do.

7    Q    And this was a text message exchange between Ms. Ritze

8    and a person identified as "Nomie Palms Springs" in her phone;

9    is that correct?

11:45AM 10   A    Yes, sir.

11   Q    And the green texts are Ms. Ritze's messages; is that

12   right?

13   A    That's correct.

14   Q    Okay.  And this first text on the top of page 8 reads,

11:45AM 15   "Don't even ask how I got involved."

16        Do you see that?

17   A    Yes, I do.

18   Q    And that's Ms. Ritze saying that?

19   A    Yes, sir.

11:45AM 20   Q    The next text from Ms. Ritze, "I wouldn't even be able to

21   tell you if I knew."

22        Do you see that?

23   A    Yes, I do.

24   Q    Now, during the course of your investigation, you learned

11:46AM 25   that Ms. Ritze did go to Las Vegas in November of 2019; is that

UNITED STATES DISTRICT COURT

```
 1   correct?
 2   A     That's correct.
 3   Q     And she went with Mr. Wayne Le; is that correct?
 4   A     Yes, sir.
 5   Q     Now, during the course of your investigation, did you
 6   also learn that several other individuals accompanied Ms. Ritze
 7   and Mr. Wayne Le in Las Vegas on that trip; is that correct?
 8   A     Yes, sir.
 9   Q     Can I have you turn to Exhibit -- back to Exhibit 201,
10   and start at page 13.
11   A     Okay.
12   Q     And is that a photograph of Ms. Ritze and other
13   individuals?
14   A     Yes, it is.
15   Q     And just to clarify, everything that is in Exhibit 201
16   was extracted from Ms. Ritze's phone?
17   A     That's correct.
18   Q     I've put Exhibit 201 on the Elmo.  Do you see that,
19   Agent Casey?
20   A     Yes, I do.
21   Q     Now, the one here, that's Ms. Ritze; correct?
22   A     That's correct.
23   Q     And we presume this is Mr. Wayne Le?
24   A     Yes, sir.
25   Q     Now, did you identify this person in red?
```

**UNITED STATES DISTRICT COURT**

1    A    I believe that's Khoa Cao, also known as K.C.

2    Q    Did you identify this woman towards the right -- at the

3    right?

4    A    I believe that's Mr. Cao's significant other.  I'm not

11:47AM 5    positive on her name.  I think it's Ayami.

6    Q    Thank you.  And the next page is the metadata associated

7    with that photograph?

8    A    That's correct.

9    Q    And it shows that it was taken on November 22nd; is that

11:48AM 10    right?

11    A    So different than the other metadata where it had a

12    capture time, this is a created time.  And sometimes that isn't

13    exact with the time captured.

14    Q    Okay.  Thank you for the clarification.

11:48AM 15          But from your investigation, it makes sense that

16    this was taken in November of 2019?

17    A    Yeah.  In that time frame, yes, sir.

18    Q    And if you could turn to page 15 of 201.

19    A    Okay.

11:48AM 20    Q    And I put page 15 of 201 on the Elmo.

21          Do you see that?

22    A    Yes, sir.

23    Q    Now, this is Ms. Ritze; correct?  Where my finger is

24    pointing?

11:48AM 25    A    Yes, sir.

|          |    |                                                                 |
|----------|----|-----------------------------------------------------------------|
|          | 1  | Q    And this looks to be Mr. Wayne Le?                          |
|          | 2  | A    That's correct.                                            |
|          | 3  | Q    Now, did you identify who this gentleman is?               |
|          | 4  | A    I believe his first name is Mark.  His last name is        |
| 11:49AM  | 5  | escaping me at the moment.                                      |
|          | 6  | Q    That's fine.  Thank you.                                   |
|          | 7  |      And did you identify this woman in the right-hand          |
|          | 8  | corner?                                                         |
|          | 9  | A    I believe that's Ms. Noemee Lewis.                         |
| 11:49AM  | 10 | Q    Lastly, if you could turn to page 17 of 201.               |
|          | 11 | A    Okay.                                                       |
|          | 12 | Q    And I've put page 17 of 201 on the Elmo.  And I believe    |
|          | 13 | we've identified all these individuals in this photograph,      |
|          | 14 | correct?                                                         |
| 11:49AM  | 15 | A    Yes, sir.                                                   |
|          | 16 | Q    So this is K.C. -- Khoa Cao's significant other; correct?  |
|          | 17 | A    Yes, sir.                                                   |
|          | 18 | Q    Is this K.C. -- or Khoa Cao?  Excuse me.                   |
|          | 19 | A    Yes, sir.                                                   |
| 11:49AM  | 20 | Q    Wayne Le; correct?                                          |
|          | 21 | A    Correct.                                                    |
|          | 22 | Q    Ms. Ritze; correct?                                         |
|          | 23 | A    Correct.                                                    |
|          | 24 | Q    We believe this is Noemee; correct?                        |
| 11:49AM  | 25 | A    Yes, sir.                                                   |

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Q     And this is a man named Mark? |
| | 2 | A     That's correct. |
| | 3 | Q     Now, during direct examination, you were shown what |
| | 4 | looked to be an insurance card naming Ms. Ritze as a driver on |
| 11:50AM | 5 | Mr. Wayne -- Wayne Le's Cadillac; is that correct? |
| | 6 | A     Yes, sir. |
| | 7 | Q     Now, during the course of your investigation, did you |
| | 8 | ever obtain any evidence that Ms. Ritze actually drove any |
| | 9 | vehicle owned by Mr. Le? |
| 11:50AM | 10 | A     No, we did not. |
| | 11 | Q     Also during direct examination, you were played an audio |
| | 12 | recording of a stop by California Highway Patrol |
| | 13 | Officer Futrell. |
| | 14 |       Do you recall that? |
| 11:50AM | 15 | A     Yes, sir. |
| | 16 | Q     And that was Exhibit 308; correct? |
| | 17 | A     I don't recall the number.  But yeah. |
| | 18 | Q     That's fine.  Now, during the course of your |
| | 19 | investigation, you learned that that stop came about -- that |
| 11:51AM | 20 | was a traffic stop; correct? |
| | 21 | A     Yes, sir. |
| | 22 | Q     And the traffic stop was due to Ms. Ritze having a |
| | 23 | suspended license; is that correct? |
| | 24 | A     Yes, sir. |
| 11:51AM | 25 | Q     Now, as we've kind of gone over here again on cross, you |

