1       **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA**

3       **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                    - - - - - - -

5   UNITED STATES OF AMERICA,        )
                                     )    **CERTIFIED**
6           Plaintiff,               )
                                     )
7       vs.                          ) No. 8:20-cr-00002-DOC
                                     )    Day 2, Volume II
8   SHEILA MARIE RITZE,              )
                                     )
9           Defendant.               )
    _____)

10

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                    Jury Trial

15              Santa Ana, California

16            Tuesday, April 5, 2022

17

18

19

20   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
21   United States District Court
     411 West 4th Street, Room 1-053
22   Santa Ana, California 92701
     (714) 558-8141
23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2
      FOR THE UNITED STATES OF AMERICA:
 3

 4         DEPARTMENT OF JUSTICE
           OFFICE OF THE UNITED STATES ATTORNEY
 5         BY:  Gregory Shepherd Scally
                Assistant United States Attorney
 6         411 West 4th Street
           8th Floor
 7         Santa Ana, California 92701
           714-338-3592
 8         gregory.scally@usdoj.gov

 9         DEPARTMENT OF JUSTICE
           OFFICE OF THE UNITED STATES ATTORNEY
10         BY:  Gregory Staples
                Assistant United States Attorney
11         411 West 4th Street
           8th Floor
12         Santa Ana, California 92701
           714-338-3535
13         greg.staples@usdoj.gov

14    FOR DEFENDANT 2) SHEILA MARIE RITZE:

15         David W. Wiechert (CJA appointed)
           WIECHERT MUNK & GOLDSTEIN PC
16         27136 Paseo Espada, Suite B1123
           San Juan Capistrano, California 92675
17         949-361-2822
           dwiechert@aol.com
18
           William James Migler (retained)
19         WIECHERT MUNK & GOLDSTEIN PC
           27136 Paseo Espada, Suite B1123
20         San Juan Capistrano, California 92675
           949-361-2822
21         william@wmgattorneys.com

22    ALSO PRESENT:

23         Special Agent Austin Casey
           Coast Guard Investigative Service
24
           Sheila Ritze, defendant
25
```

1                           I N D E X

2    PROCEEDINGS                                        PAGE

3    JURY TRIAL - DAY 2, VOLUME II

4    (Previous proceedings reported by Debbie
     Hino-Spaan in Volume I.)
5
     BERGER, Calvin (called by the government)        6
6
     BENEFIEL, Angela (called by the government)      18
7
     DR. PAUNOVIC, Brankica (called by the            38
8    government)

9                           WITNESSES

10   WITNESSES                DIRECT  CROSS  REDIRECT  RECROSS

11   BERGER, Calvin

12   By Mr. Staples               7

13   By Mr. Migler                       15

14
     BENEFIEL, Angela
15
     By Mr. Staples               18
16
     By Mr. Migler                       34
17

18   DR. PAUNOVIC, Brankica

19   By Mr. Staples               39

20

21                           EXHIBITS

22   EXHIBIT NO./DESCRIPTION        IDENTIFICATION   IN EVIDENCE

23
        101     Lobster Report Card                    30
24              (fishing license)

25      104     On-scene photo: Dao's                  29
                driver's license

```
 1                      EXHIBITS (Continued)

 2      EXHIBIT NO./DESCRIPTION          IDENTIFICATION      IN EVIDENCE

 3
        131      Autopsy photo: body bag                        46
 4               tag

 5      132      Autopsy photo: tattoo on                       61
                 Dao
 6
        133      Autopsy photo: bullet                          47
 7               wound in Dao's back

 8      134      Autopsy photo: Dao's                           53
                 face
 9
        135      Autopsy photo: Dao's                           54
10               hand

11      136      Autopsy photo: Dao's                           54
                 hand
12
        137      Autopsy photo: Dao's                           54
13               hand

14      138      Autopsy photo: Dao's                           54
                 hand
15
        139      Autopsy photo: bullet                          57
16               recovered from Dao's
                 back
17
        140      Autopsy photo: bullt                           57
18               recovered from Dao's
                 back
19      141      Autopsy photo:                                 51
                 lacerations on top of
20               head

21      142      On-scene photo: Dao's                          13
                 face
22
        143      On-scene photo: Dao's                          25
23               head lacerations

24      144      On-scene photo: body ID                        32
                 tag
25
```

```
 1                    EXHIBITS (Continued)

 2   EXHIBIT NO./DESCRIPTION          IDENTIFICATION      IN EVIDENCE

 3
        145      On-scene photo:                             10
 4               fishermen

 5      146      Photo of entry and exit                     49
                 wound
 6
        147      Photo of knife                              31
 7
        400      Physical item: bullet                       62
 8               recovered from Dao's
                 back
 9
        404      Physical exhibit (Orange                    28
10               jacket)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

6

|     |    |                                                          |
|-----|----|----------------------------------------------------------|
|     | 1  | **SANTA ANA, CALIFORNIA, TUESDAY, APRIL 5, 2022**        |
|     | 2  | **Day 2, Volume II**                                     |
|     | 3  | (11:02 a.m.)                                             |
|     | 4  | *(Previous proceedings reported by Debbie*               |
|     | 5  | *Hino-Spaan in Volume I.)*                               |
|     | 6  | *(In the presence of the jury.)*                         |
| 11:02 | 7  | THE COURT:  We're back on the record.  The jury's      |
|     | 8  | present.  The alternates are present, all counsel, the   |
|     | 9  | defendant, the investigating agency.  And, Counsel, on   |
|     | 10 | behalf of the government, your first witness, please.    |
| 11:02 | 11 | MR. STAPLES:  Yes, Your Honor.  United States          |
|     | 12 | calls Officer Calvin Berger.                             |
| 11:02 | 13 | THE COURT:  Thank you, sir.  If you'd raise your       |
|     | 14 | right hand, please.                                      |
| 11:02 | 15 | **CALVIN BERGER, CALLED BY THE GOVERNMENT, SWORN**     |
| 11:03 | 16 | THE WITNESS:  I do.                                    |
| 11:03 | 17 | THE COURT:  Thank you.  Sir, if you'd be seated in    |
|     | 18 | the witness box.  It's just to my right.  If you'd state |
|     | 19 | your full name for the jurors.                           |
| 11:03 | 20 | THE WITNESS:  Calvin Berger.                           |
| 11:03 | 21 | THE COURT:  Spell your last name, sir.                |
| 11:03 | 22 | THE WITNESS:  B-E-R-G-E-R.                             |
| 11:03 | 23 | THE COURT:  Thank you.                                 |
| 11:03 | 24 | Then direct examination by the government.             |
| 11:03 | 25 | MR. STAPLES:  Thank you, Your Honor.                   |

|       |    |                                                    |
|-------|----|----------------------------------------------------|
| 11:03 | 1  | **DIRECT EXAMINATION**                             |
| 11:03 | 2  | BY MR. STAPLES:                                    |
| 11:03 | 3  | Q.   Good morning, Officer Berger.                 |
| 11:03 | 4  | A.   Good morning.                                 |
| 11:03 | 5  | Q.   Where do you currently work?                  |
| 11:03 | 6  | A.   With the City of Oceanside Police Department. |
| 11:03 | 7  | Q.   And what's your position or title there?      |
| 11:03 | 8  | A.   I am a police officer currently assigned to the Harbor |
|       | 9  | Unit.                                              |
| 11:03 | 10 | Q.   And how long have you worked for Oceanside PD? |
| 11:03 | 11 | A.   About six years now.                          |
| 11:03 | 12 | Q.   And how much of that time has been with the Harbor |
|       | 13 | Unit?                                              |
| 11:03 | 14 | A.   A little over four years.                     |
| 11:03 | 15 | Q.   All right.  Prior to working at Oceanside Police |
|       | 16 | Department, what did you do?                        |
| 11:04 | 17 | A.   I was a full-time student and working at -- part-time |
|       | 18 | at a resort.                                       |
| 11:04 | 19 | Q.   Okay.  Where'd you go to college?             |
| 11:04 | 20 | A.   Cal State University San Marcos.              |
| 11:04 | 21 | Q.   And what was your major?                      |
| 11:04 | 22 | A.   Criminology and justice studies.             |
| 11:04 | 23 | Q.   Okay.  And so you went from college to Oceanside Police |
|       | 24 | Department?                                        |
| 11:04 | 25 | A.   Yes, sir.                                     |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
| 11:04 | 1  | Q.   And did you receive any training when you began at     |
|       | 2  | Oceanside Police Department?                                |
| 11:04 | 3  | A.   Yes, sir.                                              |
| 11:04 | 4  | Q.   Can you just describe the length of the training?      |
| 11:04 | 5  | A.   It's the six-month-long California POST-approved Police |
|       | 6  | Academy, the San Diego County Regional Academy.            |
| 11:04 | 7  | Q.   Okay.  Now, you say that you had been working for the  |
|       | 8  | Harbor Unit of Oceanside Police Department.  Can you tell  |
|       | 9  | the jury what that entails?                                 |
| 11:04 | 10 | A.   In the Harbor Unit, our primary focus is maritime law  |
|       | 11 | enforcement within the Oceanside small craft harbor, and   |
|       | 12 | along the north county coastline just outside the harbor.  |
|       | 13 | So we do both land- and water-based patrols of that area and |
|       | 14 | provide rescue services within that area as well.          |
| 11:05 | 15 | Q.   So you do both what we might call "law enforcement"    |
|       | 16 | duties as well as search and rescue?                        |
| 11:05 | 17 | A.   Yes, sir.                                              |
| 11:05 | 18 | Q.   And I take it that the department has a boat or -- a   |
|       | 19 | boat or more boats in Oceanside marina?                     |
| 11:05 | 20 | A.   Yes, sir.                                              |
| 11:05 | 21 | Q.   Do you recall being on duty in October 16th, 2019?     |
| 11:05 | 22 | A.   Yes, sir.                                              |
| 11:05 | 23 | Q.   Do you recall receiving a call -- do you recall        |
|       | 24 | receiving a call for assistance that day shortly before 1:00 |
|       | 25 | in the afternoon?                                           |

| | | |
|---|---|---|
| 11:05 | 1 | A.   Yes, sir. |
| 11:05 | 2 | Q.   Who was the call from? |
| 11:05 | 3 | A.   It was from United States Coast Guard Sector San Diego. |
| 11:06 | 4 | Q.   What was the call about? |
| 11:06 | 5 | A.   It was -- reference a possible body floating in the |
| | 6 | water about 7 nautical miles northwest of the Oceanside |
| | 7 | harbor. |
| 11:06 | 8 | Q.   When you say "nautical miles," what does that mean to |
| | 9 | the average person? |
| 11:06 | 10 | A.   That would be roughly 8 miles. |
| 11:06 | 11 | Q.   Were you provided any kind of location information as |
| | 12 | to where the body was? |
| 11:06 | 13 | A.   We were provided coordinates of the approximate |
| | 14 | location. |
| 11:06 | 15 | Q.   And did the Coast Guard indicate who provided them that |
| | 16 | information? |
| 11:06 | 17 | A.   It was from a fishing vessel in the area. |
| 11:06 | 18 | Q.   All right.  Once you received that information, what |
| | 19 | did you do? |
| 11:06 | 20 | A.   Myself, Officer Ephron, and Officer Cuniff responded to |
| | 21 | check the area on Oceanside Rescue Boat 3. |
| 11:06 | 22 | Q.   And I asked you if the Coast Guard provided you |
| | 23 | location.  Did they provide you coordinates? |
| 11:06 | 24 | A.   Yes, sir. |
| 11:06 | 25 | Q.   Can you tell the jury what that was or what they were? |

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

10

11:06    1    A.    It's just latitude and longitude we use to identify a

         2    specific location within the ocean.

11:07    3    Q.    And do you use GPS to -- to try and find that location?

11:07    4    A.    Yes, sir.  We, uh -- we take the provided coordinates,

         5    input 'em into a GPS aboard our vessel, and that will

         6    essentially give us directions to that location.