**UNITED STATES DISTRICT COURT**

```
 1    were shown quite a handful of documentary exhibits.  Is that

 2    fair to say?

 3    A    Yes, sir.

 4    Q    Now, would you agree with me that the name James Dao was

 5    never mentioned in any of the exhibits that were shown to you

 6    during direct examination?

 7    A    Yes, sir.

 8    Q    And when I say "James Dao," you also mean -- mean to

 9    include any alias, such as "Tri Dao"; correct?

10    A    Yes, sir.

11    Q    And "Saigon"; correct?

12    A    That's correct.

13    Q    Now, I want to move to the morning of December 19, 2019,

14    which was the morning that Ms. Ritze was arrested; correct?

15    A    Yes, sir.

16    Q    Now, you weren't part of the team that actually entered

17    into Ms. Ritze's apartment to arrest her; is that right?

18    A    Not initial entry, no, sir.

19    Q    Now, you -- withdraw that.

20         You were seated in a van outside of her apartment

21    complex; is that right?

22    A    Yes, sir.

23    Q    And that was a van in which you and Agent Coughlin

24    questioned Ms. Ritze; is that right?

25    A    That's correct.
```

Q     Now, when you first saw Ms. Ritze that morning, was it

when she was being led to the van for questioning?

A     Special Agent Coughlin and I went up to her apartment, and

that's where we met Ms. Ritze and then escorted her down to the

11:52AM  van.

Q     Okay.  And when you saw Ms. Ritze that morning, she had a

visible wound on her forehead; is that correct?

A     She did have a small laceration on her forehead, yes.

Q     Laceration.

11:53AM        And did you understand that that laceration required

treatment by an on-site EMT?

A     I'm not sure I was aware of that at the time.

Q     Have you since learned that fact?

A     Yes.

11:53AM Q     Now, you were armed when you were questioning Ms. Ritze

in the van; is that correct?

A     That's correct.

Q     And you were armed with a handgun?

A     That's correct.

11:53AM Q     And Agent Coughlin was armed as well; correct?

A     Yes, he was.

Q     And your firearm was in its holster; is that right?

A     Yes.

Q     And the firearm was visible in its holster; is that

11:53AM  correct?

     1  A    I don't believe so.  I believe it was concealed.

     2  Q    Now, one goal that you had, when you were interviewing

     3  Ms. Ritze, was to get her to incriminate herself; is that

     4  correct?

11:53AM 5           MR. SCALLY:  Objection.  Relevance.  403.

     6           THE COURT:  Overruled.  I'm sorry.  Overruled.

     7           You can answer the question, sir.

     8           THE WITNESS:  My objection was to get a statement

     9  from Ms. Ritze.

11:40AM 10  Q    BY MR. MIGLER:  A statement.

    11           And because you were trying to gather evidence

    12  against Ms. Ritze, you wanted that statement to include

    13  incriminating evidence.  Is that fair to say?

    14  A    It's fair to say that I was seeking a statement of the

11:54AM 15  truth.

    16  Q    And not only to incriminate herself, but you also wanted

    17  her to incriminate Wayne Le.  Is that fair to say?

    18           MR. SCALLY:  Objection.  Assumes a fact not in

    19  evidence.

11:54AM 20           THE COURT:  Overruled.

    21           You can answer the question, sir.

    22           THE WITNESS:  Again, the aim of my interview and

    23  Special Agent Coughlin's interview was just to get a statement

    24  of the facts.

11:40AM 25  Q    BY MR. MIGLER:  Now, as of the morning of December 19,

1    2019, a criminal Complaint had already been filed against

2    Ms. Ritze; is that right?

3    A    That's correct.

4    Q    And so she was already now a defendant; right?

11:54AM 5            MR. SCALLY:  Objection.  Calls for a legal

6    conclusion.

7            THE COURT:  No, he can state his state of mind; what

8    his opinion was at the time.  Overruled.

9            THE WITNESS:  Can you repeat the question, please.

11:55AM 10   Q    BY MR. MIGLER:  Sure.  As of December -- as of the

11   morning of December 19, 2019, Ms. Ritze was already a

12   defendant.  Is that fair to say?

13   A    I'm not sure that I had formed that classification.

14   Q    Well, she was already -- she had already been arrested by

11:55AM 15   the FBI; is that right?

16   A    Yeah.  I guess that's fair to say, yeah.

17   Q    Now, you didn't need a criminal complaint to be filed nor

18   for you to talk to Ms. Ritze by that morning; is that right?

19   A    That's correct.

11:55AM 20   Q    And you didn't need to have an FBI team enter her home at

21   5:00 a.m. to talk to her that morning; correct?

22   A    No.  Not -- no.

23   Q    You could have visited her at her home at any time before

24   that morning; is that right?