11:07    7    Q.    All right.  And so I believe you testified that you and

         8    the other officers headed for that location?

11:07    9    A.    Yes, sir.

11:07   10    Q.    Did you locate the fishing boat that had found the

        11    body?

11:07   12    A.    Yes, sir.

11:07   13    Q.    If you look in front of you, there's a small stack of

        14    documents.  There should be one marked at the lower right

        15    Exhibit 145.

11:07   16    A.    Yes, sir.

11:07   17    Q.    Do you recognize that?

11:07   18    A.    Yes, sir.

11:07   19    Q.    What is that?

11:07   20    A.    This is the vessel that we located while responding to

        21    the call.

11:07   22    Q.    I would move to admit Exhibit 145, Your Honor.

11:07   23              THE COURT:  It's received.

11:07   24         *(Exhibit Number 145 received in evidence.)*

11:07   25         *(Exhibit displayed.)*

| | | |
|---|---|---|
| 11:07 | 1 | BY MR. STAPLES: |
| 11:07 | 2 | Q.   Is this the picture -- did you take this picture, or |
| | 3 | did one of the other officers? |
| 11:08 | 4 | A.   I believe it was Officer Ephron. |
| 11:08 | 5 | Q.   Okay.  And this was the boat with the fishermen who |
| | 6 | found the body? |
| 11:08 | 7 | A.   Yes, sir. |
| 11:08 | 8 | Q.   Obviously, this was taken once you got there? |
| 11:08 | 9 | A.   Yes, sir. |
| 11:08 | 10 | Q.   So the clouds in the background and the condition of |
| | 11 | the sea, that's what you recall were the conditions at that |
| | 12 | time? |
| 11:08 | 13 | A.   Yes, sir. |
| 11:08 | 14 | Q.   And when you made contact with the fishermen on this |
| | 15 | boat, did they direct you to where the body was? |
| 11:08 | 16 | A.   Yes, sir. |
| 11:08 | 17 | Q.   About how far were they from it? |
| 11:08 | 18 | A.   I would say within a hundred yards. |
| 11:08 | 19 | Q.   Okay.  Had they been -- had they purposely stayed with |
| | 20 | the body till you arrived? |
| 11:08 | 21 | A.   Yes, sir. |
| 11:08 | 22 | Q.   And once they pointed the body to you, what did you do? |
| 11:08 | 23 | A.   We responded to that location and located the body. |
| 11:08 | 24 | Q.   And tell the jury what you saw in the water. |
| 11:08 | 25 | A.   Uh, it was the body floating facedown. |

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

12

| | | |
|---|---|---|
| 11:09 | 1 | Q.   Okay.  And do you recall any color of clothing that was |
| | 2 | worn? |
| 11:09 | 3 | A.   Wearing an orange windbreaker, and I believe gray, like |
| | 4 | jogging pants. |
| 11:09 | 5 | Q.   All right.  And did you and the other officers pull up |
| | 6 | to the body in your boat? |
| 11:09 | 7 | A.   Yes, sir. |
| 11:09 | 8 | Q.   And you saw them -- you saw a man.  Was it a man or a |
| | 9 | woman? |
| 11:09 | 10 | A.   Uh, initially, we couldn't tell from behind. |
| | 11 | Officer Ephron grabbed one'a the subject's arms.  I grabbed |
| | 12 | his other arm.  As we pulled 'em outta the water, we could |
| | 13 | identify 'em as a man. |
| 11:09 | 14 | Q.   So at the time you pulled up, he's floating facedown -- |
| 11:09 | 15 | *(Court reporter requests clarification for the* |
| | 16 | *record.)* |
| 11:09 | 17 | BY MR. STAPLES: |
| 11:09 | 18 | Q.   You pulled the body out of the water, you and |
| | 19 | Officer Ephron and at that point, do you turn it over on its |
| | 20 | back? |
| 11:09 | 21 | A.   Yes, sir. |
| 11:09 | 22 | Q.   And you're able to determine it was a man? |
| 11:09 | 23 | A.   Yes, sir. |
| 11:09 | 24 | Q.   Did he appear to be dead to you? |
| 11:09 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 11:10 | 1 | Q.   Why do you say that? |
| 11:10 | 2 | A.   As we grabbed his limbs, I observed that they were |
| | 3 | stiff, uh, which is a sign of death, *rigor mortis*. |
| 11:10 | 4 | Q.   Did you see any blood? |
| 11:10 | 5 | A.   Yes, sir. |
| 11:10 | 6 | Q.   Where did you see blood? |
| 11:10 | 7 | A.   There was blood coming from the subject's forehead and |
| | 8 | blood on his upper back, I believe. |
| 11:10 | 9 | Q.   Okay.  I'm gonna ask you to take a look at Exhibit 142 |
| | 10 | that's in front of you.  Do you recognize that? |
| 11:10 | 11 | A.   Yes, sir. |
| 11:10 | 12 | Q.   What is that? |
| 11:10 | 13 | A.   That is the body shortly after we pulled it outta the |
| | 14 | water. |
| 11:10 | 15 | Q.   And that's how -- that's how it looked that day to you? |
| 11:10 | 16 | A.   Yes, sir. |
| 11:10 | 17 | MR. STAPLES:  Move to admit 142, Your Honor. |
| 11:10 | 18 | THE COURT:  Received. |
| 11:10 | 19 | *(Exhibit Number 142 received in evidence.)* |
| 11:10 | 20 | *(Exhibit displayed.)* |
| 11:10 | 21 | BY MR. STAPLES: |
| 11:10 | 22 | Q.   So this is how the body appeared? |
| 11:10 | 23 | A.   Yes, sir. |
| 11:10 | 24 | Q.   And is this actually taken on your boat? |
| 11:11 | 25 | A.   Yes, sir. |

11:11   1   Q.   And just for the record, this is some'a the blood you

        2   were referring to on the jacket?

11:11   3   A.   Yes, sir.

11:11   4   Q.   And there appears to be some blood on this tarp or

        5   sheet?

11:11   6   A.   Yes, sir.

11:11   7   Q.   In addition to on the face?

11:11   8   A.   Yes.

11:11   9   Q.   And what's this yellow thing here?

11:11   10   A.   That is an emergency blanket we keep aboard our

        11   vessels.

11:11   12   Q.   So that blood there is blood that came out after you

        13   brought 'em on board?

11:11   14   A.   Yes, sir.

11:11   15   Q.   So the body was still -- blood was still coming out of

        16   the body after you pull it outta the water?

11:11   17   A.   Yes, sir.

11:11   18   Q.   Now, as part of your duties when you're recovering a

        19   body from the ocean, do you typically examine the body, go

        20   through the pockets or things like that?

11:11   21   A.   Typically, as far as searching the person'a the body,

        22   we will allow the medical examiner to do that when they

        23   respond to the scene.

11:12   24   Q.   So is it fair to say the goal of when you recover a

        25   body is to keep it in as close a condition as when you found

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | it?                                                          |
| 11:12 | 2  | A.   Yes, sir.                                              |
| 11:12 | 3  | Q.   And why is that?                                       |
| 11:12 | 4  | A.   Just to preserve any, uh, evidence on it or around the |
|       | 5  | body.                                                       |
| 11:12 | 6  | Q.   Thank you.                                            |
| 11:12 | 7  |         MR. STAPLES:  No further questions, Your Honor.    |
| 11:12 | 8  |         THE COURT:  Cross-examination, please.            |
| 11:12 | 9  |         MR. MIGLER:  Yes, Your Honor.                     |
| 11:12 | 10 |                    **CROSS-EXAMINATION**                  |
| 11:12 | 11 | BY MR. MIGLER:                                            |
| 11:12 | 12 | Q.   Good morning, Officer.                               |
| 11:12 | 13 | A.   Good morning.                                        |
| 11:12 | 14 | Q.   As you were headed out to respond to the coordinates |
|       | 15 | given to you by the Coast Guard, about how far away were you |
|       | 16 | when you were first able to see the deceased?            |
| 11:13 | 17 | A.   We could see the area and an object floating in the  |
|       | 18 | water from where we were contacting the vessel, which, as I |
|       | 19 | stated earlier, was probably within a hundred yards.     |
| 11:13 | 20 | Q.   So about 300 feet?                                   |
| 11:13 | 21 | A.   Roughly.                                             |
| 11:13 | 22 | Q.   And how close did you have to get before you were able |
|       | 23 | to distinguish it as a human body?                       |
| 11:13 | 24 | A.   As we got up on it, we could tell that it was a human |
|       | 25 | body, I'd say within 20 feet.                            |

| | | |
|---|---|---|
| 11:13 | 1 | Q.   And the deceased was wearing an orange windbreaker; |
| | 2 | correct? |
| 11:13 | 3 | A.   Yes, sir. |
| 11:13 | 4 | Q.   And it was a bright orange; right? |
| 11:13 | 5 | A.   Yes, sir. |
| 11:13 | 6 | Q.   And it being bright orange made it easy to see when |
| | 7 | contrasted against the blue water; right? |
| 11:13 | 8 | A.   Yes, sir. |
| 11:13 | 9 | Q.   Now, the state of the water that day or that -- at that |
| | 10 | moment, it looked to've been pretty flat, no white caps; is |
| | 11 | that correct? |
| 11:14 | 12 | A.   Yes, sir. |
| 11:14 | 13 | Q.   And you were about 7 miles out; is that -- is that your |
| | 14 | testimony? |
| 11:14 | 15 | A.   Yes, sir. |
| 11:14 | 16 | Q.   Now, you also testified on direct examination that you |
| | 17 | and Officer Ephron pulled the deceased in your -- into the |
| | 18 | boat; correct? |
| 11:14 | 19 | A.   Correct. |
| 11:14 | 20 | Q.   You grabbed one arm and Officer Ephron grabbed the |
| | 21 | other arm; right? |
| 11:14 | 22 | A.   Yes, sir. |
| 11:14 | 23 | Q.   Now, in doing so, you didn't observe anything tied to |
| | 24 | the deceased arms; correct? |
| 11:14 | 25 | A.   No, sir. |

| 11:14 | 1 | Q.   And you didn't observe anything tied to the deceased |
| | 2 | legs; correct? |
| 11:14 | 3 | A.   No, sir. |
| 11:14 | 4 | Q.   And you didn't observe anything tied to any other part |
| | 5 | of the body, like the torso; correct? |
| 11:14 | 6 | A.   No, sir. |
| 11:14 | 7 | MR. MIGLER:  All right.  Thank you, Officer. |
| 11:14 | 8 | No further questions, Your Honor. |
| 11:14 | 9 | THE COURT:  Counsel. |
| 11:14 | 10 | MR. STAPLES:  No redirect, Your Honor. |
| 11:14 | 11 | THE COURT:  Now, Counsel, in an abundance of |
| | 12 | caution to save subpoenas would you like the Court to ask |
| | 13 | the witnesses to remain on call for some period of time? |
| 11:14 | 14 | MR. MIGLER:  This witness can be excused.  We |
| | 15 | might want some witnesses on recall. |
| 11:15 | 16 | THE COURT:  I'm sorry. |
| 11:15 | 17 | MR. MIGLER:  So Officer Berger can be excused, but |
| | 18 | there might be some witnesses we'll ask for recall. |
| 11:15 | 19 | THE COURT:  Counsel.  Excused? |
| 11:15 | 20 | MR. STAPLES:  Yes, sir. |
| 11:15 | 21 | THE COURT:  Officer, thank you very much.  You're |
| | 22 | excused from these proceedings.  You may step down. |
| 11:15 | 23 | *(Witness excused.)* |
| 11:15 | 24 | THE COURT:  Your next witness, please. |
| 11:15 | 25 | MR. STAPLES:  United States calls Angela Benefiel. |