11:55AM 25   A    That's correct.

| | |
|---|---|
| 1 | Q    And/or you could have visited her office; right? |
| 2 | A    Yes. |
| 3 | Q    All right.  Thank you, Agent Casey. |
| 4 | MR. MIGLER:  No further questions, Your Honor. |
| 11:56AM 5 | THE COURT:  Thank you. |
| 6 | Redirect examination? |
| 7 | **(Counsel conferred off the record.)** |
| 8 | **REDIRECT EXAMINATION** |
| 9 | BY MR. SCALLY: |
| 11:56AM 10 | Q    Special Agent Casey, why didn't you approach Sheila Ritze |
| 11 | prior to obtaining a criminal Complaint, if you recall? |
| 12 | A    I mean, primarily, we wanted to maintain the integrity of |
| 13 | the investigation.  Had we spoken to Ms. Ritze before a |
| 14 | criminal Complaint was filed, we were worried that that would |
| 11:57AM 15 | affect our investigation into Mr. Le. |
| 16 | Q    And in particular, that one or both of them may flee |
| 17 | prosecution? |
| 18 | A    That's correct. |
| 19 | Q    Or destroy evidence? |
| 11:57AM 20 | A    That's correct. |
| 21 | Q    Such as the exhibits we discussed during your direct |
| 22 | examination recovered from her phone? |
| 23 | A    That's correct. |
| 24 | MR. SCALLY:  Nothing further. |
| 11:57AM 25 | THE COURT:  Recross-examination, please. |

| | |
|---|---|
| 1 | MR. MIGLER:  One moment, Your Honor.  Thank you. |
| 2 | THE COURT:  Certainly. |
| 3 | **(Counsel conferred off the record.)** |
| 4 | **RECROSS-EXAMINATION** |
| 11:57AM 5 | BY MR. MIGLER: |
| 6 | Q    Do you recall, Agent Casey, when the Coast Guard |
| 7 | Investigative Service first approached Wayne Le? |
| 8 | A    Yes, I do. |
| 9 | Q    And that was in November of 2019; correct? |
| 11:58AM 10 | A    That's correct. |
| 11 | Q    And they asked him about the facts relating to this case; |
| 12 | is that correct? |
| 13 | A    That interview was prefaced under kind of a ruse of a |
| 14 | missing person's report, yes. |
| 11:58AM 15 | Q    But they asked him about Mr. James Dao's disappearance; |
| 16 | is that correct? |
| 17 | A    That's correct. |
| 18 | MR. MIGLER:  Thank you.  No further questions, |
| 19 | Your Honor. |
| 11:58AM 20 | THE COURT:  All right.  You've been here the entire |
| 21 | time, so I doubt that we're excusing you.  So, sir, you may |
| 22 | step down.  Thank you very much. |
| 23 | THE WITNESS:  Thank you, Your Honor. |
| 24 | THE COURT:  Ladies and gentlemen, would you give us |
| 11:58AM 25 | an extra 15 minutes today?  Could we reconvene at 1:15 instead |

of 1:00 o'clock.  And thank you for being so prompt.  You're

admonished not to discuss this matter amongst yourselves nor to

form or express any opinion concerning the case.  Have a nice

lunch.

11:59AM 5  **(Out of the presence of the jury.)**

THE COURT:  Counsel, if you'd have a seat for just a

moment.  Thank you for your courtesy.

My memory is that the next tape originally, when we

listened to it together, took about 2 hours, approximately.  I

12:00PM 10 think 2 hours, 17 minutes, but I'm not certain.  Has that case

been reduced in time, or is it about the same length?

MR. SCALLY:  It's been reduced, but not by too

terribly much.  Probably by 15 to 20 minutes, Your Honor.

THE COURT:  The reason I'm asking is, if we're going

12:00PM 15 to bring down another witness, if it's 3:00 o'clock, I'd like

to get that witness on the stand, or witnesses.  So I might ask

you, in an abundance of caution, to bring down a couple

witnesses that we could take this in.  But we don't have to go

to 4:30 today.

12:00PM 20 MR. SCALLY:  We'll do that, Your Honor.

THE COURT:  Mr. Wiechert?

MR. WIECHERT:  Yes, Your Honor.  I expect that I

will have probably 15 minutes of cross-examination of Special

Agent Dao after this tape.  Maybe 20 minutes.

12:00PM 25 THE COURT:  Okay.

1      MR. WIECHERT:  And given the pace that we've had

2  during the week, my request would be that we terminate today's

3  session and don't start a new kind of set of witnesses --

4      THE COURT:  Just catch up a little bit?

12:01PM  5      MR. WIECHERT:  -- until Monday morning.

6      THE COURT:  Counsel, any objection?

7      MR. SCALLY:  No objection.

8      THE COURT:  Why don't we do that then.  Keep you as

9  fresh as possible.  You're both in the heart of the case, quite

12:01PM 10  frankly.

11      The doctor that you were going to try to contact

12  after yesterday's session, did we get any input about his

13  availability?

14      MR. STAPLES:  I actually have good news for once,

12:01PM 15  Your Honor.

16      THE COURT:  Just a moment.

17      Mr. Wiechert, is this good news?  We'll find out.

18  I'm just joking.

19      MR. STAPLES:  I haven't had a chance to tell him

12:01PM 20  yet, because I just found out --

21      THE COURT:  Well, why don't you go --

22      MR. STAPLES:  Well, no, the exam is going to go

23  forward tomorrow at 10:00 to 12:00.

24      THE COURT:  Great.

12:01PM 25      MR. STAPLES:  I invoked your name to get it done.

1          THE COURT:  Well, that might not have had a lot of

2     results, but thank you.

3          Well, first, Mr. Wiechert, that's really good news.

4     And it's good news for the Government also.  That way, you can

12:01PM  5     make your decision and get the report in much earlier and then

6     decide if you're going to produce the psychologist or

7     psychiatrist or not.

8          I want to really compliment both of you for doing

9     that because it would have left the defendant in a very

12:02PM 10     difficult position getting the report a short time before the

11     Government rested their case.  And I think Mr. Wiechert would

12     have been in a difficult position getting all that information

13     out to Ms. Ritze and making a decision.  So my compliments to

14     both of you.

12:02PM 15          Well, then, Counsel, 1:15?

16          MR. SCALLY:  Your Honor, I do have two, I think,

17     relatively quick substantive issues, but I haven't had a chance

18     to discuss them --

19          THE COURT:  Would you discuss those first,

12:02PM 20     because --

21          MR. SCALLY:  Could I just have a brief moment to

22     speak with him?