| 11:16 | 1 | Your Honor, may I approach with exhibits? |
| 11:16 | 2 | THE COURT:  You may.  Thank you. |
| 11:16 | 3 | Ms. Benefiel, if you would be kind enough to step |
| | 4 | forward, and if you'd enter the courtroom through those |
| | 5 | double swinging gates.  And now would you stop at that |
| | 6 | location and raise your right hand. |
| 11:16 | 7 | **ANGELA BENEFIEL, CALLED BY THE GOVERNMENT, SWORN** |
| 11:16 | 8 | THE WITNESS:  I do. |
| 11:16 | 9 | THE COURT:  Thank you.  If you'd please be seated |
| | 10 | to my right.  And would you be kind enough to state your |
| | 11 | full name for the jurors, please. |
| 11:16 | 12 | THE WITNESS:  Sure.  Angela Benefiel. |
| 11:16 | 13 | THE COURT:  And would you spell your last name, |
| | 14 | please. |
| 11:16 | 15 | THE WITNESS:  B, as in boy, E-N-E-F, as in Frank, |
| | 16 | I-E-L. |
| 11:16 | 17 | **DIRECT EXAMINATION** |
| 11:17 | 18 | BY MR. STAPLES: |
| 11:17 | 19 | Q.   Good morning, ma'am. |
| 11:17 | 20 | THE COURT:  Just a moment, Counsel. |
| 11:17 | 21 | Would you respell your last name, please. |
| 11:17 | 22 | THE WITNESS:  Sure.  B, as in boy, E-N-E-F, as in |
| | 23 | Frank, I-E-L. |
| 11:17 | 24 | THE COURT:  I-E-L.  Thank you. |
| 11:17 | 25 | And direct examination, please. |

| | | |
|---|---|---|
| 11:17 | 1 | MR. STAPLES:  Thank you, Your Honor. |
| 11:17 | 2 | BY MR. STAPLES: |
| 11:17 | 3 | Q.   Good morning, again. |
| 11:17 | 4 | A.   Good morning. |
| 11:17 | 5 | Q.   Tell the jury where you currently work. |
| 11:17 | 6 | A.   San Diego County Medical Examiner's Office. |
| 11:17 | 7 | THE COURT:  I'm sorry.  Pull that microphone, if |
| | 8 | you'd be so kind, a little closer.  In other words, just |
| | 9 | pull it down. |
| 11:17 | 10 | THE WITNESS:  Okay. |
| 11:17 | 11 | THE COURT:  There we go. |
| 11:17 | 12 | Now, would you reask the question, Counsel, and |
| | 13 | speak a little bit more slowly, 'cause we're gonna get a |
| | 14 | transcription of what you say.  Okay? |
| 11:17 | 15 | THE WITNESS:  Gotcha. |
| 11:17 | 16 | MR. STAPLES:  Thank you, Your Honor. |
| 11:17 | 17 | BY MR. STAPLES: |
| 11:17 | 18 | Q.   Ma'am, tell the jury where you work. |
| 11:17 | 19 | A.   The San Diego County Medical Examiner's Office. |
| 11:17 | 20 | Q.   And what do you do there? |
| 11:17 | 21 | A.   I'm a supervisor/investigator. |
| 11:17 | 22 | Q.   And how long have you worked for the San Diego County |
| | 23 | Medical Examiner's Office? |
| 11:17 | 24 | A.   Just at nine years. |
| 11:17 | 25 | Q.   Nine years? |

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

20

| | | |
|---|---|---|
| 11:17 | 1 | A.   Uh-huh. |
| 11:17 | 2 | Q.   And is a medical examiner's office what might be |
| | 3 | commonly called a coroner's office? |
| 11:18 | 4 | A.   It is. |
| 11:18 | 5 | Q.   Okay.  And tell the jury what your duties are as an |
| | 6 | investigator with the San Diego County Examiner's Office? |
| 11:18 | 7 | A.   Essentially, we take all calls of death that occur |
| | 8 | within the county and triage from there whether or not an |
| | 9 | investigator needs to respond to the scene.  And if we |
| | 10 | respond to a scene, then from that point, we do photographs, |
| | 11 | body examinations, follow up with families, medical history, |
| | 12 | *et cetera*. |
| 11:18 | 13 | Q.   And when you say you're doing photographs and that sort |
| | 14 | of thing, is that something you generally do at the scene? |
| 11:18 | 15 | A.   Yes, sir. |
| 11:18 | 16 | Q.   And what is the purpose of doing all that?  What ends |
| | 17 | up happening with that information you gather? |
| 11:18 | 18 | A.   So basically we are documenting the scene to be able to |
| | 19 | provide that information over to the pathologist so that |
| | 20 | they can have that, basically, the story and be able to be |
| | 21 | there at the scene when they are not there.  So we're kinda |
| | 22 | the eyes and ears for the actual pathologist and the doctor. |
| 11:19 | 23 | Q.   And the pathologist is the one who would perform |
| | 24 | autopsy? |
| 11:19 | 25 | A.   Correct. |

11:19   1    Q.    Over the course of your career with the San Diego

        2    County Medical Examiner's Office, approximately how many

        3    deaths do you deal with a year -- do -- would you

        4    investigate or supervise the investigation of?

11:19   5    A.    On average, roughly 300 a year.

11:19   6    Q.    Now, what training have you had to become an

        7    investigator with the medical examiner's office?

11:19   8    A.    So I have a master's degree in anthropology, and I'm

        9    also board certified under ABMDI, or the American Board of

        10   Medicolegal Death Investigators.

11:19   11   Q.    Could you repeat that last one a little more slowly,

        12   please?

11:19   13   A.    Sure.  It's ABMDI, which is the American Board of

        14   Medicolegal Death Investigators.

11:20   15   Q.    And do you also receive ongoing training as part of

        16   your work?

11:20   17   A.    I do.

11:20   18   Q.    And just in general can you describe briefly the

        19   procedures you follow when you respond to a scene where

        20   there's a dead body?

11:20   21   A.    Can you clarify the question?

11:20   22   Q.    Well, just -- like, what would be your first and second

        23   steps when you arrive at a scene?

11:20   24   A.    Generally, when I first arrive on scene, I make contact

        25   with the responding law enforcement agents or agencies.

|       |    |                                                                   |
|-------|----|-------------------------------------------------------------------|
|       | 1  | Basically, get a scene debriefing from them, and then from        |
|       | 2  | that point, uh, kinda walk through the scene as a whole           |
|       | 3  | depending on where it's at.  It can be a larger area or           |
|       | 4  | smaller area.  And just kinda proceed from there, kinda           |
|       | 5  | taking in the scene, and then towards -- more focused on the      |
|       | 6  | body.                                                             |
| 11:20 | 7  | Q.   Okay.  I don't think I asked you, you don't respond          |
|       | 8  | every time somebody dies in San Diego County, do you?            |
| 11:21 | 9  | A.   No, I do not.                                                |
| 11:21 | 10 | Q.   What types of deaths do you respond to?                      |
| 11:21 | 11 | A.   We respond to all types of deaths including naturals         |
|       | 12 | but predominantly most -- most commonly are more deaths that      |
|       | 13 | are accidental in nature, suicidal, homicide, *et cetera*.        |
| 11:21 | 14 | Q.   And is that determine what you describe your triage --       |
|       | 15 | triage -- triage process?                                         |
| 11:21 | 16 | A.   It is.                                                       |
| 11:21 | 17 | Q.   Were you on duty on October 16, 2019?                        |
| 11:21 | 18 | A.   I was.                                                       |
| 11:21 | 19 | Q.   Do you recall getting a call about a body being found        |
|       | 20 | at sea?                                                           |
| 11:21 | 21 | A.   I do.                                                        |
| 11:21 | 22 | Q.   Did you respond to that call?                                |
| 11:21 | 23 | A.   I did.                                                       |
| 11:21 | 24 | Q.   Where did you go?                                            |
| 11:21 | 25 | A.   I believe it was Oceanside pier.  Harbor police pier.        |

| 11:21 | 1  | Q.   That's in ocean -- that's Oceanside harbor? |

11:21  1   Q.   That's in ocean -- that's Oceanside harbor?

11:21  2   A.   Yes.

11:21  3   Q.   And so you responded to Oceanside Police Department

       4   officers?

11:22  5   A.   Yes.

11:22  6   Q.   And did you've a trainee with you that day?

11:22  7   A.   I did.

11:22  8   Q.   What was her name?

11:22  9   A.   I'm sorry.  I can't really recall.

11:22  10  Q.   Was that --

11:22  11       *(Simultaneous speaking)*

11:22  12       THE COURT:  I'm sorry.  We'll stop.  There's a

       13  speak-over.  Counsel, reask the question a little bit more

       14  slowly.

11:22  15       MR. STAPLES:  Sure, Your Honor, and I apologize

       16  for speaking over.

11:22  17       THE COURT:  Fine.

11:22  18  BY MR. STAPLES:

11:22  19  Q.   Was that Ms. Alonso?

11:22  20  A.   It was.

11:22  21  Q.   And where was the body?

11:22  22  A.   It was on the -- the harbor boat -- one of the harbor

       23  boats.

11:22  24  Q.   And to the extent you recall, what did you and

       25  Ms. Alonso do when you got to the boat?

| | | |
|---|---|---|
| 11:22 | 1 | A.   Essentially, boarded the boat and began our body |
| | 2 | examination. |
| 11:22 | 3 | Q.   Was the body clothed? |
| 11:22 | 4 | A.   Yes. |
| 11:22 | 5 | Q.   Did you take -- or did you or Ms. Alonso take pictures? |
| 11:22 | 6 | A.   Yes. |
| 11:22 | 7 | Q.   Was it Ms. Alonso? |
| 11:23 | 8 | A.   Yes, she was the photographer that day. |
| 11:23 | 9 | Q.   Show you what's put into evidence as 142. |
| 11:23 | 10 | *(Exhibit displayed.)* |
| 11:23 | 11 | BY MR. STAPLES: |
| 11:23 | 12 | Q.   Do you recognize that, ma'am? |
| 11:23 | 13 | A.   I do. |
| 11:23 | 14 | Q.   And does that accurately reflect the body when you came |
| | 15 | onboard to look at it? |
| 11:23 | 16 | A.   Not exactly as we came onboard, but shortly thereafter |
| | 17 | when we began our investigation. |
| 11:23 | 18 | Q.   How did you appear when you first came onboard? |
| 11:23 | 19 | A.   To my recollection, I believe that when we first got |
| | 20 | onboard, he was, uh -- I believe he was prone, but I would |
| | 21 | have to refer to my report. |
| 11:23 | 22 | THE COURT:  We're going to ask you to slow down |
| | 23 | your answers just a little bit. |
| 11:23 | 24 | THE WITNESS:  Sure. |
| 11:23 | 25 | THE COURT:  Okay.  Thank you. |

| | | |
|---|---|---|
| 11:23 | 1 | BY MR. STAPLES: |
| 11:23 | 2 | Q.   And at that point when you see the body, do you begin |
| | 3 | your examination? |
| 11:23 | 4 | A.   Yes, sir. |
| 11:23 | 5 | Q.   Tell the jury just in general terms what you do when |
| | 6 | you examine a body like this. |
| 11:23 | 7 | A.   Essentially, we -- we try to work in more or less a |
| | 8 | pattern, so to speak.  So we usually start from top, from |
| | 9 | the head, and move down, and we basically examine the body |
| | 10 | for any injuries, um, what other signs of -- fluids and |
| | 11 | abrasions and anything that's presented on the body. |
| 11:24 | 12 | Q.   Okay.  Now, you say you started at the head.  In front |
| | 13 | of you, there should be a stack of papers.  If you look at |
| | 14 | the second one, it should be marked 143 down in lower |
| | 15 | right-hand corner. |
| 11:24 | 16 | A.   Yes. |
| 11:24 | 17 | Q.   Do you recognize that? |
| 11:24 | 18 | A.   I do. |
| 11:24 | 19 | Q.   Is that a photo that Ms. Alonso took that day of the |
| | 20 | body? |
| 11:24 | 21 | A.   It is. |
| 11:24 | 22 | MR. STAPLES:  Move to admit 143, Your Honor. |
| 11:24 | 23 | THE COURT:  Received. |
| 11:24 | 24 | *(Exhibit Number 143 received in evidence.)* |
| | 25 | |