23          THE COURT:  Yes.

24          **(Counsel conferred off the record.)**

12:04PM 25          MR. SCALLY:  Your Honor, one of the issues is the

admission of Exhibit 200.  Mr. Wiechert has agreed that the

admission of the photograph of the AR-15 recovered from

Wayne Le's residence is admissible at this point, I think given

the Court's pretrial rulings.  But Mr. Wiechert is objecting to

12:04PM  the admission of Exhibit 200, which is a photograph of the

shotgun recovered from under Wayne Le's bed.

I'd be seeking to admit it as corroboration that

Sheila Ritze was aware that Wayne Le had guns and he did, in

fact, have guns.

12:05PM  THE COURT:  But haven't you been able to adequately

show that without the redundancy of the prejudicial effect of

the numerosity of the weapons?  It's the fact that he had

access to a .38.  He had photographs of a .38, which is

synonymous with the weapon used in the homicide.  He has

12:05PM  weapons in his bedroom that I've allowed, the AR-15, et cetera.

It appears to me that it's more an issue now of

numerosity.  I don't see how that really helps show that he has

access to weapons.  I think that that's -- quite frankly, the

prejudicial effect here starts to outweigh the probative value.

12:06PM  MR. SCALLY:  And that's fine, Your Honor.  I'll

accept that ruling and move to the next --

THE COURT:  I haven't made a ruling.  It's just up

for discussion right now.  But I've got a -- it's somewhat like

autopsy photos.  I'll let you get in a certain amount, but then

12:06PM  it becomes excessive.

1          And it's the same ruling that the defense heard with

2     the ruling concerning River and the numerosity of photographs,

3     which may come into play again.  But when the witness testifies

4     that there are numerous photographs of River, 3, 4, 5, fine.

12:06PM 5     But 20?  No.  Then it's sympathy.  It strikes both ways.

6          So it's a delicate balance.  But here, I think

7     prejudicial effect outweighs the probative value.

8          MR. SCALLY:  Fair enough, Your Honor.

9          The other issue is concerning one of the -- one of

12:06PM 10    the exhibits that we talked about in the pretrial rulings --

11    pretrial motions, and the Court made rulings on, was an exhibit

12    of a recording of Wayne Le telling Tony Hoang, "I'm going to go

13    meet with this guy that owes me money, and I'm just going to

14    off him."  And I had argued in the pretrial motions that that

12:07PM 15    should be admitted because it corroborates Sandra Ritze.

16          THE COURT:  And I think I ruled against you on that.

17          MR. SCALLY:  Exactly.  I wanted to ask the Court to

18    reconsider in light of the extent of the cross-examination of

19    Sandra Ritze that, you know, is now -- we know what that extent

12:07PM 20    was.  We've seen the suggestion that Sandra Ritze is entirely

21    making up her testimony for the purpose of getting custody of

22    River, and that she's just parroting things from the news.

23          This one particular exhibit, I believe, corroborates

24    Sandra Ritze and rebuts those suggestions made on

12:08PM 25    cross-examination.

1           THE COURT:  But what allows us the transference
2    of intent?  What the jury would then assume is that because
3    Mr. Le made that statement that, therefore, that transferred
4    intent applies to Ms. Ritze.  That has always been my concern.
12:08PM 5    And there's no ability to cross-examine.

6           And I think that that is extraordinarily
7    prejudicial.  And in addition, it's going to be a very
8    difficult time trying to look ahead in terms of the decisions
9    you're both about to make concerning the psychologist or
12:08PM 10   psychiatrist.

11          First of all, if that person's put on the stand,
12   even if it's not for the truth of the matter asserted, both
13   parties are going to get into the conversations, what Ms. Ritze
14   said, if he was aware of Mr. Le's statements, how that
12:08PM 15   affected, et cetera.  And when the Court instructs that it's
16   not for the truth, hopefully the jury will abide by that
17   admonition.  But, in fact, in a practical matter, they will
18   have heard it.  Those are very difficult calls also coming down
19   the line.

12:09PM 20          But here, the prejudicial effect still outweighs the
21   probative value.  There's no ability to cross-examine.  And for
22   rehabilitation effects, it's minimal, Counsel.

23          MR. SCALLY:  Understood, Your Honor.  And I'm not
24   sure I caught the time that we're coming back.

12:09PM 25          THE COURT:  Well, 1:15.

```
 1            MR. SCALLY:  Thank you, Your Honor.

 2            THE COURT:  Okay.  Have a good lunch.  Thank you

 3    very much.

 4            (Lunch recess from 12:09 p.m. to 1:14 p.m.)

 5            (Out of the presence of the jury.)

 6            THE COURT:  We're back on the record.  All --

 7            Are we on the record?

 8            THE REPORTER:  Yes, Your Honor.

 9            THE COURT:  Yeah.  All counsel are present, the

10    defendant, the investigating agent; the jury and alternates are

11    not present.

12            MR. WIECHERT:  Yes.  And during the course of the

13    examination of Special Agent Casey, a multipage exhibit,

14    51-page exhibit was introduced, which was Exhibit 230.  And

15    page 4 of Exhibit -- I'm sorry, page 34 of Exhibit 230 was a

16    text with regard to Wayne telling Sheila about how she had --

17    he had to restrain someone and then clean the blood off of the

18    walls and the floor.

19            We had moved pretrial to exclude that.  The Court

20    denied our motion.  I didn't object at the time that this lump

21    exhibit came in because I didn't realize that that was part of

22    it.  But I just want to preserve for the record that we still

23    maintain that shouldn't have been introduced.

24            THE COURT:  Objection is noted.  And I appreciate

25    it.  Thank you, Counsel.
```