| 11:24 | 1  | BY MR. STAPLES: |
| 11:24 | 2  | Q.   Now, you said you began -- you would usually begin at |
|       | 3  | the top of the head. |
| 11:24 | 4  | *(Exhibit displayed.)* |
| 11:24 | 5  | BY MR. STAPLES: |
| 11:24 | 6  | Q.   Do you recognize this? |
| 11:24 | 7  | A.   I do. |
| 11:24 | 8  | Q.   Can you tell the jury what it is? |
| 11:24 | 9  | A.   They're injuries that I'm seeing across the scalp of |
|       | 10 | the head, across the top. |
| 11:24 | 11 | Q.   And, in fact, is that your gloved hand holding the |
|       | 12 | head? |
| 11:25 | 13 | A.   More than likely, yes. |
| 11:25 | 14 | Q.   And is this one of the injuries you're referring to? |
| 11:25 | 15 | A.   Yes, sir. |
| 11:25 | 16 | Q.   And there's another one there; am I correct? |
| 11:25 | 17 | A.   Yes. |
| 11:25 | 18 | Q.   And it appears to be another one there? |
| 11:25 | 19 | A.   Yes. |
| 11:25 | 20 | Q.   Thank you. |
| 11:25 | 21 | And is that something you would make a note of in your |
|       | 22 | report to the pathologist? |
| 11:25 | 23 | A.   I would. |
| 11:25 | 24 | Q.   Did you also look at the jacket -- excuse me -- the |
|       | 25 | jacket that the decedent was wearing? |

| 11:25 | 1 | A.   I did. |
| 11:25 | 2 | MR. STAPLES:  Your Honor, at this point, may the |
| | 3 | agent approach and assist the witness?  I want to show her |
| | 4 | Exhibit 400, which is the jacket. |
| 11:25 | 5 | THE COURT:  You may. |
| 11:25 | 6 | MR. STAPLES:  And, ma'am, there's some gloves up |
| | 7 | there. |
| 11:26 | 8 | Excuse me.  I have misidentified it.  It's |
| | 9 | Exhibit 404, Your Honor. |
| 11:26 | 10 | THE COURT:  404.  Thank you. |
| 11:26 | 11 | THE WITNESS:  Do you want me put that up here? |
| 11:26 | 12 | MR. STAPLES:  Yes, ma'am. |
| 11:26 | 13 | THE WITNESS:  Do you want me pull it out? |
| 11:26 | 14 | MR. STAPLES:  Yes, ma'am. |
| 11:26 | 15 | BY MR. STAPLES: |
| 11:26 | 16 | Q.   And if you can place the bag down for a moment, so the |
| | 17 | jury can see.  I'm going to ask you to take a look at that |
| | 18 | and ask you if you recognize that as the jacket that was |
| | 19 | worn on the body that you examined on October 16, 2019. |
| 11:27 | 20 | A.   I do. |
| 11:27 | 21 | Q.   Now, when you examined that jacket, do you recall |
| | 22 | finding any holes in it? |
| 11:27 | 23 | A.   I do. |
| 11:27 | 24 | Q.   Where did you find the hole? |
| 11:27 | 25 | A.   On the upper back. |

| | | |
|---|---|---|
| 11:27 | 1 | MR. STAPLES:  Your Honor, I'd ask if the witness |
| | 2 | could stand and show the jury where on the jacket the hole |
| | 3 | was. |
| 11:27 | 4 | THE COURT:  You may do so. |
| 11:27 | 5 | THE WITNESS:  (Witness complies.) |
| 11:27 | 6 | BY MR. STAPLES: |
| 11:27 | 7 | Q.   And did you recognize what kinda hole that was or have |
| | 8 | a -- let me withdraw that. |
| 11:27 | 9 | Was that a hole of interest to you? |
| 11:27 | 10 | A.   It was. |
| 11:27 | 11 | Q.   Why? |
| 11:27 | 12 | A.   Anything that would penetrate the clothing would be of |
| | 13 | interest. |
| 11:27 | 14 | Q.   Okay.  And did you see blood around that hole at the |
| | 15 | time? |
| 11:27 | 16 | A.   I did. |
| 11:27 | 17 | MR. STAPLES:  Your Honor, I'd move 404 into |
| | 18 | evidence. |
| 11:27 | 19 | THE COURT:  Received. |
| 11:27 | 20 | *(Exhibit Number 404 received in evidence.)* |
| 11:27 | 21 | MR. STAPLES:  Thank you, ma'am.  You can put it |
| | 22 | back in the bag. |
| 11:27 | 23 | THE WITNESS:  (Witness complies.) |
| 11:27 | 24 | BY MR. STAPLES: |
| 11:27 | 25 | Q.   And if you can -- you can remove your gloves. |

| | | |
|---|---|---|
| 11:27 | 1 | A.   (Witness complies.) |
| 11:27 | 2 | Q.   Now, in addition to examining the body, do you also |
| | 3 | check pockets for contents that sorta thing? |
| 11:28 | 4 | A.   I do. |
| 11:28 | 5 | Q.   All right.  And did you find a driver's license? |
| 11:28 | 6 | A.   I do -- or I did. |
| 11:28 | 7 | Q.   Would you look at the next exhibit in your stack, which |
| | 8 | should be 104? |
| 11:28 | 9 | A.   Uh-huh. |
| 11:28 | 10 | Q.   Do you recognize that? |
| 11:28 | 11 | A.   I do. |
| 11:28 | 12 | Q.   Is that the driver's license you found on the body you |
| | 13 | examined? |
| 11:28 | 14 | A.   It was. |
| 11:28 | 15 | MR. STAPLES:  We'd move to admit Exhibit 104, |
| | 16 | Your Honor. |
| 11:28 | 17 | THE COURT:  Received. |
| 11:28 | 18 | *(Exhibit Number 104 received in evidence.)* |
| 11:28 | 19 | *(Exhibit displayed.)* |
| 11:28 | 20 | BY MR. STAPLES: |
| 11:28 | 21 | Q.   And, ma'am, for the jury if they can't see, can you |
| | 22 | just read the name? |
| 11:28 | 23 | A.   Sure.  It's Tri Minh Dao. |
| 11:28 | 24 | Q.   Okay.  And there's his photograph and signature? |
| 11:28 | 25 | A.   Correct. |

| | | |
|---|---|---|
| 11:28 | 1 | Q.   Also, did you find a fishing license on the body? |
| 11:28 | 2 | A.   I did. |
| 11:28 | 3 | Q.   Would you look at 101, please. |
| 11:29 | 4 | A.   Okay. |
| 11:29 | 5 | Q.   Do you recognize that? |
| 11:29 | 6 | A.   I do. |
| 11:29 | 7 | Q.   Actually, this is full-season Spiny Lobster Report |
| | 8 | Card.  And you found this on the body as well? |
| 11:29 | 9 | A.   Correct. |
| 11:29 | 10 | MR. STAPLES:  Your Honor, I'd move 101 into |
| | 11 | evidence. |
| 11:29 | 12 | THE COURT:  Received. |
| 11:29 | 13 | *(Exhibit Number 101 received in evidence.)* |
| 11:29 | 14 | *(Exhibit displayed.)* |
| 11:29 | 15 | BY MR. STAPLES: |
| 11:29 | 16 | Q.   And I'll just go up to the top.  Do you see where it |
| | 17 | says full-season spiny lobster report card? |
| 11:29 | 18 | A.   I do. |
| 11:29 | 19 | Q.   And what date is it valid on? |
| 11:29 | 20 | A.   It's valid from 10/14/2019 to 3/18 of 2020. |
| 11:29 | 21 | Q.   And the name? |
| 11:29 | 22 | A.   Tri Minh Dao. |
| 11:29 | 23 | Q.   Thank you. |
| 11:29 | 24 | Do you recall finding an inhaler on the body? |
| 11:29 | 25 | A.   I don't recall that right offhand.  I believe I did, |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | but I'd have to refer to my report for that.                |
| 11:30 | 2  | Q.   Did you find a knife?                                   |
| 11:30 | 3  | A.   I do recall that.                                       |
| 11:30 | 4  | Q.   Would you look at 147, please?                          |
| 11:30 | 5  | A.   Yes.                                                    |
| 11:30 | 6  | Q.   Do you recognize that?                                  |
| 11:30 | 7  | A.   I do.                                                   |
| 11:30 | 8  | Q.   Is that the knife you found?                            |
| 11:30 | 9  | A.   Yes.                                                    |
| 11:30 | 10 |         MR. STAPLES:  We'd move 147 into evidence,           |
|       | 11 | Your Honor.                                                 |
| 11:30 | 12 |         THE COURT:  Received.                                |
| 11:30 | 13 |    *(Exhibit Number 147 received in evidence.)*              |
| 11:30 | 14 |    *(Exhibit displayed.)*                                    |
| 11:30 | 15 | BY MR. STAPLES:                                              |
| 11:30 | 16 | Q.   Ma'am, do you recall where that knife was?  Was it in a |
|       | 17 | pocket or on a belt loop or...                              |
| 11:30 | 18 | A.   Again, I'd have to refer to my report for the exact     |
|       | 19 | location of it, but I do believe that it was in a pocket.   |
| 11:30 | 20 | Q.   Thank you.                                              |
| 11:30 | 21 | A.   Uh-huh.                                                 |
| 11:30 | 22 | Q.   Once you complete your exam, what do you do with the    |
|       | 23 | body itself?                                                |
| 11:30 | 24 | A.   So at that point, once the examination has been         |
|       | 25 | completed, based on the evidence that I found, in order to  |

```
          1   preserve any evidence we would typically bag the hands and
          2   the head and the feet of the individual, and they would also
          3   be placed inside a vinyl pouch for transport, and then the
          4   name would be placed on the outside'a the bag with a red
          5   tamperproof seal, and we would document all of that.
11:31     6   Q.   All right.  And just so it's clear for the record, when
          7   you say you would bag the hands, the head, and the feet,
          8   what do you mean?
11:31     9   A.   We would place individual paper bags over each of
         10   those.
11:31    11   Q.   And seal them?
11:31    12   A.   And seal them, uh-huh.
11:31    13   Q.   Now, you mentioned you would complete a -- once you put
         14   the body in the body bag, you would affix a card to it?
11:31    15   A.   Correct.
11:31    16   Q.   Would you look at 144, please, ma'am, which should be
         17   the last document in your stack?
11:31    18   A.   Okay.
11:31    19   Q.   What is that?
11:31    20   A.   That's basically the body ID tag that we place on the
         21   outside of our body bags.
11:32    22        MR. STAPLES:  All right.  I would move 144,
         23   Your Honor.
11:32    24        THE COURT:  Received.
11:32    25       (Exhibit Number 144 received in evidence.)
```

| 11:32 | 1 | *(Exhibit displayed.)* |
| 11:32 | 2 | BY MR. STAPLES: |
| 11:32 | 3 | Q.  Okay.  I'm not gonna back out, but this is the -- this |
|       | 4 | sort of white-gray material is the body bag? |
| 11:32 | 5 | A.  Correct. |
| 11:32 | 6 | Q.  And this is the tag that you or Ms. Alonso would've |
|       | 7 | filled out? |
| 11:32 | 8 | A.  Correct. |
| 11:32 | 9 | Q.  So it has the name Tri Minh Dao; correct? |
| 11:32 | 10 | A.  Correct. |
| 11:32 | 11 | Q.  What's this number here? |
| 11:32 | 12 | A.  The 2019-02681, that's his case number with our office, |
|       | 13 | the San Diego County Medical Examiner's Office. |
| 11:32 | 14 | Q.  And can you tell the jury what this is? |
| 11:32 | 15 | A.  That is the number that correlates with the tamperproof |
|       | 16 | seal that is also pictured in that, or shown in the picture. |
| 11:32 | 17 | Q.  This is the tamperproof seal? |
| 11:32 | 18 | A.  Correct. |
| 11:32 | 19 | Q.  And so this would be the date that you examined the |
|       | 20 | body? |
| 11:32 | 21 | A.  Correct. |
| 11:32 | 22 | Q.  Explain to the jury how this tamperproof seal works. |
| 11:33 | 23 | A.  So essentially with the tamperproof seals, they're a |
|       | 24 | piece'a plastic that is opened, and then it's -- once you |
|       | 25 | lock the seal into place, there's no way that the seal can |