| | |
|---|---|
| 1 | Okay.  We'll get the jury. |
| 2 | **(In the presence of the jury.)** |
| 3 | THE COURT:  We're back in session.  The jury is |
| 4 | present, the alternates.  All counsel are still present, the |
| 01:17PM 5 | defendant, the investigating agency. |
| 6 | And, Counsel, would you like to call your next |
| 7 | witness, please. |
| 8 | MR. SCALLY:  Yes, Your Honor.  Thank you.  The |
| 9 | United States calls Special Agent Andrew Cho. |
| 01:17PM 10 | THE COURT:  Thank you so much. |
| 11 | Agent Cho, would you step forward, please.  Would |
| 12 | you raise your right hand, sir. |
| 13 | **ANDREW CHO, GOVERNMENT WITNESS, WAS SWORN** |
| 14 | THE COURT:  Thank you, sir.  Would you please |
| 01:17PM 15 | approach the witness stand. |
| 16 | And, sir, if you would be kind enough to be seated. |
| 17 | And would you pull that chair a little bit closer, if you can. |
| 18 | Sir, would you state your full name for the jurors. |
| 19 | THE WITNESS:  Andrew Cho, C-h-o. |
| 01:18PM 20 | THE COURT:  Counsel, would you give me one moment. |
| 21 | I left my notes in chambers.  I'll be right back. |
| 22 | **(Pause in proceedings.)** |
| 23 | THE COURT:  Thank you. |
| 24 | Counsel, direct examination, please. |
| 01:19PM 25 | MR. SCALLY:  Thank you, Your Honor. |

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | BY MR. SCALLY: |
| 3 | Q    Special Agent Cho, who do you work for? |
| 4 | A    FBI. |
| 01:19PM 5 | Q    And how long have you worked for the FBI? |
| 6 | A    20 years. |
| 7 | Q    Did you interview Sheila Ritze on December 19th, 2019, |
| 8 | after Special Agent Casey interviewed Sheila Ritze? |
| 9 | A    Yes, I did. |
| 01:19PM 10 | Q    Was that interview video-recorded? |
| 11 | A    Yes, it was. |
| 12 | MR. SCALLY:  Your Honor, at this time, I'd move to |
| 13 | admit Government's Exhibits 323 through 345 as that interview. |
| 14 | THE COURT:  Received. |
| 01:19PM 15 | **(Exhibit Numbers 323 through 345 received.)** |
| 16 | MR. SCALLY:  Permission to publish those exhibits, |
| 17 | Your Honor? |
| 18 | THE COURT:  You may publish. |
| 19 | **(Video recording was played, not reported.)** |
| 01:59PM 20 | MR. SCALLY:  No further questions, Your Honor. |
| 21 | THE COURT:  And cross-examination? |
| 22 | **CROSS-EXAMINATION** |
| 23 | BY MR. WIECHERT: |
| 24 | Q    Good afternoon, Special Agent Cho.  We've met before. |
| 02:00PM 25 | I'm sorry about your arm. |

1    You conducted an interrogation of Sheila Ritze on

2  the morning of December 19, 2019, at Santa Ana jail; is that

3  correct?

4  A    Yes, sir.

02:00PM 5  Q    And the tape that was played doesn't indicate the time of

6  the interview.

7    Do you recall the time that the interview commenced?

8  A    Shortly after -- like around 8:30-ish.

9  Q    The original interview that took place outside

02:00PM 10  Ms. Ritze's home, did you have an understanding of how long

11  that interview took place?

12  A    About an hour, 40, 50 minutes.

13  Q    And did you understand that it commenced around 5:30 in

14  the morning?

02:00PM 15  A    Yes, sir.

16  Q    And then after that interview completed, there would have

17  been a van ride or a car ride over to the Santa Ana jail;

18  correct?

19  A    Yeah, correct.

02:01PM 20  Q    And you were at the Santa Ana jail at the time not to

21  interview Ms. Ritze, but for a different reason; correct?

22  A    Correct.

23  Q    What was that reason?

24  A    To transport Wayne Le.

02:01PM 25  Q    All right.  And when you learned that Ms. Ritze was at

 1  the Santa Ana jail, you decided this might be an opportunity to

 2  talk to her again; correct?

 3  A    Yes, sir.

 4  Q    And so you and another special agent of the FBI asked for

02:01PM  5  an opportunity to interview her in one of the rooms at the

 6  Santa Ana jail?

 7  A    She was already in the room when I arrived.  So I arrived

 8  after her.

 9  Q    Okay.  And then the jail accommodated you and put Sheila

02:01PM 10  Ritze in a room, and you and another agent joined her; correct?

11  A    Correct.

12  Q    And at that time, you had an option as to whether or not

13  you would give her a full set of Miranda warnings again;

14  correct?

02:02PM 15          MR. SCALLY:  Objection.  Relevance.  403.

16          THE COURT:  Overruled.

17  Q    BY MR. WIECHERT:  You know what Miranda warnings are,

18  don't you?

19  A    Yes, sir.

02:02PM 20  Q    Yes.  And there are a couple primarily pillars of Miranda

21  warnings.  The first being that whatever you say can be used

22  against you; correct?