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
|       | 1  | be broken, uh, or it -- the body bag can be opened without               |
|       | 2  | the seal being broken, and it's obvious -- it's very evident             |
|       | 3  | if the plastic becomes compromised.                                      |
| 11:33 | 4  | Q.   And is that done to ensure that once the body leaves                |
|       | 5  | your custody until the time it reaches the coroner, no one               |
|       | 6  | has any access to it?                                                     |
| 11:33 | 7  | A.   Correct.                                                            |
| 11:33 | 8  | Q.   Thank you.                                                          |
| 11:33 | 9  | A.   Uh-huh.                                                             |
| 11:33 | 10 | Q.   And in this case, after you tagged the -- completed the            |
|       | 11 | tag and sealed the bag, was it, in fact, sent to the                     |
|       | 12 | coroner?                                                                  |
| 11:33 | 13 | A.   Correct.                                                            |
| 11:33 | 14 | MR. STAPLES:  Thank you.                                                 |
| 11:33 | 15 | THE WITNESS:  Uh-huh.                                                    |
| 11:33 | 16 | MR. STAPLES:  I have nothing further, Your Honor.                       |
| 11:33 | 17 | THE COURT:  Cross-examination, please.                                   |
| 11:33 | 18 | MR. MIGLER:  Yes, Your Honor.                                            |
| 11:33 | 19 | **CROSS-EXAMINATION**                                                    |
| 11:33 | 20 | BY MR. MIGLER:                                                           |
| 11:34 | 21 | Q.   Good morning, Ms. Benefiel.                                         |
| 11:34 | 22 | A.   Good morning.                                                       |
| 11:34 | 23 | Q.   One of your primary tasks as a medical examine --                  |
|       | 24 | examination investigator is to identify the deceased at or              |
|       | 25 | recovered from the crime scene; is that correct?                        |

| | | |
|---|---|---|
| 11:34 | 1 | A.    Correct. |
| 11:34 | 2 | Q.    And in this case, you were able to identify the |
| | 3 | deceased by the driver's license that was found on his |
| | 4 | person; right? |
| 11:34 | 5 | A.    Correct. |
| 11:34 | 6 | Q.    And you just compared the photo on the license with the |
| | 7 | appearance of the deceased; right? |
| 11:34 | 8 | A.    Correct. |
| 11:34 | 9 | Q.    And there were also -- and there was also another form |
| | 10 | of identification found on the body, that being the spiny |
| | 11 | lobster card; correct? |
| 11:34 | 12 | A.    Correct. |
| 11:34 | 13 | Q.    And that was shown to you as Exhibit 101.  Let me put |
| | 14 | that -- |
| 11:34 | 15 | *(Exhibit displayed.)* |
| 11:34 | 16 | BY MR. MIGLER: |
| 11:34 | 17 | Q.    -- on the ELMO. |
| 11:34 | 18 | A.    Correct. |
| 11:35 | 19 | Q.    And it has the deceased's name right here? |
| 11:35 | 20 | A.    Correct. |
| 11:35 | 21 | Q.    And says "Tri Minh Dao"; correct? |
| 11:35 | 22 | A.    Correct. |
| 11:35 | 23 | Q.    And then here it says "outlet number."  Do you see |
| | 24 | that? |
| 11:35 | 25 | A.    I do. |

| | | |
|---|---|---|
| 11:35 | 1 | Q.   And then do you see here it says 10/14/2019? |
| 11:35 | 2 | A.   I do. |
| 11:35 | 3 | Q.   And then do you see the time 9:16 p.m.? |
| 11:35 | 4 | A.   I do. |
| 11:35 | 5 | Q.   Now, there was also another form of identification.  It |
| | 6 | was just the general California fishing license found on the |
| | 7 | body; correct? |
| 11:35 | 8 | A.   I don't recall. |
| 11:35 | 9 | Q.   Now, would you agree that having both the deceased's |
| | 10 | California driver's license and that spiny lobster card made |
| | 11 | it very easy to identify the deceased in this case? |
| 11:35 | 12 | A.   It gave us a strong probability. |
| 11:35 | 13 | Q.   Strong probability.  Okay.  Thank you. |
| 11:36 | 14 | Now, on direct examination, you testified that you |
| | 15 | respond to about 300 deaths a year; is that correct? |
| 11:36 | 16 | A.   Correct. |
| 11:36 | 17 | Q.   In a given year, how many examinations that you perform |
| | 18 | involved a body found floating in the ocean? |
| 11:36 | 19 | A.   Uh, roughly, depending on the year, one to -- one to |
| | 20 | twelve. |
| 11:36 | 21 | Q.   So, it's far rarer than other forms of death; correct? |
| 11:36 | 22 | A.   Correct. |
| 11:36 | 23 | Q.   And have you ever worked on a case where a body was |
| | 24 | recovered after having been sunk to the ocean floor? |
| 11:36 | 25 | A.   No. |

| | | |
|---|---|---|
| 11:36 | 1 | Q.   And as you were examining the body, you didn't see any |
| | 2 | indication that anything was tied to the deceased's arms; |
| | 3 | correct? |
| 11:36 | 4 | A.   Correct. |
| 11:36 | 5 | Q.   And you didn't see any indication that anything was |
| | 6 | tied to the deceased's legs; correct? |
| 11:36 | 7 | A.   Correct. |
| 11:37 | 8 | Q.   And you didn't see any indication that anything was |
| | 9 | tied anywhere else on the body like the body's torso; |
| | 10 | correct? |
| 11:37 | 11 | A.   Correct. |
| 11:37 | 12 | Q.   And you didn't see any indication or evidence of any |
| | 13 | efforts made to sink the deceased here; correct? |
| 11:37 | 14 | A.   Correct. |
| 11:37 | 15 | MR. MIGLER:  All right.  Thank you, Ms. Benefiel. |
| 11:37 | 16 | No further questions, Your Honor. |
| 11:37 | 17 | THE COURT:  Redirect examination, please. |
| 11:37 | 18 | MR. STAPLES:  No, Your Honor. |
| 11:37 | 19 | Thank you. |
| 11:37 | 20 | THE COURT:  All right.  May the witness be |
| | 21 | excused, Counsel? |
| 11:37 | 22 | MR. MIGLER:  Yes, Your Honor. |
| 11:37 | 23 | MR. STAPLES:  Yes, Your Honor. |
| 11:37 | 24 | THE COURT:  Thank you very much for your |
| | 25 | attendance.  You're excused from these proceedings. |

| | | |
|---|---|---|
| 11:37 | 1 | *(Witness excused.)* |
| 11:37 | 2 | THE COURT:  Would you be kind enough to call your |
| | 3 | next witness, please. |
| 11:37 | 4 | MR. STAPLES:  The United States calls Dr. Brankica |
| | 5 | Paunovic. |
| 11:37 | 6 | THE COURT:  Thank you. |
| 11:38 | 7 | Thank you.  If you'd step forward, please, through |
| | 8 | the double doors.  Then, Doctor, would you be kind enough to |
| | 9 | raise your right hand, please. |
| 11:38 | 10 | **DR. BRANKICA PAUNOVIC, CALLED BY THE GOVERNMENT, SWORN** |
| 11:38 | 11 | THE WITNESS:  I do. |
| 11:39 | 12 | THE COURT:  Thank you.  Would you please be seated |
| | 13 | in the witness box just to my right.  Thank you. |
| 11:39 | 14 | And, Doctor, would you be kind enough to state |
| | 15 | your full name for the jurors, please. |
| 11:39 | 16 | THE WITNESS:  Brankica, B-R-A-N-K-I-C-A. |
| 11:39 | 17 | THE COURT:  Would you spell that a little bit more |
| | 18 | or slowly.  B-R? |
| 11:39 | 19 | THE WITNESS:  -- A-N-K-I-C-A. |
| 11:39 | 20 | THE COURT:  J? |
| 11:39 | 21 | THE WITNESS:  K-I-C-A. |
| 11:39 | 22 | THE COURT:  Thank you. |
| 11:39 | 23 | THE WITNESS:  Last name, P-A-U-N-O-V-I-C. |
| 11:39 | 24 | THE COURT:  O-V? |
| 11:39 | 25 | THE WITNESS:  I-C. |

| | | |
|---|---|---|
| 11:39 | 1 | THE COURT: I-C. Okay. |
| 11:39 | 2 | And direct examination, please. |
| 11:39 | 3 | **DIRECT EXAMINATION** |
| 11:39 | 4 | BY MR. STAPLES: |
| 11:39 | 5 | Q. Good morning, Doctor. |
| 11:39 | 6 | A. Good morning. |
| 11:39 | 7 | Q. You're a medical doctor? |
| 11:39 | 8 | A. Yes. |
| 11:39 | 9 | Q. Did you work for the San Diego County Medical |
| | 10 | Examiner's Office? |
| 11:39 | 11 | A. Yes. |
| 11:39 | 12 | Q. From when to when approximately? |
| 11:40 | 13 | A. First, I was the fellow in that office from July 2016 |
| | 14 | to June 2017. Then I was hired as deputy medical examiner |
| | 15 | in December 2017, and I worked there till December 30th, |
| | 16 | 2021. |
| 11:40 | 17 | Q. And what are you doing now? |
| 11:40 | 18 | A. Now, I'm transitioning with the county to a part-time |
| | 19 | job, staying still as a deputy medical examiner. |
| 11:40 | 20 | Q. Okay. And is a deputy medical examiner someone who |
| | 21 | performs? |
| 11:40 | 22 | A. Yes. |
| 11:40 | 23 | Q. Okay. Before we get into your responsibilities can you |
| | 24 | tell the jury what your background is in terms of your |
| | 25 | education in the field of medicine? |

| | | |
|---|---|---|
| 11:40 | 1 | A.   To become deputy medical examiner, we have to finish |
| | 2 | medical school.  I graduated in Belgrade, Serbia.  Then we |
| | 3 | need pathology residency.  I did an atomic and clinical |
| | 4 | pathology in Connecticut.  Then I did pediatric pathology |
| | 5 | fellowship in Philadelphia, and then forensic pathology |
| | 6 | fellowship in San Diego office. |
| 11:41 | 7 | Q.   Let me just interrupt you for a moment, Doctor.  Can |
| | 8 | you tell the jury what a fellowship is?  What do you |
| | 9 | actually do in a fellowship? |
| 11:41 | 10 | A.   It's like a subspecialty training.  Pathology is like |
| | 11 | residency.  You become -- |
| 11:41 | 12 | *(Court reporter requests clarification for the* |
| | 13 | *record.)* |
| 11:41 | 14 | THE COURT:  A little bit slower.  We're going to |
| | 15 | get a transcript, so would you start again, please. |
| 11:41 | 16 | THE WITNESS:  Yes. |
| 11:41 | 17 | So subspecialty of pathology.  To become a |
| | 18 | pathologist, you need residency, but then if you wanna be |
| | 19 | medical examiner, you need forensic pathology fellowship. |
| 11:41 | 20 | BY MR. STAPLES: |
| 11:41 | 21 | Q.   And that's what you just described? |
| 11:41 | 22 | A.   Yes. |
| 11:41 | 23 | Q.   Are you licensed to practice medicine in California? |
| 11:42 | 24 | A.   Yes, I am. |
| 11:42 | 25 | Q.   For how long? |

11:42    1    A.    We are renewing licenses every two years.