23  A    Yes.

24  Q    And the second pillar is that you have a right to an

02:02PM 25  attorney at basically any point in the process, including the

| | |
|---|---|
| 1 | interrogation; correct? |
| 2 | A    Yes. |
| 3 | Q    So when you started the interview of Ms. Ritze, you |
| 4 | didn't retell her those rights; correct? |
| 02:02PM 5 | A    Correct. |
| 6 | Q    Instead, you told her that it was in her best interest to |
| 7 | cooperate with you; correct? |
| 8 | A    No. |
| 9 | MR. SCALLY:  Objection.  Best evidence rule. |
| 02:02PM 10 | THE COURT:  Overruled. |
| 11 | Q    BY MR. WIECHERT:  Now -- go ahead. |
| 12 | A    We heard this -- or my partner advised her that the rights |
| 13 | that was read to her by the other agents were in play, and she |
| 14 | acknowledged. |
| 02:03PM 15 | MR. WIECHERT:  Can we play the first two minutes of |
| 16 | the interview again, please. |
| 17 | Q    BY MR. WIECHERT:  And, Special Agent Cho, I'm just going |
| 18 | to replay the first two minutes of the interview so we can see |
| 19 | how it started. |
| 02:03PM 20 | THE WITNESS:  Okay. |
| 21 | **(Audio recording was played, not reported.)** |
| 22 | Q    BY MR. WIECHERT:  Now, Special Agent Cho, at line 22 of |
| 23 | the transcript of the interview, you did indicate to Ms. Ritze |
| 24 | that, in your experience, 99 percent of the people who didn't |
| 02:04PM 25 | take the opportunity to talk to you regretted it; correct? |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | A     Yes, sir.                                            |
|       | 2  |          MR. WIECHERT:  And if you could continue, sir.    |
|       | 3  | Thank you.                                                 |
|       | 4  |          **(Audio recording was played, not reported.)**  |
| 01:59PM | 5  | Q     BY MR. WIECHERT:  You indicated to Ms. Ritze that you |
|       | 6  | knew she was in shock back there; correct?                 |
|       | 7  | A     Yes.                                                 |
|       | 8  | Q     And what is your definition of the word "shock," sir? |
|       | 9  | A     Well, average person whose house is entered by the FBI |
| 02:05PM | 10 | would be in shock; would be -- would have been startled.   |
|       | 11 | Q     My question was, what is the definition of the word  |
|       | 12 | "shock," sir, to you?                                      |
|       | 13 | A     I don't know.  Elevated sense of something that happened |
|       | 14 | to her unexpectedly.                                       |
| 02:06PM | 15 | Q     You understood that during the course of the arrest of |
|       | 16 | Ms. Ritze, that there was a breach of her doorway; correct? |
|       | 17 | A     Yes.                                                 |
|       | 18 | Q     That after the breach of the doorway by an FBI SWAT team, |
|       | 19 | they placed two flash-bangs in her house; correct?        |
| 02:06PM | 20 | A     Yes.                                                 |
|       | 21 | Q     And that through the course of the execution of the  |
|       | 22 | arrest warrant, that Ms. Ritze had a gash on her head; correct? |
|       | 23 | A     Yes.                                                 |
|       | 24 | Q     And we saw that gash on her head during the course of the |
| 02:06PM | 25 | interview; correct?                                        |

                1   A     Correct.

                2           MR. WIECHERT:  And if you could keep going, Special

                3   Agent Casey.

                4           **(Audio recording was played, not reported.)**

01:59PM    5   Q     BY MR. WIECHERT:  Sir, you see that during the beginning

                6   of the interview, you spoke to Ms. Ritze, about two minutes,

                7   about the advantages of cooperation; correct?

                8   A     That's correct.

                9   Q     And then your partner said, "This is to remind you of

02:08PM   10   your Miranda rights"; correct?

               11   A     Yes.

               12   Q     But he didn't remind Ms. Ritze of what those Miranda

               13   rights were; correct?

               14   A     Correct.

02:08PM   15   Q     In the tape, you indicate that you had an opportunity to

               16   meet with Special Agent Casey prior to interviewing Ms. Ritze;

               17   is that correct?

               18   A     No.  I spoke to him over the phone.

               19   Q     Did you talk to him?

02:08PM   20   A     No.  I think it was my partner.

               21   Q     Is it your testimony that you weren't debriefed about

               22   Ms. Ritze's first interview before you conducted your second

               23   interview?

               24   A     That's correct.  I was told that she was very cooperative,

02:08PM   25   which she was, clearly, on the video.

```
 1   Q    You were advised, sir, that Ms. Ritze had not admitted
 2   that she knew that there was anything nefarious planned when
 3   the boat left Dana Point Harbor on October 15; correct?
 4   A    Right after the interview with Ms. Sheila, I was told that
02:09PM  5   she was cooperative.  And that's what triggered me to think
 6   about re-interviewing her.  That was the extent of the
 7   briefing.
 8   Q    One of the reasons you wanted to talk to Sheila again was
 9   to try to get her to admit that she knew that something bad was
02:09PM 10   going to happen when she went out on that lobster fishing trip;
11   correct?
12   A    Purpose of me interviewing her was to get more
13   information.  As you'd probably agree, the more you talk to
14   people, the more information you could get out.  And the fact
02:09PM 15   that she was cooperative gave me another opportunity to do so.
16   That was the main reason.
17   Q    You have been trained how to testify at Quantico;
18   correct?
19           MR. SCALLY:  Objection.  Relevance.  403.
02:09PM 20           THE COURT:  Overruled.
21   Q    BY MR. WIECHERT:  You've been trained to testify -- how
22   to testify in court proceedings; correct?
23   A    Yes, sir.
24   Q    You understand that if you're asked a yes or no question,
02:10PM 25   you should be answering "yes" or "no," right?
```

```
 1   A    No.

 2             MR. SCALLY:  Objection.  Argumentative.

 3   Q    BY MR. WIECHERT:  Okay.  So when you don't --

 4             THE COURT:  Overruled.

 5   Q    BY MR. WIECHERT:  -- when you don't answer "yes" or "no"

 6   to a yes or no question, it is because you want to basically

 7   elaborate to get your version out; correct?

 8             MR. SCALLY:  Objection.  Argumentative.

 9             THE COURT:  Counsel, just restate the question.

10             MR. WIECHERT:  I'll keep going, Your Honor.

11   Q    BY MR. WIECHERT:  One of your desires during the course

12   of this interview was to have Ms. Ritze basically say to you

13   that she knew that something was wrong when she went out on the

14   boat on October 15; correct?

15   A    No.

16   Q    "No"?  Is that your answer?

17   A    Yes.

18   Q    All right.  Now, during the course of your examination,

19   one of the things you did on multiple occasions was remind

20   Ms. Ritze about her daughter; correct?

21   A    Yes, sir.

22   Q    And at Quantico, are you trained about interrogation

23   techniques?

24   A    Yes.

25   Q    And is one of the interrogation techniques you're trained
```