11:42    2    Q.    And your license is current?

11:42    3    A.    Yes.

11:42    4    Q.    I wanna have you sort of walk the jury through what you

         5    do when you perform an autopsy, just in general terms.

11:42    6    A.    So every morning, we have morning meeting, when we look

         7    at all the cases for the day.  We assigning cases doctors.

         8    In this case, it was assigned to me because I was first on

         9    the list for the day, so the doctor who's first on the list

        10    gets most challenging cases.

11:42   11          Then we are going to the morgue, where we meeting with

        12    law enforcement agency.  The body is still in a bag.  Then

        13    we're doing layer by layer examination.  We look at the bag.

        14    We opening.  Then we doing external exam.  Then we opening

        15    the body, doing internal exam, and describing everything we

        16    see on the way.

11:43   17    Q.    Now, taking a step back.  Is the San Diego Medical

        18    Examiner's Office an independent agency?  In other words,

        19    does it have any affiliation with any law enforcement?

11:43   20    A.    No affiliation.

11:43   21    Q.    So it's -- it's independent?

11:43   22    A.    I think so.

11:43   23    Q.    And you're -- do you view your job as being a job in

        24    law enforcement?

11:43   25    A.    We are not part of law enforcement or safety group.  We

1    are part of public safety group, I think.

11:43    2    Q.    Thank you.

11:43    3          Are you board certified?

11:43    4    A.    Yes, I am.

11:43    5    Q.    Tell the jury what it means to be board certified as a

6    doctor.

11:43    7    A.    So after doing residency and fellowships, after each of

8    them, there is an exam that you have to pass to become board

9    certified, and I am board certified in anatomic, in

10    clinical, in pediatric pathology, and forensic pathology.

11:44    11    Q.    And have you done any research or any publishing in the

12    field of pathology?

11:44    13    A.    I did.  Before my residency, I worked as a researcher.

11:44    14    Q.    Okay.  And just in case it's not clear, what is

15    pathology?

11:44    16    A.    Pathologists are doctors that are getting tissue

17    samples.  So if you have a surgery, anything that is taken

18    out of the body goes to pathologist, who looks under the

19    microscope and gives diagnosis.  That's anatomic pathology.

11:44    20          There's also clinical one, where we running the lab, so

21    all blood specimens are also in our lab.

11:44    22    Q.    Okay.  And I think as you testified earlier, as -- a

23    subset of pathology also includes performing autopsies?

11:45    24    A.    Correct.

11:45    25    Q.    Now, what -- tell the jury what forensic pathology is.

11:45   1    A.   So if you only finishing residence in pathology, you're

        2    doing only hospital autopsies so it's -- there is no legal

        3    issue in them.  Those are people dying from natural disease.

        4    If any death is not natural, then it has to go through

        5    medical examiner.

11:45   6    Q.   And would that then become a subject of forensic

        7    pathology?

11:45   8    A.   Correct.

11:45   9    Q.   Now, have you ever testified in court before as an

        10   expert in forensic pathology?

11:45   11   A.   Yes, I did.

11:45   12   Q.   How many times?

11:45   13   A.   I don't have a log, but I would say around 30 times.

11:45   14   Q.   And any of those times you've appeared in court have

        15   you ever been deemed not to be qualified as an expert?

11:45   16   A.   No, I wasn't.

11:46   17   Q.   Now, on October 17, 2019, did you perform an autopsy on

        18   Tri Minh Dao?

11:46   19   A.   I did.

11:46   20   Q.   Did you prepare a report of your findings?

11:46   21   A.   Yes.

11:46   22   Q.   And did you also take some photos?

11:46   23   A.   Yes.  My photographer took photos.

11:46   24   Q.   At your direction?

11:46   25   A.   Yes.

| | | |
|---|---|---|
| 11:46 | 1 | Q.   And did you perform an external examination on the body |
| | 2 | of Tri Minh Dao? |
| 11:46 | 3 | A.   Yes, it's a part of autopsy examination. |
| 11:46 | 4 | Q.   And just, in general, tell the jury when you examine -- |
| | 5 | do the physical examination of a body, what do you usually |
| | 6 | do? |
| 11:46 | 7 | A.   First, we do more general things, like a hair color, |
| | 8 | eye color, anything -- scars, tattoos -- and then we proceed |
| | 9 | with injuries. |
| 11:46 | 10 | Q.   Okay.  And so, to the uninitiated, that's something |
| | 11 | that you do. |
| 11:47 | 12 |     Do you remove the clothing from the body when you |
| | 13 | perform this? |
| 11:47 | 14 | A.   Yes.  Normally bods are unclothed when we see them, but |
| | 15 | in homicide cases they still have clothing on. |
| 11:47 | 16 | Q.   And in this case, was there clothing on Mr. Dao's body? |
| 11:47 | 17 | A.   Yes, it was. |
| 11:47 | 18 | Q.   I'm gonna show you what's been admitted into evidence |
| | 19 | as Exhibit 142. |
| 11:47 | 20 |     *(Exhibit displayed.)* |
| 11:47 | 21 | BY MR. STAPLES: |
| 11:47 | 22 | Q.   Do you recognize that? |
| 11:47 | 23 | A.   I do. |
| 11:47 | 24 | Q.   Is that Mr. Dao's body? |
| 11:47 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:47 | 1 | Q.   Is that roughly what you saw when you opened the bag? |
| 11:47 | 2 | A.   Yes, but I think this is the picture from the scene. |
| 11:47 | 3 | Q.   Correct.  I'm just asking is that roughly the state |
| | 4 | that Mr. Dao was in when you opened the body bag? |
| 11:47 | 5 | A.   Yes. |
| 11:47 | 6 | Q.   And so he would've arrived to you with his orange |
| | 7 | jacket and the rest of his clothing on? |
| 11:48 | 8 | A.   Correct.  This white sheet that's underneath the body |
| | 9 | was just folded, and he was put in a body bag. |
| 11:48 | 10 | Q.   Okay.  And so when you perform your physical |
| | 11 | examination, all of his clothing is removed, and I take it |
| | 12 | you just go head to toe looking for the items you described? |
| 11:48 | 13 | A.   Yes. |
| 11:48 | 14 | Q.   Including any injuries? |
| 11:48 | 15 | A.   Yes. |
| 11:48 | 16 | Q.   Now, before opening the bag, I want to show -- have you |
| | 17 | take a look at Exhibit 131, which should be in front of you |
| | 18 | in a little stack that's paper-clipped together; do you see |
| | 19 | that? |
| 11:48 | 20 | A.   Yes. |
| 11:48 | 21 | Q.   Do you recognize 131? |
| 11:48 | 22 | A.   I do. |
| 11:48 | 23 | Q.   What is it? |
| 11:48 | 24 | A.   It's a picture of what we call "red seal" that is |
| | 25 | closing the zipper on the body bag with additional tag with |

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
|       | 1  | the decedent's name and case number.                        |
| 11:48 | 2  | MR. STAPLES:  We'll move 131 into evidence,                 |
|       | 3  | Your Honor.                                                 |
| 11:48 | 4  | THE COURT:  Received.                                        |
| 11:48 | 5  | *(Exhibit Number 131 received in evidence.)*                |
| 11:48 | 6  | *(Exhibit displayed.)*                                       |
| 11:48 | 7  | BY MR. STAPLES:                                              |
| 11:48 | 8  | Q.   And, ma'am, is this the tag that was accompanying the  |
|       | 9  | bag or attached to the bag for Tri Minh Dao?                |
| 11:49 | 10 | A.   Correct.                                                |
| 11:49 | 11 | Q.   And what's that number there?                           |
| 11:49 | 12 | A.   That is the case number.                                |
| 11:49 | 13 | Q.   Okay.  And what's that number there?                    |
| 11:49 | 14 | A.   That number is the same number as on the red seal.      |
| 11:49 | 15 | Q.   There?  *(Indicating.)*                                 |
| 11:49 | 16 | A.   Yes.                                                    |
| 11:49 | 17 | Q.   Is that a -- a -- sort of a security precaution?        |
| 11:49 | 18 | A.   So at the scene, investigator would put this red seal   |
|       | 19 | closing the zipper, and it can only be cut by a doctor when  |
|       | 20 | autopsy starts.                                              |
| 11:49 | 21 | Q.   Okay.                                                   |
| 11:49 | 22 | A.   And that's why we need to match this number with the   |
|       | 23 | investigator's number.                                       |
| 11:49 | 24 | Q.   Okay.  And did you do that in this case?                |
| 11:49 | 25 | A.   Yes.                                                    |

| | | |
|---|---|---|
| 11:49 | 1 | Q.   And this red seal here, do you physically open it? |
| 11:49 | 2 | A.   Yes.  I need scissors to cut -- to cut it.  You cannot |
| | 3 | open it and then put it back. |
| 11:50 | 4 | Q.   Now, in your examination, you're -- excuse me, your |
| | 5 | physical examination of Mr. Dao's body, did you, in fact, |
| | 6 | find any injuries? |
| 11:50 | 7 | A.   Yes. |
| 11:50 | 8 | Q.   Would you take a look at Exhibit 133, please. |
| 11:50 | 9 | A.   Yes. |
| 11:50 | 10 | Q.   Do you recognize that, Doctor? |
| 11:50 | 11 | A.   I do. |
| 11:50 | 12 | Q.   What is it? |
| 11:50 | 13 | A.   So this is the picture of the decedent's back showing |
| | 14 | the entrance gunshot wound. |
| 11:50 | 15 | MR. STAPLES:  Move to admit 133, Your Honor. |
| 11:50 | 16 | THE COURT:  Received. |
| 11:50 | 17 | *(Exhibit Number 133 received in evidence.)* |
| 11:50 | 18 | *(Exhibit displayed.)* |
| 11:50 | 19 | BY MR. STAPLES: |
| 11:50 | 20 | Q.   I just wanna take it out first to orient.  So this is |
| | 21 | the back of Mr. Dao's head? |
| 11:50 | 22 | A.   Yes. |
| 11:50 | 23 | Q.   And as you describe, this is his back? |
| 11:50 | 24 | A.   Yes. |
| 11:51 | 25 | Q.   And this number here on the card -- what number is |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | that?                                                      |
| 11:51 | 2  | A.   That's a medical examiner's case number.             |
| 11:51 | 3  | Q.   And that would be the same number that's on the tag  |
|       | 4  | that was on the bag when the body arrived?                |
| 11:51 | 5  | A.   Correct.                                             |
| 11:51 | 6  | MR. STAPLES:  Your Honor, is it possible to get           |
|       | 7  | the witness a microphone.  I'd like her to stand and point|
|       | 8  | to the screen and show the jury what...                   |
| 11:51 | 9  | THE COURT:  Yes.                                          |
| 11:51 | 10 | MR. STAPLES:  Thank you.  Doctor, I'd like you to        |
|       | 11 | stand up and just show the jury what the wound is, and if |
|       | 12 | you can, the trajectory of the bullet.                   |
| 11:51 | 13 | THE COURT:  We're going to hand you a microphone,        |
|       | 14 | and you can place your back to me so that the jury can see|
|       | 15 | what you're pointing to.                                  |
| 11:51 | 16 | THE WITNESS:  So this is, like we said, his back,        |
|       | 17 | left upper back.  And this is the entrance gunshot wound  |
|       | 18 | where the bullet entered, and then the bullet was        |
|       | 19 | approximately here under the skin.                       |
| 11:52 | 20 | BY MR. STAPLES:                                          |
| 11:52 | 21 | Q.   You say it was under the skin.  Were you able to     |
|       | 22 | recover the bullet?                                       |
| 11:52 | 23 | A.   Yes, I was.                                         |
| 11:52 | 24 | Q.   And based on your examination and what you see in this|
|       | 25 | photograph, what direction was the bullet coming from?   |

| | | |
|---|---|---|
| 11:52 | 1 | A.   It was coming from right to left and upward. |
| 11:52 | 2 | Q.   And so is it fair to say it was a shot from behind |
| | 3 | Mr. Dao? |
| 11:52 | 4 | A.   It's -- you would need to imagine that the gun was |
| | 5 | positioned like this.  *(Indicating.)* |
| 11:52 | 6 | Q.   So behind and to the side? |
| 11:52 | 7 | A.   Yes. |
| 11:52 | 8 | Q.   Thank you.  You can sit down for a moment, but you may |
| | 9 | wanna keep the microphone. |
| 11:52 | 10 | Now, you did also find a bullet wound to the head? |
| 11:52 | 11 | A.   Yes. |
| 11:52 | 12 | Q.   Would you take a look at Exhibit 146, please, Doctor. |
| | 13 | Do you recognize that? |
| 11:53 | 14 | A.   I do. |
| 11:53 | 15 | Q.   Is that a photograph that was taken by your |
| | 16 | photographer of Mr. Dao's head? |
| 11:53 | 17 | A.   Correct. |
| 11:53 | 18 | MR. STAPLES:  I would move 146 into evidence, |
| | 19 | Your Honor. |
| 11:53 | 20 | THE COURT:  Received. |
| 11:53 | 21 | *(Exhibit Number 146 received in evidence.)* |
| 11:53 | 22 | *(Exhibit displayed.)* |
| 11:53 | 23 | BY MR. STAPLES: |
| 11:53 | 24 | Q.   Now, to begin with, Doctor, again, that's the case |
| | 25 | number? |