01:59PM  5
02:10PM 10
02:10PM 15
02:10PM 20
02:11PM 25

| | |
|---|---|
| 1 | in reminding a suspect about being separated from loved ones if |
| 2 | they don't cooperate with you? |
| 3 | A    No.  We don't get that specific, no. |
| 4 | Q    So did you make that up on your own, then, if you weren't |
| 02:11PM 5 | trained that way? |
| 6 | A    Yes.  I responded to her after she mentioned her daughter |
| 7 | twice.  And I addressed her concern. |
| 8 | Q    You mention- -- |
| 9 | A    If you look at the video, that's what I did.  I never |
| 02:11PM 10 | mentioned her daughter in the very beginning.  She mentioned it |
| 11 | for the second time around 20, 30 minutes into the interview, |
| 12 | and I addressed that issue. |
| 13 | Q    How many times did you mention her daughter to her? |
| 14 | A    Oh, multiple times after that. |
| 02:11PM 15 | Q    It was multiple times, was it not? |
| 16 | A    Yes, sir. |
| 17 | Q    And you also mentioned the fact that you had actually |
| 18 | looked at the Facebook postings of Ms. Ritze; correct? |
| 19 | A    Correct. |
| 02:11PM 20 | Q    And that was true, wasn't it? |
| 21 | A    Correct.  Yes.  That's what -- |
| 22 | Q    And when you saw the Facebook postings of Ms. Ritze, you |
| 23 | saw that she had posted multiple pictures of her and her |
| 24 | daughter; correct? |
| 02:12PM 25 | A    Yes. |

```
  1    Q    You knew, when you mentioned her daughter, that you were

  2    hitting a soft part of Ms. Ritze; correct?  A sensitive part.

  3    A    I was -- yes.  I was responding to her concerns about her

  4    daughter.

  5    Q    And you wanted to play that as a pressure point to get

  6    her to talk; correct?

  7    A    I was -- it was important to her, and I addressed her

  8    issue.

  9    Q    Let me show what has been received as Exhibit 542QQ.

 10              Was this one of the pictures you saw of Ms. Ritze

 11    prior to your interrogation of her?

 12    A    It was over two years ago.  I don't remember exactly what

 13    photos I saw.

 14    Q    You will note on the photograph that it was uploaded on

 15    December 7, 2019, which was about 12 days before the interview;

 16    correct?

 17    A    Yes.

 18    Q    Okay.  And you also notice that in the title of the

 19    picture, it said, "My sunshine on a cloudy day.  Stoked and

 20    proud to have her and to be loved by her.  Mommy/Riv Dog

 21    weekend," with some hearts thereafter.

 22              Do you see that, sir?

 23    A    Yes, sir.

 24    Q    If you had seen that, you would have concluded that

 25    Ms. Ritze had a great deal of love for her daughter; correct?
```

02:12PM  5
02:13PM 10
02:13PM 15
02:13PM 20
02:13PM 25

```
 1   A     Yes, sir.

 2   Q     Now, at no time during the course of the interview did

 3   Ms. Ritze ever admit to you that she knew, when she was going

 4   out on the boat with Mr. Dao and Mr. Le, that something was

 5   going to happen between them; correct?

 6   A     Right.

 7   Q     In the interview, there is a reference to a picture where

 8   you tell her, Ms. Ritze, that you have a photograph of a dead

 9   person on her boat; correct?

10   A     Correct.

11   Q     Now, first of all, you don't have a photograph of a

12   person -- a dead person on her boat; correct?

13   A     I have a photo of what appeared to be a person laying in

14   her boat with a life preserver thrown on top of her head.

15   Q     You know, sir, having investigated this case, that the

16   photo you have is not of a dead person on her boat; correct?

17   A     Correct.

18   Q     Thank you.

19         And when did you first receive that picture?

20   A     Shortly after we downloaded her phone.

21   Q     So how many weeks before the interview?

22   A     Oh.  Several weeks.

23   Q     Several weeks?

24   A     Four, five weeks.

25   Q     Now, as part of the toolbox that's available to the FBI,
```

UNITED STATES DISTRICT COURT

1  there are photographic analysts at your disposal; correct?

2  A    Yes.

3  Q    And are they in D.C. as well as in Orange County?

4  A    I don't know.

02:15PM 5  Q    You don't know.

6        Did you ever send that picture that you were

7  referring to to Ms. Ritze to any photo analyst at the FBI to

8  determine whether or not that actually was a dead body on her

9  boat?

02:15PM 10  A    There's no way to determine that.  The body was all

11  covered with clothing, and there was no exposed part of that

12  body; it was all covered up with clothing.

13  Q    You didn't know, sir, whether that picture actually

14  depicted a dead body at the time that you told Ms. Ritze it

02:16PM 15  did; correct?

16  A    I'm investigating a murder that occurred on a boat.  I see

17  a photo of what appeared to be a person laying on the boat with

18  a life preserver on top of her head.

19  Q    Did you understand that my last question was a yes or no

02:16PM 20  question?

21  A    Can you repeat that question.

22  Q    All right.  So let's try to do this.  You didn't know,

23  when you told Ms. Ritze that you had a picture of a dead person

24  on her boat, that there was actually a dead person on her boat;

02:16PM 25  correct?

1   A      Correct.

2   Q      Thank you.

3          MR. WIECHERT:  Nothing else, Your Honor.

4          THE COURT:  And redirect examination, please.

02:16PM   5          MR. SCALLY:  Thank you, Your Honor.

6                       **REDIRECT EXAMINATION**

7   BY MR. SCALLY:

8   Q      Special Agent Cho, on cross-examination, you were asked

9   questions about the wound on Sheila Ritze's forehead during

02:17PM   10   your interview.

11          Do you recall those questions?

12   A      Yes, sir.

13   Q      Did she appear to you to be in physical pain as a result

14   of that wound at the time of the interview?

02:17PM   15   A      Not at all.

16   Q      Did she appear to be in need of medical assistance for

17   that cut on her forehead at the time of the interview?