11:53   1   A.   Yes.

11:53   2   Q.   And if I can ask you to stand again with the microphone

        3   and please point out to the jury what we are seeing here.

11:53   4   A.   So you need to imagine that this is top of the head,

        5   face is like this, and then I shaved the hair so I can

        6   visualize the wounds better.  This is the entrance wound,

        7   and this is the exit wound.

11:53   8   Q.   And just for the record, Doctor, when you say the face

        9   is up here, you're pointing to the top of the exhibit?

11:54  10   A.   Correct.

11:54  11   Q.   So his face would be going upwards and back of his head

       12   would be going downwards?

11:54  13   A.   Yes.

11:54  14   Q.   And, um, can you sort of trace the trajectory of the

       15   bullet?

11:54  16   A.   So it goes like this.  This is little bit oblique

       17   position of the picture, I think, because it went little bit

       18   more from back to front, so kind of -- so it was from right

       19   to left and from back to front.

11:54  20   Q.   So again, from back to front?

11:54  21   A.   Uh-huh, yes.

11:54  22   Q.   And then this wound here that has sort of a boomerang

       23   shape, what's that?

11:54  24   A.   So that's the exit where the bullet exited.

11:54  25             MR. STAPLES:  Thank you, Doctor.  You may sit

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | down.                                                        |
| 11:55 | 2  | And I'd ask you to take a look at 141, please.               |
| 11:55 | 3  | BY MR. STAPLES:                                              |
| 11:55 | 4  | Q.   Now, in addition to the bullet wound, did you find      |
|       | 5  | evidence of trauma to Mr. Dao's head?                        |
| 11:55 | 6  | A.   I did.                                                  |
| 11:55 | 7  | Q.   And does 141 show evidence of that trauma?              |
| 11:55 | 8  | A.   Yes.                                                    |
| 11:55 | 9  | MR. STAPLES:  Move 141 into evidence, Your Honor.            |
| 11:55 | 10 | THE COURT:  Received.                                        |
| 11:55 | 11 | *(Exhibit Number 141 received in evidence.)*                 |
| 11:55 | 12 | *(Exhibit displayed.)*                                       |
| 11:55 | 13 | BY MR. STAPLES:                                              |
| 11:55 | 14 | Q.   Again, just to get us oriented, that's the case number, |
|       | 15 | correct, Doctor?                                             |
| 11:55 | 16 | A.   Correct.                                                |
| 11:55 | 17 | Q.   And I apologize for making you stand up and sit down    |
|       | 18 | again, but if you could take the microphone and please       |
|       | 19 | describe what the jury is seeing, and beginning with the     |
|       | 20 | orientation of the face.                                     |
| 11:55 | 21 | A.   So now you can even easier see this is the face, so we  |
|       | 22 | are looking top of the head.  This is what we previously     |
|       | 23 | saw, entrance wound, exit wound.  But now you see some       |
|       | 24 | additional injuries.  You see the skin tears One, two,       |
|       | 25 | three, four *(Indicating)*.                                  |

| | | |
|---|---|---|
| 11:56 | 1 | Q.   When you say "skin tears," what kind of wound did you |
| | 2 | determine those to be? |
| 11:56 | 3 | A.   So we call them lacerations. |
| 11:56 | 4 | Q.   And were you able to determine a cause of those |
| | 5 | lacerations? |
| 11:56 | 6 | A.   Lacerations are caused by blunt force trauma. |
| 11:56 | 7 | Q.   And please tell the jury what blunt force trauma means |
| | 8 | to a pathologist, a forensic pathologist. |
| 11:56 | 9 | A.   It means it's not caused by sharp object.  That's how |
| | 10 | we differentiate between sharp force injuries and blunt |
| | 11 | force injuries. |
| 11:56 | 12 | Q.   What would be some examples of a blunt force -- uh, |
| | 13 | what would be an example of what might cause a blunt force |
| | 14 | injury? |
| 11:56 | 15 | A.   Most commonly we see them in car accidents.  All |
| | 16 | injuries people get in car accidents are blunt force |
| | 17 | injuries, but it can be being struck with any kind of blunt |
| | 18 | object, as long as it's not a knife. |
| 11:57 | 19 | Q.   Thank you. |
| 11:57 | 20 |      You may as well stand.  I have another one for you. |
| 11:57 | 21 |      Did you discover injuries to his -- to Mr. Dao's face |
| | 22 | as well? |
| 11:57 | 23 | A.   Yes. |
| 11:57 | 24 | Q.   If you would take a look at 134.  Does that depict the |
| | 25 | injuries you saw on Mr. Dao's face? |

| 11:57 | 1 | A.   Correct. |
| 11:57 | 2 | MR. STAPLES:  Move to enter 134, Your Honor. |
| 11:57 | 3 | THE COURT:  Received. |
| 11:57 | 4 | *(Exhibit Number 134 received in evidence.)* |
| 11:57 | 5 | *(Exhibit displayed.)* |
| 11:57 | 6 | BY MR. STAPLES: |
| 11:57 | 7 | Q.   Now, Doctor, again, this is the case number; correct? |
| 11:57 | 8 | A.   Correct. |
| 11:57 | 9 | Q.   Now, the earlier picture we looked at, there appeared |
|       | 10 | to be a good amount of blood on Mr. Dao's face? |
| 11:57 | 11 | A.   Yes. |
| 11:57 | 12 | Q.   So it's fairly safe to assume that his face had been |
|       | 13 | cleaned of all blood before this picture was taken? |
| 11:57 | 14 | A.   Yes.  This is after we wash the body. |
| 11:57 | 15 | Q.   Okay.  Could you please point to the jury the injuries |
|       | 16 | you see to Mr. Dao's face? |
| 11:58 | 17 | A.   Here we can see another skin tear, laceration.  Then |
|       | 18 | there is a scrape or abrasion, and there were also -- |
| 11:58 | 19 | *(Court reporter requests clarification for the* |
|       | 20 | *record.)* |
| 11:58 | 21 | THE WITNESS:  Bruises. |
| 11:58 | 22 | BY MR. STAPLES: |
| 11:58 | 23 | Q.   And did you determine these to also be caused by blunt |
|       | 24 | force trauma? |
| 11:58 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:58 | 1 | Q.   Now, did you -- do you recall finding any injury -- |
| | 2 | excuse me -- injures anywhere else on his body? |
| 11:58 | 3 | A.   There were two scrapes on his knees. |
| 11:58 | 4 | Q.   Okay. |
| 11:58 | 5 | A.   On bilateral knees that were like pale and ill-defined. |
| 11:58 | 6 | Q.   Okay.  Could you tell if they were recent or not? |
| 11:58 | 7 | A.   Probably recent, but it was difficult to say as it may |
| | 8 | be after handling the body after it was taken out of the |
| | 9 | water. |
| 11:59 | 10 | Q.   Would you take a look at Exhibit 135 through 138, |
| | 11 | please.  They're all -- they should be paper-clipped |
| | 12 | together.  I wanna ask you if you took a look at Mr. Dao's |
| | 13 | hands. |
| 11:59 | 14 | A.   Yes. |
| 11:59 | 15 | Q.   Are those photographs that were taken by your |
| | 16 | photographer of Mr. Dao's hands at the time of the autopsy? |
| 11:59 | 17 | A.   Yes. |
| 11:59 | 18 |      MR. STAPLES:  I would admit 135, 136, 137, and |
| | 19 | 138, Your Honor. |
| 11:59 | 20 |      THE COURT:  135, 136, 137, 138 are received into |
| | 21 | evidence. |
| 11:59 | 22 |      *(Exhibit Numbers 135 through 138 received in* |
| | 23 |      *evidence.)* |
| 11:59 | 24 |      MR. STAPLES:  I'm gonna place -- actually, you can |
| | 25 | sit down for this round, Doctor.  Thank you. |

| | | |
|---|---|---|
| 11:59 | 1 | *(Exhibit displayed.)* |
| 11:59 | 2 | BY MR. STAPLES: |
| 11:59 | 3 | Q.   Placing 135 on the ELMO.  You see the case number. |
| 11:59 | 4 | Doctor, did you find any evidence of trauma to -- this |
| | 5 | would be Mr. Dao's left hand? |
| 12:00 | 6 | A.   No trauma. |
| 12:00 | 7 | Q.   This is the backside. |
| 12:00 | 8 | I'm showing you 136, which is the palm side of his left |
| | 9 | hand. |
| 12:00 | 10 | *(Exhibit displayed.)* |
| 12:00 | 11 | BY MR. STAPLES: |
| 12:00 | 12 | Q.   Did you find any signs of trauma there? |
| 12:00 | 13 | A.   No trauma. |
| 12:00 | 14 | Q.   Showing you 137, which is Mr. Dao's right hand, the |
| | 15 | back of his right hand. |
| 12:00 | 16 | *(Exhibit displayed.)* |
| 12:00 | 17 | BY MR. STAPLES: |
| 12:00 | 18 | Q.   Did you find any trauma on his right hand? |
| 12:00 | 19 | A.   No. |
| 12:00 | 20 | Q.   And, again, the palm of his right hand, Exhibit 138. |
| 12:00 | 21 | *(Exhibit displayed.)* |
| 12:00 | 22 | BY MR. STAPLES: |
| 12:00 | 23 | Q.   Did you find any trauma? |
| 12:00 | 24 | A.   No. |
| 12:00 | 25 | Q.   Looking at his hands altogether, did you see any sign |