18   A      No.

19   Q      Did she appear to understand your questions?

02:18PM   20   A      Yes.

21   Q      Did she appear to be alert?

22   A      Yes.

23   Q      And oriented?

24   A      Yes.

02:18PM   25   Q      With respect to the photo that you had of what appeared

1    to you to be a dead body, what made you believe it to be a dead

2    body?

3    A    Based on the context, I'm investigating a murder that

4    occurred on her boat.  And I see a photo of what appeared to be

02:18PM  5    a person lying on the starboard side of her boat with a life

6    preserver thrown on top of her head.  So I made that connection

7    based on that.

8                MR. SCALLY:  No further questions, Your Honor.

9    Thank you.

02:18PM 10                THE COURT:  And --

11                MR. WIECHERT:  Nothing else, Your Honor.

12                THE COURT:  -- recross-examination?

13                May the witness be excused, Counsel, or would you

14    like the witness left on call?

02:19PM 15                MR. WIECHERT:  On call.

16                THE COURT:  On call.

17                MR. SCALLY:  Fine, Your Honor.

18                THE COURT:  We've set the date of April 19th.  It's

19    next week and then a couple days.  The case could actually

02:19PM 20    conclude earlier than that.  But we're going to ask you to

21    remain on call until April 19th at 5:00 p.m.  If you're needed,

22    everybody will be polite, we'll send out a subpoena and find

23    you.

24                Thank you very much, sir.  You may step down.

02:19PM 25                MR. SCALLY:  Your Honor, could we speak with the

1    Court for a moment?

2         THE COURT:  Certainly.

3              Just one moment, ladies and gentlemen.  Well, better

4    yet, why don't you take a recess.  And if you'd be so kind --

02:19PM 5    well, just a moment.  Maybe not.  Just remain there for just a

6    moment.

7              **(Sidebar out of the presence of the jury:)**

8         THE COURT:  We're at sidebar.

9              And, Counsel, you've asked for a brief discussion

02:25PM 10   because I think that this is the time that we've agreed that

11   we're going to recess instead of me calling for the next

12   witness in front of a jury.  I appreciate your courtesy.  Thank

13   you, both.

14             **(A discussion was held off the record.)**

02:25PM 15            **(Open court in the presence of the jury.)**

16        THE COURT:  We're back on the record.  The jury --

17   I'm sorry.  Let me make sure.

18             Back on the record.  The jury is present.  The

19   alternates are present, all counsel, the defendant, and the

02:25PM 20   investigating agency.

21             We're going to send you home tonight.  We believe

22   that starting Monday would have continuity to it, et cetera.

23             And counsel's doing their best to estimate when you

24   would get the case for deliberation.  We'll be in session next

02:25PM 25   week, certainly Monday, Tuesday, Wednesday, Thursday.  We could

be in session on Friday or a portion thereof.  But we think

you're going to get the case Monday or Tuesday of the following

week, in all likelihood, for argument.  About two weeks ahead

of schedule, frankly.

02:26PM        Don't hold us to that, but that's a good faith

estimate on all parties' part.  So we think you're going to

start your deliberations in about a week or so, maybe earlier,

than planned.  Now, remember, we gave you the outside estimate.

When we asked you to come in as jurors, we gave you a month

02:26PM estimate.

       But in the meantime, please don't discuss this

matter with anybody.  Don't form or express any opinion about

this case, even in your own mind.  And Monday at 8:00 o'clock.

And thank you so much for your promptness.

02:26PM        **(Out of the presence of the jury.)**

       THE COURT:  If you'd be seated.  Thank you for your

courtesy, Counsel.  We've had a sidebar, and that sidebar was

counsel and the Court reminding each other that we planned to

recess at this time for continuity.  But an issue started to be

02:27PM raised.

       And, Counsel, why don't you express your concerns.

       MR. STAPLES:  Yes, Your Honor.  In the

cross-examination of Agent Cho, the subject was brought up that

the defendant was not re-advised of her Miranda rights.  And

02:27PM the Government has absolutely no concern with the

```
  1   cross-examination into any coercion or subterfuge that may have

  2   been used.

  3           The issue the Government has is by expressly

  4   bringing up a claim of not being properly advised of Miranda,

  5   that the jury, not being otherwise instructed, might take it

  6   upon themselves to determine, "Well, maybe we shouldn't

  7   consider that or maybe her Miranda rights were violated."

  8           I'm only alerting the Court now.  I would like to

  9   research it over the weekend and address it.  Again, I don't

 10   think that Mr. Wiechert -- I'm not saying he did anything

 11   improper.  I'm just saying when that subject came up, it's a

 12   legitimate concern for us.  I could be wrong, but I'd like the

 13   opportunity to research it --

 14           THE COURT:  Sure.

 15           MR. STAPLES: -- come back on Monday, and address it

 16   with the Court.

 17           THE COURT:  Mr. Wiechert?

 18           MR. WIECHERT:  I have no opposition to Mr. Staples

 19   researching this weekend, Your Honor.

 20           THE COURT:  Okay.  Then is there anything further?

 21   Because I plan to let you go.  I think your representation was

 22   you wanted to exchange some instructions over the weekend.  So

 23   is there anything further?

 24           MR. SCALLY:  No, Your Honor.

 25           MR. WIECHERT:  Nothing else.
```

1          THE COURT:  All right.  Then we're in recess.  Then

2    8:00 o'clock on --

3          MR. STAPLES:  Oh, one thing.  Do you have hearings?

4    Do we need to move stuff?  Do you have a calendar before us on

02:29PM 5    Monday?

6          THE COURT:  We have a 7:30 calendar, but -- if you'd

7    be so kind.  You can just move them back if you'd like to, but

8    we'll need those tables for about a half-hour on Monday.

9          Have a good weekend.

02:29PM 10          **(Proceedings concluded at 2:29 p.m.)**

11                      --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  April 8, 2022*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**