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | that he'd been involved in any kind of violent altercation?        |
| 12:00 | 2  | A.   Based on hands I didn't see any injuries.                     |
| 12:00 | 3  | Q.   Now, you testified that there was a bullet lodged in          |
|       | 4  | Mr. Dao's left shoulder.  How far in was it?                       |
| 12:00 | 5  | A.   We don't measure the distance between the entrance and        |
|       | 6  | exit.  But it was on the same side of the back.  Just little       |
|       | 7  | bit upward.                                                        |
| 12:01 | 8  | Q.   Perhaps I stated that poorly.                                 |
| 12:01 | 9  |      How deep into his body was the bullet?                        |
| 12:01 | 10 | A.   Just under the skin.                                          |
| 12:01 | 11 | Q.   Sort of in the fatty tissue?                                  |
| 12:01 | 12 | A.   Yes.                                                          |
| 12:01 | 13 | Q.   And did you recover that bullet?                              |
| 12:01 | 14 | A.   Yes, I did.                                                   |
| 12:01 | 15 | Q.   Doctor, would you look at 139 and 140, please.               |
| 12:01 | 16 | A.   Yes.                                                          |
| 12:01 | 17 | Q.   Do you recognize those photographs?                           |
| 12:01 | 18 | A.   I do.                                                         |
| 12:01 | 19 | Q.   Are those photos of the bullet you recovered from            |
|       | 20 | Mr. Dao's left shoulder?                                           |
| 12:01 | 21 | A.   Yes.                                                          |
| 12:01 | 22 |          MR. STAPLES:  Your Honor, I move 139 and 140 into         |
|       | 23 | evidence.                                                          |
| 12:01 | 24 |          THE COURT:  Received.                                     |
| 12:01 | 25 |          139 and 140.                                              |

```
           1         (Exhibit Numbers 139 and 140 received in

           2         evidence.)

12:01      3              MR. STAPLES:  Putting 139 on the ELMO.

12:01      4         (Exhibit displayed.)

12:01      5    BY MR. STAPLES:

12:01      6    Q.   This is the bullet laid to the side?

12:01      7    A.   Yes.

12:01      8    Q.   And your job isn't to determine what caliber bullet or

           9    anything like that, is it?

12:02     10    A.   No.

12:02     11    Q.   Your job is to preserve the piece of evidence?

12:02     12    A.   Correct.

12:02     13    Q.   So this is as it appeared as you pulled it out of

          14    Mr. Dao's shoulder?

12:02     15    A.   Yes.

12:02     16    Q.   And just for completion's sake, this Exhibit 140 is the

          17    same bullet only we're looking at it, I guess, vertically?

12:02     18    A.   Yes.

12:02     19    Q.   Thank you.

12:02     20         Now, in addition to the external examination you did on

          21    Mr. Dao's body, did you perform any internal examination?

12:02     22    A.   Yes.  So after we describe everything you saw, then we

          23    are doing layer-by-layer internal examination.

12:02     24    Q.   Did that include any tests for drugs or alcohol?

12:02     25    A.   Yes.  While looking internal changes we are collecting
```

        specimens, blood, vitreous fluid, urine if -- if it's there,

        and then we send that to toxicology.

12:03   Q.  And was -- was any trace of drugs or alcohol found in

        Mr. Dao's body?

12:03   A.  We tested his blood for alcohol and common drugs of

        abuse, and everything was negative.

12:03   Q.  "Negative" meaning no trace?

12:03   A.  Nothing.

12:03   Q.  Did you find anything else in your internal examination

        of Mr. Dao that might've led to his death?

12:03   A.  So internally there was bleeding around the brain of --

        significant for injuries.  But, otherwise, natural disease,

        he only had fatty liver.

12:03   Q.  Is that often a symptom from drinking too much alcohol?

12:03   A.  Most common causes are obesity and alcohol use.

12:03   Q.  Okay.  And you said there was bleeding, I'm sorry,

        around the brain?

12:03   A.  Yes.

12:03   Q.  Was that from the gunshot wound?

12:03   A.  It's hard to say is it from blunt force injuries or

        gunshot wound.  I would say together.

12:04   Q.  And is that a serious condition?

12:04   A.  Yes.

12:04   Q.  As a result of both your external and internal

        examination of Mr. Dao's body, did you come to a conclusion

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | as to the cause of death?                                    |
| 12:04 | 2  | A.   Yes.                                                    |
| 12:04 | 3  | Q.   What was that conclusion?                               |
| 12:04 | 4  | A.   The cause of death was drowning, with blunt force       |
|       | 5  | injuries and gunshot wound of head listed as contributing   |
|       | 6  | conditions.                                                  |
| 12:04 | 7  | Q.   And tell the jury what you mean when you say            |
|       | 8  | "contributing conditions."                                  |
| 12:04 | 9  | A.   So something that contributed to the main cause of      |
|       | 10 | death.                                                       |
| 12:04 | 11 | Q.   Okay.  Is it -- would it be a fair characterization     |
|       | 12 | that these contributing factors made death more likely?     |
| 12:04 | 13 | A.   Yes.                                                    |
| 12:04 | 14 | Q.   In your professional opinion, had Mr. Dao been pulled   |
|       | 15 | from the water after he'd been shot and beaten would he have |
|       | 16 | survived his wounds?                                         |
| 12:05 | 17 |         MR. MIGLER:  Objection.  No foundation.              |
| 12:05 | 18 |         THE COURT:  Overruled.  You can cast the opinion.    |
| 12:05 | 19 |         THE WITNESS:  It's hard to say how fast pulled out   |
|       | 20 | from the water because it takes few minutes to drown.  So if |
|       | 21 | he was literally taken out the water within a minute and     |
|       | 22 | taken to a hospital, maybe he would survive.                 |
| 12:05 | 23 |         MR. STAPLES:  Well, let me put it to you this --     |
| 12:05 | 24 |         THE COURT:  I can't hear the objection.              |
| 12:05 | 25 |         MR. MIGLER:  The motion is to strike as to           |

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

60

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | speculation.                                               |
| 12:05 | 2  | THE COURT:  Overruled.                                     |
| 12:05 | 3  | BY MR. STAPLES:                                            |
| 12:05 | 4  | Q.  Well, let me ask it to you this way.  Had he not been  |
|       | 5  | in the water but simply been a case where he had been shot |
|       | 6  | in the manner you observed and beaten in the manner you    |
|       | 7  | observed, would you, in your professional opinion and      |
|       | 8  | experience expected that to have been fatal injuries?      |
| 12:05 | 9  | A.  Depends the level of case he would get.  If he would be |
|       | 10 | taken to the hospital, there is a chance he would survive.  |
|       | 11 | If he would just stay like that, go to bed, maybe bleeding  |
|       | 12 | would continue, and maybe he would die in his sleep.  So,   |
|       | 13 | depends.                                                   |
| 12:06 | 14 | Q.  Thank you.                                             |
| 12:06 | 15 | MR. STAPLES:  One moment, Your Honor.                      |
| 12:06 | 16 | BY MR. STAPLES:                                            |
| 12:06 | 17 | Q.  Finally, Doctor, did you notice any tattoos on the     |
|       | 18 | body?                                                      |
| 12:06 | 19 | A.  Yes, there was one tattoo.                             |
| 12:06 | 20 | Q.  Would you take a look at 132, Doctor.                  |
| 12:06 | 21 | A.  Yes.                                                   |
| 12:06 | 22 | Q.  Is that the tattoo you saw on Mr. Dao's body?          |
| 12:06 | 23 | A.  Yes.                                                   |
| 12:06 | 24 | MR. STAPLES:  Your Honor, I'd move 132 into               |
|       | 25 | evidence.                                                  |

| | | |
|---|---|---|
| 12:06 | 1 | THE COURT:  Received into evidence, 132. |
| 12:07 | 2 | *(Exhibit Number 132 received in evidence.)* |
| 12:07 | 3 | *(Exhibit displayed.)* |
| 12:07 | 4 | BY MR. STAPLES: |
| 12:07 | 5 | Q.   Again, Doctor, that's the case number? |
| 12:07 | 6 | A.   Correct. |
| 12:07 | 7 | Q.   And this is the tattoo.  Can you tell, is that supposed |
| | 8 | to be his left shoulder? |
| 12:07 | 9 | A.   Yes.  Left shoulder and upper arm. |
| 12:07 | 10 | Q.   Okay.  Thank you. |
| 12:07 | 11 | MR. STAPLES:  One moment, Your Honor. |
| 12:07 | 12 | I neglected one thing, Your Honor.  I apologize. |
| 12:07 | 13 | BY MR. STAPLES: |
| 12:07 | 14 | Q.   Doctor, did you preserve the bullet?  I mean, not |
| | 15 | preserve it.  You kept the bullet for law enforcement? |
| 12:07 | 16 | A.   Yes. |
| 12:07 | 17 | MR. STAPLES:  May the agent approach, Your Honor, |
| | 18 | and assist the doctor in finding the bullet.  It's up there |
| | 19 | on the stand. |
| 12:07 | 20 | THE COURT:  You may. |
| 12:08 | 21 | MR. STAPLES:  For the Court's timing purposes, |
| | 22 | this is my last question. |
| 12:08 | 23 | *(Agent provides physical exhibit to the witness.)* |
| 12:08 | 24 | BY MR. STAPLES: |
| 12:08 | 25 | Q.   Doctor, is that the bullet that you recovered from |

8:20-CR-00002-DOC   - 4/5/2022 - Day 2, Volume II

62

|  |  |  |
|---|---|---|
|  | 1 | Mr. Dao's body? |
| 12:08 | 2 | A.    Yes. |
| 12:08 | 3 | Q.    Does it have your office's case number on it? |
| 12:08 | 4 | A.    Has my case number -- has body's case number and my |
|  | 5 | initials. |
| 12:09 | 6 | MR. STAPLES:  Thank you. |
| 12:09 | 7 | I'd move Exhibit 400 into evidence, Your Honor. |
| 12:09 | 8 | THE COURT:  400 is received into evidence. |
| 12:09 | 9 | *(Exhibit Number 400 received in evidence.)* |
| 12:09 | 10 | MR. STAPLES:  Thank you very much, Doctor. |
| 12:09 | 11 | No further questions. |
| 12:09 | 12 | THE COURT:  Counsel, would it be acceptable if |
|  | 13 | cross-examination starts in an hour? |
| 12:09 | 14 | MR. STAPLES:  Certainly. |
| 12:09 | 15 | THE COURT:  All right. |
| 12:09 | 16 | Then ladies and gentlemen, would you return at |
|  | 17 | 1:15.  I always want you to have at least an hour for lunch. |
|  | 18 | Okay? |
| 12:09 | 19 | So you're admonished not to discuss this matter |
|  | 20 | amongst yourselves, nor to form or express any opinion |
|  | 21 | concerning the case.  We'll see you at 1:15. |
| 12:09 | 22 | Just leave your notes on the seat you occupy. |
| 12:09 | 23 | *(Jury recesses.)* |
| 12:09 | 24 | THE COURT:  Then, Doctor, if you'd return and be |
|  | 25 | seated on the witness stand at 1:15. |

| | | |
|---|---|---|
| 12:10 | 1 | And, Counsel, we're in recess.  Thank you. |
| 12:10 | 2 | MR. STAPLES:  Thank you, Your Honor. |
| 12:10 | 3 | *(Lunch recess held at 12:10 p.m.)* |
| 12:10 | 4 | -oOo- |
| 12:10 | 5 | |
| | 6 | |
| | 7 | |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

8:20-CR-00002-DOC  - 4/5/2022 - Day 2, Volume II

64

| | | |
|---|---|---|
| 12:10 | 1 | -oOo- |
| 12:10 | 2 | |
| 12:10 | 3 | CERTIFICATE |
| 12:10 | 4 | |
| 12:10 | 5 | I hereby certify that pursuant to Section 753, |
| | 6 | Title 28, United States Code, the foregoing is a true and |
| | 7 | correct transcript of the stenographically reported |
| | 8 | proceedings held telephone in the above-entitled matter and |
| | 9 | that the transcript page format is in conformance with the |
| | 10 | regulations of the Judicial Conference of the United States. |
| 12:10 | 11 | |
| 12:10 | 12 | Date:  April 5, 2022 |
| 12:10 | 13 | |
| 12:10 | 14 | |
| 12:10 | | /s/ Debbie Gale |
| 12:10 | 15 | _____ |
| 12:10 | | DEBBIE GALE, U.S. COURT REPORTER |
| 12:10 | 16 | CSR NO. 9472, RPR, CCRR |
| 12:10 | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |